# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF HAWAII

KELI'I AKINA, *et al.,*

     *Plaintiffs,*

          v.

STATE OF HAWAII, *et al.,*

     *Defendants.*

Case 1:15-CV-00322-JMS-BMK

MEMORANDUM IN SUPPORT OF MOTION

## MEMORANDUM IN SUPPORT OF MOTION

### TABLE OF CONTENTS

I. Historical Background from Intervenors Perspective  . . . . . . . . . . . . . . . . . . . . . 1

II. Argument  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    Timeliness. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    B.    Interest of Intervenors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    C.    Imparement of Interest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    D.    Adequacy of Representation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

III. Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Certificate of Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## TABLE OF AUTHORITIES

*Arakaki v. Cayetano*, 324 F.3d 1078 (9th Cir. 2003) . . . . . . . . . . . . . . 8, 13, 17-19

*Kahalekai v. Doi*, 60 Haw. 324, 590 P.2d 543 (1979). . . . . . . . . . . . . . . . . . . . . 7

*Kahawaiolaa v. Norton,* 386 F.3d 1271 (9th Cir. 2004). . . . . . . . . . . . . 13, 14, 18

*Kealoha v. Machado*, 131 Haw. 62, 315 P.3d 213 (2013) . . . . . . . . . . . . . . . . . 7

*Morton v. Mancari,* 417 U.S. 535 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Rice v. Cayetano*, *Rice v. Cayetano*, 528 U.S. 495 (2000) . . . . . . . . . . . . . . 16, 17

*State v. Zimring*, 58 Haw. 106 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Thurston v. Bishop*, 7 Haw. 421 (1888) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States ex rel McGough v. Covington Tech. Co.*, 967 F.2d 1391 (9th
    Cir.1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. City of Los Angeles*, 288 F.3d 391 (9th Cir.2002) . . . . . . . . . . . 8

***Statutes cited:***

25 U.S.C. § 479 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Admission Act, § 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 13

Admission Act, § 5(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-7, 10-14, 17, 18, 20

H.R.S. § 10-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

H.R.S., Chapter 10H . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 20

Hawaiian Homes Commission Act, 1920 . . . . . . . . . . . . . . . . . . . 4-7, 13, 14, 17, 20

Hawaiian Homes Commission Act, 1920, § 221 . . . . . . . . . . . . . . . . . . . . . . . . 11

Revised Laws of Hawaii, 1925, v. II, pp 2120-2152. . . . . . . . . . . . . . . . . . . . . . 2

*Rules cited:*

Fed.R.Civ.Proc., Rule 24(a)(2)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*Other authorities cited:*

*A Broken Trust, The Hawaiian Homelands Program: Seventy Years of Failure*
        *of the Federal and State Governments to Protect the Civil Rights of*
        *Native Hawaiians*, Hawaii Advisory Committee to the U.S. Commission
        on Civil Rights, December 1991 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Cannelora, Louis, "The Origin of Hawaii Land Titles and the Rights of Native
        Tenants," Security Title Corp., Honolulu, Hawaii (1974) . . . . . . . . . . . . 1-3

Chinen, Jon Jitsuzo, "Original Land Titles in Hawaii", Library of Congress
        No. 51- 17314 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Chinen, Jon Jitsuzo, "The Great Mahele", University of Hawaii Press,
        (1957),2, 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Final Report on the Public Land Trust, Legislative Auditor of the State of*
        *Hawaii*, Rep. No. 86-17, December 1986 . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Fuchs, Lawrence H., *Hawaii Pono: A Social History*, Harcourt, Brace &
        World, Inc., New York (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Management and Financial Audit of the Department of Hawaiian Home*
        *Lands*, Auditor of the State of Hawaii, Rep. No. 93-22, December 19936
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Progress Report on the Implementation of Recommendations of the Federal-*
        *State Task Force*, Office of the Inspector General, Audit Report, Rep.
        No. 92-I-641, March, 1992 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Sen Doc. No. 151, 75th Cong., 3d Sess, Serial Set 10247 (Jan. 5, 1939) . . . . . . . 4

Wright, Theon, *The Disenchanted Isles*, The Dial Press, New York (1972) . . . . . 1

"Broken Promise: How Everyone Got Hawaiians' Homelands Except Hawaiians"
Wall Street Journal, September 9, 1991 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

# I. Historical Background from Intervenors Perspective

In 1778, upon arrival of James Cook in the Sandwich Islands the native Hawaiian population exceeded 300,000. Wright, Theon, *The Disenchanted Isles*, The Dial Press, New York (1972) p. 68. It is generally accepted that there was then in existence a feudal type of land ownership system, in which all of the land was owned by the King and granted by him to his chiefs, known as *konohikis*, and, in turn, by them to lower level chieftans and eventually the tenant farmers. See Chinen, Jon Jitsuzo, "Original Land Titles in Hawaii", Library of Congress No. 51- 17314 (1961), p. 1; Cannelora, Louis, "The Origin of Hawaii Land Titles and the Rights of Native Tenants," Security Title Corp., Honolulu, Hawaii (1974), p. 1.

Even then it could not be considered a true feudal system, as native tenants were not serfs with no interest in the land. Instead, Hawaiian native tenants, as a group, had an undivided one-third interest in the total land mass of the Hawaiian Islands and surrounding waters. This was recognized in the first constitution of the Kingdom of Hawaii adopted in 1840. As provide therein:

> Kamehameha I, was the founder of the kingdom, and to him belonged all the land from one end of the Islands to the other, though it was not his own private property. It belonged to the chiefs and the people in common, of whom Kamehameha I was the head, and had the management of landed property.

*State v. Zimring*, 58 Haw. 106, 111 (1977) quoting *Fundamental Law of Hawaii* (1904) at 3 quoting The Constitution of 1840.

This shows that the King held title merely as trustee for the use and benefit of

the beneficiaries—the chiefs, konohikis and the people.

On December 10, 1845, the Board of Commissioners to Quiet Titles, commonly known as the Land Commission was established to adjudicate and settle disputes over titles of real property. Cannelora, supra, p. 7. It was recognized in the Principals of the Land Commission as well as the Privy Counsel that the ownership of the land at that time was held in equal one-third undivided interests by the King, the *konohiki* landlords and the tenants living on the land. Cannelora, supra, pp. 10, 12. *See also Thurston v. Bishop*, 7 Haw. 421, 430 (1888). These principles are fully set out in Revised Laws of Hawaii, 1925, v. II, pp 2120-2152.

The Land Commission analyzed in detail the land system existing at the time in the Islands. It then declared that "there are but three classes of person having vested rights in the land, 1st, the government, 2nd, the landlord (the chiefs and *konohiki*), and 3rd, the tenant." Chinen, Jon Jitsuzo, "The Great Mahele", University of Hawaii Press, (1957), p. 9.

The problem was that the Land Commission had no means to divide these interests, so that fee simple ownership of land could not be obtained unless all of these parties joined in the deed. In order to solve this problem the King and *konohiki* divided their lands between themselves in what is known as The Great Mahele. This was actually a series of divisions between the King and 245 *konohiki* made between January 27, 1848 and March 7, 1848, which allowed *konohiki* to take their claims to

the Land Commission and obtain title to the land subject to the rights of the native tenants. Cannelora, supra, p. 13. Native tenants were not able to obtain title to their interests until 1850, when legislation was enacted allowing them to present *kuleana* claims to the Land Commission. Cannelora, supra, 17-19.

But the law did not favor the granting of such claims. First, native tenants were less well educated and less informed than the *konohiki* class and may not have been aware of their right to obtain title or the means to perfect it. Second, native tenants were given only a 4 and one-half year period within which to file their claims, after which the claims were forever barred. *Id*. p. 19. The *konohiki*, on the other hand, were given several extensions totaling 49 years to file claims. *Id.* Third, native tenants were required to incur considerable expense of a survey of their claim, while *konohiki* were not. *Id.* As a result, only approximately 28,000 acres of land—far less than the one-third interest that had previously been recognized—was awarded to native tenants under this provision. Fuchs, Lawrence H., *Hawaii Pono: A Social History*, Harcourt, Brace & World, Inc., New York (1961) p. 257.

Thus, this provision purportedly to allow native tenants to obtain fee simple title to their land actually operated to ***extinguish the claims of the vast majority of native tenants*** who failed to go through the process of surveying and registering *kuleana* claims. Title to the land to which they would have been entitled remained with the Kingdom of Hawaii and eventually transferred to the United States by the

3

Newlands Resolution.

When the number of native Hawaiians had plummeted from about 300,000, in 1778, to only 40,000, in 1920, Congress became aware of the condition of native Hawaiians teetering on the verge of extinction.  The descendants of the native Hawaiian tenants were then barely surviving in abject poverty in the urban centers of Hawaii. Following extensive hearings, Congress found that the cause of such dismal conditions of native Hawaiians was "a landless people in the country of their forefathers." Sen Doc. No. 151, 75th Cong., 3d Sess, Serial Set 10247 (Jan. 5, 1939), pp. 81-83. Landlessness, destitution and poverty: that is the legacy left by the Kingdom of Hawaii to the descendants of native Hawaiian tenants. At the same time, an undivided, undelivered one-third interest in the 1.8 million acres of government land was impressed with the outstanding equitable property interests of native tenants who did not receive their lands under the *kuleana* law.

Therefore, it was entirely appropriate for Congress to set aside 200,000 acres of this land in order to redress this grave injustice suffered by native tenants under the Kingdom of Hawaii and attempt to rehabilitate the descendants of the native tenants having not less than one-half part Hawaiian blood. It was in 1920, that the United States Congress was so moved to enact the Hawaiian Homes Commission Act, 1920, ("HHCA") to rehabilitate the native Hawaiians. Congress enacted the HHCA as

compensation to the descendants for the loss their ancestors had suffered in the *Mahele.* This was not a racial discrimination any more than the intestate succession laws that limit the right to inherit to the more closely related kin.

It was the United States Congress that determined long ago in 1920, the connection between the dismal condition of the native Hawaiian tenants and their loss of their land. It was the United States Congress that went about to repair such condition by setting aside a portion of the land the United States held, for the exclusive benefit and the purpose of rehabilitating the native Hawaiian tenants and their heirs under the HHCA. It was the United States Congress that reasoned that rehabilitating the native Hawaiian tenants upon a portion of their formerly undistributed lands (that should have been distributed in the *Mahele* of 1848) would allow the native Hawaiians to strive to pick themselves up through hard work, on their lands, and thereby rehabilitate themselves with the opportunity under the HHCA.

In 1959, the proponents of statehood persuaded Congress to turn over the administration of the Hawaiian Homes program to the State in exchange for the imposition of the State-Federal compact in § 4 of the Admission Act and the § 5(f) trust for the purpose of the betterment of the condition of native Hawaiians.

In § 4 of the Admission Act, the State agreed to a solemn compact with the

United States  that the HHCA would be adopted as a provision of the State Constitution. After statehood. But after statehood, the State did little or nothing to implement HHCA or the § 5(f) trust until 1978. *Final Report on the Public Land Trust, Legislative Auditor of the State of Hawaii*, Rep. No. 86-17, December 1986; *A Broken Trust, The Hawaiian Homelands Program: Seventy Years of Failure of the Federal and State Governments to Protect the Civil Rights of Native Hawaiians*, Hawaii Advisory Committee to the U.S. Commission on Civil Rights, December 1991; *Progress Report on the Implementation of Recommendations of the Federal-State Task Force*, Office of the Inspector General, Audit Report, Rep. No. 92-I-641, March, 1992; *Management and Financial Audit of the Department of Hawaiian Home Lands*, Auditor of the State of Hawaii, Rep. No. 93-22, December 1993; "Broken Promise: How Everyone Got Hawaiians' Homelands Except Hawaiians" Wall Street Journal, September 9, 1991, p. 1.

In 1978, as the result of native Hawaiian pressure to implement HHCA and the § 5(f) trust, State Constitutional amendments were proposed to establish OHA. However, in doing so the seeds of a plan to eventually eliminate HHCA and § 5(f) were planted. The proposed amendments included the definition of a term called "Hawaiians" as "any descendant of the races inhabiting the Hawaiian Islands, prior to 1778" without regard to a blood quantum. This proposed Constitutional definition

6

was not ratified by the voters and did not become part of the Constitution. *Kahalekai v. Doi*, 60 Haw. 324, 342, 590 P.2d 543 (1979). Nevertheless, the term was defined and adopted by the legislature as part of the statutory establishment of OHA. H.R.S. § 10-2. Ever since its establishment, OHA has been doing its best to eliminate the blood quantum. *Kealoha v. Machado*, 131 Haw. 62, 315 P.3d 213 (2013).

In 2011, the enactment of H.R.S., Chapter 10H authorizing the establishment of the Hawaiian governing entity which is the subject of this litigation was an attempt by the State to establish an entity with which it can negotiate to eliminate the HHCA and § 5(f). The State plans to offer OHA assets, the Hawaiian homelands and a portion of the § 5(f) trust lands (probably including the Island of Kaho'olawe) in exchange for a release of any native Hawaiian claims to the remainder of State lands. See Exhibit "A." This would be approved because 90 % of the members of this Hawaiian entity would be Hawaiians who are not entitled to benefit from HHCA or § 5(f).

## II. ARGUMENT

To intervene as a matter of right under Federal Rule of Civil Procedure, Rule 24(a)(2) an applicant must timely claim "an interest relating to the property or transaction which is the subject of the action," the protection of which may, as a practical matter, be impaired or impeded by the action if the applicant is not allowed

to participate in the litigation. Rule 24(a)(2) provides:

> Upon timely application anyone shall be permitted to intervene in an action: . . . (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter  impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

The Ninth Circuit applies a four-prong test to determine if an applicant has a right to intervene: (1) the motion must be timely; (2) the applicant must claim a "significantly protectable" interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede its ability to protect that interest; and (4) the applicant's interest must be inadequately represented by the parties to the action. *Arakaki v. Cayetano*, 324 F.3d 1078, 1083 (9th Cir. 2003).

Generally, "Rule 24(a)(2) is construed broadly in favor of proposed intervenors." *United States ex rel McGough v. Covington Tech. Co.*, 967 F.2d 1391, 1394 (9th Cir.1992). The "liberal policy in favor of intervention serves both efficient resolution of issues and broadened access to the courts." *United States v. City of Los Angeles*, 288 F.3d 391, 397-98 (9th Cir.2002) (citation omitted).

> By allowing parties with a practical interest in the outcome of a particular case to intervene, we often prevent or simplify future litigation involving related issues; at the same time, we allow an additional interested party to express its views before the court.

8

Id. at 398 (citation omitted).

**A.      *Timeliness.***

The complaint was filed herein on August 13, 2015. A motion for preliminary injunction was filed by Plaintiffs on August 28, 2015. A status conference was held on September 11, 2015 at which a hearing on the motion for preliminary injunction was set for October 20, 2015, any opposition to the motion was to be filed by September 30, 2015 and any reply by October 9, 2015.

State and OHA defendants filed their answers on September 10, 2015. Foundation defendants filed their answer on September 14, 2015.

This motion is timely.

**B.      *Interest of Intervenors.***

Samuel L. Kealoha, Jr., is a U.S. Army Vietnam-Era veteran who served in Vietnam, 1st Cav. 2-5. He is a Hawaiian homestead applicant, who has been on the waiting list since 1977. The reason the State has failed to deliver his homestead is the State "lost" his application. Mr. Kealoha's interest is his concern that the parties here, both the State and its OHA, are not speaking on behalf of native Hawaiian beneficiaries. "They are talking over us. The scheme of undermining the native Hawaiians' interest in § 5(f) and it being subject to corruption has gone on too long. The State came up with this charade of OHA, and the U.S. has not brought suit

against the State for breach of trust under § 5(f). The United States should know the difference between Congress' definition of native Hawaiian of 1920, (that the state solemnly accepted in 1959,) versus the State's made-up definition of 'Hawaiian' in 1978, when it manufactured the OHA scheme created to undermine growing native Hawaiian interests in § 5(f)."

Mr. Kealoha is also a former OHA trustee, and can provide this Court a unique vantage point from a native Hawaiian who, as Trustee, was too often out-voted by "Hawaiian" trustees (hostile to native Hawaiians), who sought to benefit themselves and this diluted class of "Hawaiians," including their friends, relatives and others who are not native Hawaiian, with lucrative contracts. Mr. Kealoha witnessed the State's OHA agency misspend § 5(f) proceeds that could have been used to fund the HHCA.

Virgil E. Day, Jr., is a U.S. Army Vietnam-Era veteran, who applied for a Hawaiian homestead in 1984, yet did not receive his lease until 1999, because the State claimed they had no money for infrastructure. Now a lessee, yet holding an unimproved lot with no paved road and no running water, at Kahiki Nui, island of Maui. Mr. Day is a member of *Ka Ohana o Kahiki Nui*, a homestead beneficiary organization seeking settlement of Kahiki Nui. *Ka Ohana o Kahiki Nui* applied to OHA for a grant for water tanks, but OHA refused to expend any § 5(f) money to assist the beneficiaries.

10

Patrick Kahawaiolaa,  is a U.S. Navy Vietnam-Era veteran who, as a native Hawaiian, was born and raised on the Keaukaha Hawaiian homestead, serving in various capacities, the latest as President of the Keaukaha Hawaiian Homestead Association for approximately the last six (6) years. Keaukaha, on the Big Island of Hawaii, opened in1924, the second Hawaiian homestead, following Kalamaula, on the island of Molokai. Mr. Kahawaiolaa has been a party in a number of suits against the State of Hawaii, its Department of Hawaiian Home Lands ("DHHL") and OHA. His main interest is full implementation of the HHCA, rehabilitation and self-determination of native Hawaiians, use of § 5(f) monies to benefit native Hawaiians and to settle the homelands. Mr. Kahawaiolaa also has been a party in opposing HHCA § 221 violations, dealing with burdensome water costs sought to be charged to homesteaders by the state's counties, in clear violation of the HHCA. Mr. Kahawaiolaa lost his homestead over this fight. Mr. Kahawaiolaa also opposed removal of Hawaiian home lands from the inventory of lands available to native Hawaiian settlement, as the State of Hawaii continues, to this day, to lease such lands to persons, parties and entities not contemplated by the HHCA. The State does so under pretext it has no money, while funneling millions to OHA that, in turn, does not expend such §5(f) monies on beneficiaries of the HHCA to settle their lands.

Josiah L. Hoohuli, is a U.S.M.C. Veteran. A pure blood native Hawaiian, and

homestead lessee, he was raised on his mother's homestead, who received her lease in 1930. Born in 1938, Mr. Hoohuli has lived his entire life on the Hawaiian homestead, except for two years in California while in the service, but served two years in the USMC in Hawaii, when he resided upon his homestead. Mr. Hoohuli, opposed the State of Hawaii creating OHA in 1978, giving OHA § 5(f) monies, while OHA does not help fund the HHCA. Mr. Hoohuli believes native Hawaiian beneficiaries should be in charge of their own money so that it can be used for native Hawaiian economic independence, self-sufficiency and rehabilitation upon the homelands. Mr. Hoohuli is a founding member of Ho'ala Kanawai, Inc, that was formed in about 1975, and is significant because it was an educational agency charged to educate native Hawaiians about § 5(f) of the Admission Act, and also be the entity for native Hawaiians.

Melvin Hoomanawanui,  is retired from the Honolulu Fire Department, and a homesteader of Lai o Pua Hawaiian homestead, Kona, island of Hawaii. Mr. Hoomanawanui joined Ho'ala Kanawai, Inc., in 1978. Mr. Hoomanawanui has always been an advocate for bona-fide native Hawaiians. He vehemently opposes the State funneling § 5(f) monies to its agency, OHA, and OHA misusing, misspending and cheating native Hawaiians out of monies that should be used to fund the HHCA, or otherwise rehabilitate native Hawaiians.

Proposed Intervenors seek to intervene in this action as Defendants to assert a cross-claim against the other Defendants to challenge the State's authority to establish a "Sovereign Hawaiian Entity" without a blood quantum limited to not less than one-half part of the blood of the races inhabiting the Hawaiian Islands prior to 1778. See Exhibit "B" attached. Intervenors would allege that the creation of such entity to represent native Hawaiians without a blood quantum is a violation of their right to Equal Protection and that expenditure of § 5(f) income and proceeds to do so is a violation of the § 5(f) trust. Indeed, it would appear that the State intends to transfer Hawaiian home lands to the Entity, no doubt in exchange for a release of the State from any further duty to implement HHCA under the § 4 Admission Act compact. See Exhibit "A" attached.

Intervenors attempted to raise a similar Equal Protection claim in *Arakaki v. Cayetano, supra*, and *Kahawaiolaa v. Norton,* 386 F.3d 1271 (9th Cir. 2004).  In *Norton*, Intervenors were claiming that they were denied equal protection under the Fifth Amendment by the United States in depriving them of the right to organize as an Indian tribe. The Ninth Circuit held that "native Hawaiian" was not a racial classification but rather a political classification. The facts that the United States had never dealt directly with native Hawaiians, but rather with the Kingdom of Hawaii, which was not a native tribe and that Congress had provided benefits to native

13

Hawaiians under HHCA and § 5(f) of the Admission Act, was a sufficient rational basis to justify the discrimination.

However, the Ninth Circuit severely criticized the Department of the Interior for neglecting native Hawaiians, as follows:

> Although we conclude that the Department of Interior's exclusion of Hawaiians passes constitutional muster, we recognize that, in many ways, the result is less than satisfactory. We would have more confidence in the outcome if the Department of Interior had applied its expertise to parse through history and determine whether native Hawaiians, or some native Hawaiian groups, could be acknowledged on a government-to-government basis. It would have been equally rational, if perhaps not more so, for the Department to have decided to undertake that inquiry in the first instance. However, under equal protection rational basis review, it is not for us "to judge the wisdom, fairness, or logic" of the choices made. *Heller,* 509 U.S. at 319, 113 S.Ct. 2637 (quoting *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993)). Thus, in the end, we must commit this question to Congress to apply its wisdom in deciding whether or not native Hawaiians should be included among those eligible to apply for federal tribal recognition.

*Kahawaiolaa v. Norton, supra*, 386 F.3d at 1283.

Of course, the State of Hawaii and OHA have for many years attempted without success to persuade Congress to establish a government-to-government relationship with Hawaiians (without any blood quantum) through the so-called Akaka Bill. Having failed in this effort, the State is now attempting to create its own government-to-government relationship with Hawaiians (without any blood quantum).

However the lack of any blood quantum as a qualification for voting and membership in this State created Hawaiian governmental entity is a violation of Intervenors' right to equal protection under the Fourteenth Amendment to the U.S. Constitution.

All other native Americans have the right under federal law to determine for themselves the qualifications for membership in their tribal entities. In order to apply for tribal recognition under the Indian Reorganization Act, "Indian" is defined as follows:

> The term "Indian" as used in this Act shall include all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction, and all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation, and shall further include all other persons of one-half or more Indian blood. For the purposes of this Act, Eskimos and other aboriginal peoples of Alaska shall be considered Indians. The term "tribe" wherever used in this Act shall be construed to refer to any Indian tribe, organized band, pueblo, or the Indians residing on one reservation. The words "adult Indians" wherever used in this Act shall be construed to refer to Indians who have attained the age of twenty-one years.

25 U.S.C. § 479.

Since persons applying for recognition as an Indian tribe are, by definition, not members of a recognized Indian tribe, the only Indians who can apply for recognition are "persons of one-half or more Indian blood." This is the exact same blood quantum as the "not less than one-half part of the blood" definition of "native Hawaiian" which

15

the State ignores in the establishment of this "Hawaiian" governmental entity. This discrimination is a violation of Intervenors' right of equal protection as protected by the Fourteenth Amendment to the U.S. Constitution. It is this right to equal protection that Intervenors' seek to assert. There is no compelling governmental interest for this discrimination nor even a rational basis for it.

In *Rice v. Cayetano*, *Rice v. Cayetano*, 528 U.S. 495 (2000), the State attempted to justify the restriction of voting rights for OHA Trustees to Hawaiians (without a blood quantum) was justified by analogy to Indian tribes under *Morton v. Mancari,* 417 U.S. 535 (1974). The Supreme Court rejected this argument holding that OHA Trustees are state officials not of a quasi-sovereign native American governing entity. *Rice v. Cayetano, supra*, 528 U.S. at 520. Justices Breyer and Souter in a separate concurring opinion would have rejected the Indian analogy argument based on the fact that the lack of a blood quantum in the voting requirements for OHA did not resemble an Indian tribe:

> As importantly, the statute defines the electorate in a way that is not analogous to membership in an Indian tribe. Native Hawaiians, considered as a group, may be analogous to tribes of other Native Americans. But the statute does not limit the electorate to native Hawaiians. Rather it adds to approximately 80,000 native Hawaiians about 130,000 additional "Hawaiians," defined as including anyone with one ancestor who lived in Hawaii prior to 1778, thereby including individuals who are less than one five-hundredth original Hawaiian (assuming nine generations between 1778 and the present). See Native Hawaiian Data Book 39 (1998). Approximately 10% to 15% of OHA's

16

funds are spent specifically to benefit this latter group, see Annual Report 38, which now constitutes about 60% of the OHA electorate.

* * *

Of course, a Native American tribe has broad authority to define its membership. *See Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 72, n. 32 (1978). There must, however, be some limit on what is reasonable, at the least when a State (which is not itself a tribe) creates the definition. And to define that membership in terms of 1 possible ancestor out of 500, thereby creating a vast and unknowable body of potential members — leaving some combination of luck and interest to determine which potential members become actual voters — goes well beyond any reasonable limit. It was not a tribe, but rather the State of Hawaii, that created this definition; and, as I have pointed out, it is not like any actual membership classification created by any actual tribe.

*Rice v. Cayetano, supra*, at 526-7 [Breyer, J., Concurring].

In this case, Intervenors would be claiming that the Hawaiian governmental entity, lacking a blood quantum, violates their Equal Protection rights under the Fourteenth Amendment and expenditures of OHA funds in support of such entity illegal entity is a breach of the § 5(f) trust.

In *Arakaki v. Cayetano, supra*, Intervenors attempted to intervene to assert a similar equal protection claim as that asserted in *Norton*. In *Arakaki*, the Plaintiffs were seeking to invalidate HHCA and § 5(f) as a denial of *their* right to equal protection and to enjoin the State from using taxpayer monies to support the HHCA and OHA programs. The District Court ruled that the Plaintiffs did not have standing to challenge the validity of HHCA or § 5(f).

The District Court and Court of Appeals both ruled that Intervenors had a

significantly protectable interest to allow intervention. *Id*., at 1085-6.

## C.   *Imparement of Interest.*

In *Arakaki* the District Court and Court of Appeals ruled that Intervenors' interest in receiving benefits under HHCA and § 5(f) might have been impaired as the result of Plaintiffs' claims. *Id*., at 1086.  Similarly, in this case, Intervenors' interest in receiving benefits under § 5(f) will be impaired by the expenditure of § 5(f) funds on an election that is illegal and violates their Equal Protection rights.

In *Arakaki* the District Court and Court of Appeals, held that Intervenors Equal Protection claims would not be impaired by the claims raised by Plaintiffs and that they could very well bring their own suit to assert those rights, which they did in *Norton*. In this case, however, the Equal Protection claim is the basis for the claim that the election in which Plaintiffs seek to vote is illegal. Therefore, expenditure of § 5(f) funds upon such illegal election will impair Intervenors' interest therein. The Equal Protection claim is intimately intertwined within the breach of trust claim.

## D.   *Adequacy of Representation.*

In *Arakaki*, the Court of Appeals listed the factors to be considered in determining the adequacy of representation as follows:

> This Court "follow[s] the guidance of Rule 24 advisory committee notes that state that 'if an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene.'" *Southwest Center*, 268 F.3d at

822 (citation omitted). As noted above, Hoohuli's continued receipt of benefits will cease altogether should Plaintiffs prevail. Hoohuli would be justified in intervention to protect the continued receipt of benefits if it demonstrates that existing parties do not adequately protect its interest. *Donnelly*, 159 F.3d at 409. The burden on proposed intervenors in showing inadequate representation is minimal, and would be satisfied if they could demonstrate that representation of their interests "may be" inadequate. *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n. 10, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972).

This Court considers three factors in determining the adequacy of representation: (1) whether the interest of a present party is such that it will undoubtedly make all of a proposed intervenor's arguments; (2) whether the present party is capable and willing to make such arguments; and (3) whether a proposed intervenor would offer any necessary elements to the proceeding that other parties would neglect. *California v. Tahoe Reg'l Planning Agency,* 792 F.2d 775, 778 (9th Cir. 1986).

*Arakaki v. Cayetano, supra*, at 1086.

In applying these factors, the *Arakaki* court concluded that the State of Hawaii could adequately represent Intervenors. However, applying these factors to the present case makes it clear that none of the existing parties can adequately represent Intervenors' interest. The present parties all want the election to go forward. The only contention between the present parties is who should be qualified to vote. Intervenors wish to assert the position that the election is illegal and should not be allowed to proceed. None of the present parties can adequately represent Intervenors' position. All of the present parties are in opposition to Intervenors' position.

### III. CONCLUSION.

The Kingdom of Hawaii, which the State wants to recreate with Chapter 10H

was a corrupt, puppet government under the control of "western" interests. The missionaries came and married and wrote the wills for the Hawaiian princesses to gain control of their land. They created phoney trusts supposedly to benefit the native Hawaiian community but ran them in their own self interest. They conceived the Great Mahele and *kuleana* law, supposedly to allow native Hawaiians to get title to their own land, which operated, in fact, to dispossess and alienate native Hawaiians from the *aina*.

In the same way, the State of Hawaii wants to create this phoney Hawaiian Entity in order to create an entity representing native Hawaiians that will release the State from its obligations under HHCA and § 5(f). If the State wants to negotiate or otherwise deal with native Hawaiians on a government-to-government basis, it should recognize one or more of the groups like *Ka Lahui Hawaii* that have been formed by native Hawaiians themselves, instead of imposing on them a Hawaiian entity without a blood quantum with an election in which native Hawaiians who do not support it are not allowed to vote.

Based upon the foregoing authorities and argument, intervention as a matter of right is appropriate in this case. The motion to intervene should be granted.

Dated: Honolulu, Hawaii, September 25, 2015.

/s/ Walter R. Schoettle
WALTER R. SCHOETTLE,
Attorney for Proposed Intervenors

## CERTIFICATE OF COMPLIANCE

The foregoing document contains 5139 words as reported by WordPerfect word count function.

Dated: Honolulu, Hawaii, September 25, 2015.

_____

WALTER R. SCHOETTLE,
Attorney for Proposed Intervenors