SULLIVAN MEHEULA LEE
A Limited Liability Law Partnership

WILLIAM MEHEULA        (2277)
NADINE Y. ANDO         (3158)
NATASHA L.N. BALDAUF   (9620)
745 Fort Street, Suite 800
Honolulu, Hawai‘i 96813
Telephone: (808) 599-9555
Facsimile: (808) 533-2467
meheula@smlhawaii.com; ando@smlhawaii.com;
baldauf@smlhawaii.com

Attorneys for Defendants
NA‘I AUPUNI and THE AKAMAI FOUNDATION

McCORRISTON MILLER MUKAI MacKINNON LLP
DAVID J. MINKIN        #3639-0
TROY J. H. ANDRADE     #9542-0
JESSICA M. WAN         #10183-0
Five Waterfront Plaza, 4th Floor
500 Ala Moana Boulevard
Honolulu, Hawai‘i 96813
Telephone: (808) 529-7300
Facsimile: (808) 524-8293
Email: *minkin@m4law.com; andrade@m4law.com;*
    *jwan@m4law.com*
Attorneys for Defendant NA‘I AUPUNI

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI‘I

| | |
|---|---|
| KELI‘I AKINA, KEALII MAKEKAU, JOSEPH KENT, YOSHIMASA SEAN MITSUI, PEDRO KANA‘E GAPERO, and MELISSA LEINA‘ALA MONIZ,<br><br>Plaintiffs, | CASE NO: 1:15-cv-00322-JMS-BMK<br><br>DEFENDANTS NA‘I AUPUNI and THE AKAMAI FOUNDATION'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION [DKT |

vs.

THE STATE OF HAWAII, GOVENOR
DAVID Y. IGE, in his official capacity;
ROBERT K. LINDSEY JR.,
Chairperson, Board of Trustees, Office
of Hawaiian Affairs, in his official
capacity; COLETTE Y. MACHADO,
PETER APO, HAUNANI APOLIONA,
ROWENA M.N. AKANA, JOHN D.
WAIHEʻE IV, CARMEN HULU
LINDSEY, DAN AHUNA,
LEINAʻALA AHU ISA, Trustees,
Office of Hawaiian Affairs, in their
official capacities; KAMANAʻOPONO
CRABBE, Chief Executive, Office of
Hawaiian Affairs, in his official
Capacity; JOHN D. WAIHEʻE III,
Chairman, Native Hawaiian Roll
Commission, in his official Capacity;
NĀʻĀLEHU ANTHONY, LEI KIHOI,
ROBIN DANNER, MĀHEALANI
WENDT, Commissioners, Native
Hawaiian Roll Commission, in their
official capacities; CLYDE W.
NĀMUʻO, Executive Director, Native
Hawaiian Roll Commission, in his
official capacity; THE AKAMAI
FOUNDATION; and THE NAʻI
AUPUNI FOUNDATION; and DOE
DEFENDANTS 1-50,

        Defendants.

47]; DECLARATION OF JAMES
KUHIO ASAM; DECLARATION OF
LOUIS PEREZ; EXHIBITS "1" TO
"16"; CERTIFICATE OF
COMPLIANCE PURSUANT TO L.R.
7.5(b); CERTIFICATE OF SERVICE

Hearing:
Date:    October 20, 2015
Time:    9:30 a.m.
Judge:   Hon. Michael J. Seabright

# TABLE OF CONTENTS

I.    **STATEMENT OF FACTS** ............................................................2

II.   **DISCUSSION** ................................................................ 11

     A.    Plaintiffs Will Not Succeed on the Merits of Their Claims ............... 11

         1.    Plaintiffs have not sustained their burden of establishing that NA is a state actor. ................................................. 11

         2.    An Injunction Would Violate NA's and Native Hawaiians Freedom of Association .......................................... 17

         3.    Any State Action Here Is Minimal When Compared To The Federal Government's Efforts In The IRA ............................. 22

     B.    The Balance of Hardships Tips Greatly in NA's Favor .................... 26

III.   **CONCLUSION** ................................................................ 35

## TABLE OF AUTHORITIES

**Cases**

*Affordable Housing Develop. Corp. v. City of Fresno*, 433 F.3d 1182
(9th Cir. 2006)............................................................................. 20

*Boy Scouts of America v. Dale*, 530 U.S. 640 (2000)...................................... 19, 20

*Brentwood Acad. v. Tennessee Secondary*
*Sch. Athletic Ass'n*, 531 U.S. 288 (2001) ............................................... 14, 16

*California Democratic Party v. Jones*, 530 U.S. 567 (2000) .................... 13, 19, 22

*Cousins v. Wigoda*, 419 U.S. 477, 489 (1975)........................................... 18, 21, 22

*Davis v. Guam*, 785 F.3d 1311 (9th Cir. 2015)...................................................... 29

*E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984 (9th Cir. 2006) ......... 27

*Flagg Bros. v. Brooks*, 436 U.S. 149 (1978)................................................ 11, 12, 13

*Global Horizons, Inc. v. U.S. Dep't of Labor*, 510 F.3d 1054 (9th Cir. 2007)....... 27

*Johnson v. Knowles*, 113 F.3d 1114 (9th Cir. 1997)............................................... 13

*Kahawaiolaa v. Norton*, 386 F.3d 1271 (9th Cir. 2004).................................. 23, 24

*Kostic v. Nago*, 878 F.Supp.2d 1124 (D. Haw. 2012) ........................................... 33

*LGS Architects, Inc. v. Concordia Homes of Nevada*, 434 F.3d 1150
(9th Cir. 2006)............................................................................. 36

*Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982)............................................... 16

*Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, (1994) ........................... 18

*N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886 (1982).............................. 18

*Naoko Ohno v. Yuko Yasuma*, 723 F.3d 984 (9th Cir. 2013)................................ 12

*Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 193 (1988)...................... 14

*Nixon v. Condon,* 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984 (1932)....................... 13

*Polk County v. Dodson,* 454 U.S. 312, 102 S.Ct. 445,
70 L.Ed.2d 509 (1981)................................................................... 14, 15

*Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234
  (10th Cir. 2001)...................................................................... 34

*Rice v. Cayetano*, 528 U.S. 495 (2000)........................................... 21, 31

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) ............................. 18, 19, 21

*Single Moms, Inc. v. Montana Power Co.*, 331 F.3d 743 (9th Cir. 2003)........ 15, 16

*Smith v. Allwright,* 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944).............. 13, 30

*Sports Form, Inc. v. United Press Int'l, Inc.,* 686 F.2d 750 (9th Cir.1982)............ 26

*Stanley v. Univ. of Southern Calif.*, 13 F.3d 1313 (9th Cir. 1994) ........................ 36

*Terry v. Adams,* 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953) .......... 13, 30, 31

*White v. Lee*, 227 F.3d 1214 (9th Cir. 2000)....................................... 19

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ........................... 1, 35

**Statutes**

Haw. Rev. Stat. § 10H-5 ................................................................. 25

Haw. Rev. Stat. §10H-9 ................................................................. 29

Haw. Rev. Stat. Chap. 10 ............................................................ 8, 34

**Other Authorities**

20 U.S.C. §16(G)(ii) & (iii) ........................................................... 32

20 U.S.C. §7512(16)(C)................................................................ 32

42 U.S.C. §11701(6) .................................................................... 26

42 U.S.C. §11701(22) .................................................................. 32

79 Fed. Reg. at 35298 .................................................................. 26

Act of Nov. 1, 1988, Pub. L. No. 100-581, § 101, 102 Stat. 2938 (1988)............. 24

Alexa Koenig & Jonathan Stein, 48 Santa Clara Law. Rev. 79 (2008)................. 25

Alva C. Mather, *Old Promises: The Judiciary and the Future of Native
  American Federal Acknowledgement Litigation*, 151 U. Pa. L. Rev. 1827,
  1831 (2003)......................................................................... 24

Article 3 of the United Nations Declaration on the Rights of
Indigenous Peoples .................................................................. 4

*Cohen's Handbook of Federal Indian Law* § 4.06[2] at 286-88 (Nell Jessup
Newton ed., 2012)......................................................... 24

Hawaiian Homelands Homeownership Act of 2000, Pub. L. No. 106-569,
114 Stat. 2968-69 (2000) ............................................. 26

Indian Reorganization Act ("**IRA**"), 48 Stat. 984 (1934) (codified as
amended at 25 U.S.C. 461 et seq.)................................. 23

Pub.L. 106-569, Title V, §512, Dec. 27, 2000, 114 Stat. 2966 ............................. 32

## DEFENDANTS NAʻI AUPUNI AND THE AKAMAI FOUNDATION'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION [DKT 47]

Naʻi Aupuni ("**NA**") and The Akamai Foundation ("**Akamai**") submit this opposition memorandum to Plaintiffs' Motion for Preliminary Injunction ("**Motion**"), and incorporate herein the oppositions filed by (1) the trustees and chief executive officer of the Office of Hawaiian Affairs ("**OHA**"); and (2) the Native Hawaiian Roll commissioners and its Executive Director ("**NHRC**"), together with the State of Hawaiʻi and Governor Ige (collectively "**State Defendants**").

In addition to the arguments set forth in OHA's and the State Defendants' Oppositions, Plaintiffs' Motion should be denied as Plaintiffs do not meet their burden of proving: (1) their likelihood of success on the merits, (2) that they would suffer irreparable harm, (3) the balance of equities tips in their favor, <u>and</u> (4) that granting an injunction is in the public interest. <u>Winter v. Natural Res. Def. Council</u>, 555 U.S. 7 (2008). Significantly, in addition to the reasons set forth in OHA's and the State's briefs, Plaintiffs will not succeed on the merits of their claims against NA because NA is not a state actor, NA is engaging in protected First Amendment activity, and federal law supports the State Defendants' and OHA's support of NA's private, independent election. Not only are Plaintiffs likely to fail on the merits of their claims, but, as set forth below, they also will

suffer no harm in the absence of an injunction and the public interest favors denying their Motion.

## I.  STATEMENT OF FACTS

On July 6, 2011, **Act 195** became law and established the NHRC to publish a roll of Native Hawaiians "intended to facilitate the process under which qualified Native Hawaiians may independently commence the organization of a convention of qualified Native Hawaiians, established for the purpose of organizing themselves." Act 195 also acknowledged that the State should not interfere with Native Hawaiians' right to "freely determine their political status" as stated in Article 3 of the United Nations Declaration on the Rights of Indigenous Peoples. *See* Exhibit 1 and Asam Declaration ¶3.

On May 21, 2013, **Act 77** became law, which amended Act 195 to allow OHA registrants from its multiple databases of verified Native Hawaiians to be added to the NHRC's roll. *See* Exhibit 2, Asam Declaration ¶4. Pursuant to Act 77, starting in September 2013, OHA sent electronic files to the NHRC that included the OHA registrants for inclusion in the NHRC's roll. *See* Namuo Declaration ¶¶4, 6 and Crabbe Declaration ¶10, 15. Since August 2013, OHA and NHRC made repeated and reasonable attempts to inform OHA registrants that their registration information could be stopped from being transmitted to the NHRC or

that they could opt out of the NHRC's roll by filling out a short form.  *See* Namuo Declaration ¶¶5-14, 21 and Crabbe Declaration ¶12-14, 16.

The NHRC's website also provided this opt-out form at http://kokua.kanaiolowalu.org/support/solutions/articles/148799-removal-from-the-native-hawaiian-roll-commission.  *See* Namuo Declaration ¶8.

On June 20, 2014, the Department of the Interior ("**DOI**") issued its procedures for re-establishing a government-to-government relationship with the Native Hawaiian Community ("**ANPRM**") that favorably reported on the State of Hawaii's efforts to support reorganizing a Native Hawaiian government citing Act 195.  *See* Exhibit 3 and Asam Declaration ¶5.

On October 16, 2014, the BOT authorized the realignment of the budget for Governance Planning, consisting of Native Hawaiian trust funds and pursuant to OHA's policy to support Native Hawaiian self-governance.  The realignment would provide funds to an independent entity that would formulate a democratic process through which Native Hawaiians could consider organizing, for themselves, a governing entity.  *See* Crabbe Declaration ¶17.

NA is a Hawaii non-profit corporation that supports efforts to achieve Native Hawaiian self-determination.  NA was incorporated on December 23, 2014.  *See* Asam Declaration ¶6.  NA's Bylaws provide:

> Section 1.3  Formation Background.   By Action Item dated March 6, 2014, the Office of Hawaiian Affairs (OHA) authorized and

3

approved the use of the Funds to enable Native Hawaiians to participate in a process through which a structure for a governing entity may be determined by the collective will of the Native Hawaiian people by transmitting the Funds to an entity that is *independent of OHA and any apparatus of the State of Hawai'i*. OHA initially invited nine Ali'i trusts, Royal societies and Civic organizations to discuss the development of this independent body. From that group of nine, the following three organizations, each represented by two individuals, continued the discussion: King Lunalilo Trust & Home (James Kuhio Asam and Michelle Nalei Akina), 'Ahahui Ka'ahumanu (Pauline Nakoolani Namuo and Geraldine Abbey Miyamoto) and Hale O Nā Ali'i O Hawai'i (Naomi Kealoha Ballesteros and Selena Lehua Schuelke). Eventually, the three organizations and the six individuals decided that the purpose of entity would be best served if the six individuals in their individual capacity and not as representatives of any organization should form and lead the independent entity by serving as directors of the Na'i Aupuni.

*See* Exhibit 4 (emphasis added) and Asam Declaration ¶6.

NA is comprised of directors who are Native Hawaiian, are active in the Native Hawaiian community and formed NA to provide a process for Native Hawaiians to further self-determination and self-governance for Native Hawaiians. All of NA's decisions have been in furtherance of Native Hawaiians' right to "freely determine their political status" as stated in Article 3 of the United Nations Declaration on the Rights of Indigenous Peoples. *See* Asam Declaration ¶29.

One of the initial decisions that the NA directors made was that the voters for election of delegates and the delegates should be limited to Native Hawaiians. While NA anticipated that the convention delegates will discuss and perhaps propose a recommendation on membership of the governing entity, NA decided,

*on its own*, that Native Hawaiian delegates should make that determination and that its election and convention process thus should be composed of Native Hawaiians. Furthermore, prior to entering into the below described Grant Agreement, NA informed OHA that it intended to use the NHRC's roll ("**Roll**") but that it might also look into whether there are other available lists of Native Hawaiians that it could also use to form its voter list. Thus, under the Grant Agreement, NA has the sole discretion to determine whether to go beyond the inclusion of the Roll in developing its list of individuals eligible to participate in Native Hawaiians' self-governance process. *See* Asam Declaration ¶13.

NA requested grant funds from OHA so that NA may conduct its election of delegates, convention and ratification vote process. On April 27, 2015, at NA's request, OHA, Akamai and NA entered into a **Grant Agreement** whereby OHA provided $2,595,000 of Native Hawaiian trust funds to Akamai as a grant for the purpose of NA conducting an election of delegates, convention and ratification vote ("**Scope of Services**"). *See* Exhibit 5, Asam Declaration ¶14, Perez Declaration ¶3 and Crabbe Declaration ¶18. The Grant Agreement importantly also provides:

> 3. **Na'i Aupuni's Autonomy**. As set forth in the separate Fiscal Sponsorship Agreement, OHA hereby agrees that neither OHA nor AF will directly or indirectly control or affect the decisions of NA in the performance of the Scope of Services, and OHA agrees that NA has no obligation to consult with OHA or AF on its decisions regarding the performance of the Scope of Services. NA hereby

agrees that the decisions of NA and its directors, paid consultants, vendors, election monitors, contractors, and attorneys regarding the performance of the Scope of Services will not be directly or indirectly controlled or affected by OHA.

Also, on April 27, 2015, NA and Akamai entered into a Fiscal Sponsorship Agreement because NA does not have a 501(c)(3) exemption. *See* Exhibit 6, Asam Declaration ¶15 and Perez Declaration ¶4. Akamai is a private, Hawaii non-profit corporation with no contracts with OHA other than the Grant Agreement and the Fiscal Sponsorship Agreement and no contracts with NHRC. *See* Asam Declaration ¶15 and Perez Declaration ¶5.

On May 8, 2015, OHA, NA and Akamai entered into a Letter Agreement that addressed the timing and disbursement of the grant funds. Pursuant to this Letter Agreement, as of August 2015, Akamai has obtained all of said grant funds from OHA. *See* Exhibit 7, Asam Declaration ¶16 and Perez Declaration ¶6.

On May 27, 2015, NA launched its website at **www.naiaupuni.org** that attached these agreements with OHA and Akamai, and included FAQs that addressed issues related to the NA election and convention process. *See* Exhibit 8 and Asam Declaration ¶17.

As noted above, an issue that NA directors discussed was the utility of available lists of adult Native Hawaiians *other than* the NHRC's list. After considering this issue for over two-months, NA directors determined that the NHRC's list was the best available option because it is extraordinarily expensive

6

and time consuming to compile a list of Native Hawaiians. Thus, on June 1, 2015, the NA board decided, *on its own*, that it would use only the NHRC's certified list as supplemented by OHA's Hawaiian Registry program. *See* Asam Declaration ¶18.

NA understood that OHA's Hawaiian Registry process did not require attestation to the "unrelinquished sovereignty of the Native Hawaiian people", and "intent to participate in the process of self-governance" ("**Declaration One**"). NA concluded, *on its own*, that having this alternative registration process was favorable because it provided Native Hawaiians who may take issue with Declaration One with the opportunity to participate in the NA process.[1] Accordingly, NA noted on its website that Native Hawaiians may register through the NHRC or OHA's Hawaiian Registry and provided links to both registration options. *See* Exhibit 8 and Asam Declaration ¶19.

On June 18, 2015, NA and Election-America ("**EA**") entered into an Agreement for EA to provide services to conduct the delegate election. *See* Exhibit 9, Asam Declaration ¶21 and Backert Declaration ¶3 (Exhibit 16).

By letter dated June 25, 2015, NA requested that the NHRC provide EA with its certified list of voters in mid-July 2015. *See* Exhibit 10 and Asam Declaration ¶22.

---

[1] NHRC also has not required attestation to "unrelinquished sovereignty." *See* Dec. of Namuo ¶23.

On July 10, 2015, the NHRC voted to certify qualified Native Hawaiians as of that date pursuant to HRS Chapter 10H. *See* Exhibit N and Namuo Declaration ¶16.

By email dated July 14, 2015, the NHRC informed NA of its certification decision and requested that NA pay its consultant $5,000 for the cost of producing an electronic file of the certified registrants to EA, which NA shortly thereafter paid to the consultant. *See* Exhibit 11, Asam Declaration ¶23, Namuo Declaration ¶17 and Perez Declaration ¶7.

As previously requested by NA, on July 17, 2015, the NHRC's consultant sent EA the initial certified list of voters. Thereafter, NHRC's consultant has periodically transferred additional registrant information to EA. *See* Backert Declaration ¶4 (Exhibit 16) and Namuo Declaration ¶17. Neither NA nor Akamai have any contractual relationship with the NHRC, notwithstanding the agreement to pay NHRC's consultant about $15,000 to date (which includes the aforementioned $5,000) for the cost of the electronic files containing the certified registrants and updating information. *See* Perez Declaration ¶8 and Asam Declaration ¶24.

On August 3, 2015, EA sent to approximately 95,000 certified Native Hawaiians a **Notice** of the election of delegates that included information about

becoming a delegate candidate.  *See* Exhibit 12, Asam Declaration ¶25 and Backert

Declaration ¶5 (Exhibit 16).  The Notice included that the following key dates:

| | |
|---|---|
| 9/15/15 | Deadline to apply to be a delegate candidate |
| 10/15/15 | Deadline to be certified registrants eligible to vote |
| 11/1/15 | EA to transmit ballots to certified voters |
| 11/30/15 | Deadline for votes to be received by EA |
| Feb-April/2016 | Convention |
| June 2016 | Potential ratification vote |

*See* Exhibit 12.  The Notice also described NA's apportionment plan:

> Oʻahu will be represented by 20 delegates.
> Hawaiʻi Island will be represented by 7 delegates.
> Maui will be represented by 3 delegates.
> Kauaʻi & Niʻihau will be represented by 2 delegates.
> Molokaʻi & Lanaʻi combined will be represented by 1 delegate.
> Out-of-state Hawaiians will be represented by 7 delegates.

*Id.*  NA, *on its own*, decided on these dates and deadlines, the apportionment plan

and the election process set forth in the Notice.  NA is also allowing Native

Hawaiians who do not live in the State of Hawaii to vote in the delegate election

and to serve as delegates at the convention.  For purposes of determining who is

eligible to vote in the November delegate election, NA will allow individuals that

the NHRC has certified as of October 15, 2015.  *See* Exhibit 12 and Asam

Declaration ¶25.

On August 13, 2015, Plaintiffs filed their Complaint in this case.

On August 30, 2015, the Honolulu Star-Advertiser published an **op-ed** by

NA that stated in part:

9

> Two of the Native Hawaiian Grassroot plaintiffs complain they were deprived of the opportunity to register with the Roll Commission because they do not agree with the Commission's declaration to affirm the "unrelinquished sovereignty of the Native Hawaiian people and an intent to participate in the process of self-governance."
>
> We understand that the Roll Commission has registered and certified voters -- and will continue to do so -- even if these voters refuse to agree to this declaration.

*See* Exhibit 13. NA submitted this op-ed in response to the allegations of Plaintiffs Akina and Makekau that they would register if they did not have to attest to Declaration One, and to inform Plaintiffs and Native Hawaiians generally that they may register without making this attestation. *See* Asam Declaration ¶26.

On September 29, 2015, the DOI published its proposed administrative rule ("**NPRM**") that describes Act 195 at 18. The NPRM at 63 defined those who may participate in the ratification process as including those "enumerat[ed] on a roll of Native Hawaiians certified by a State of Hawaii commission or agency under State law, where enumeration is based on documentation that verifies descent, excluding noncitizens of the United States". The NPRM comment period will last 90 days and the "Department will then review and analyze those comments along with the testimony received during the scheduled teleconferences to determine if a final rule should issue", *see* FAQs at 7. *See* Exhibit 15 and Asam Declaration ¶33.

On September 30, 2015, EA announced the delegate candidates. *See* Exhibit 14, Asam Declaration ¶27 and Backert Declaration ¶6 (Exhibit 16).

All decisions regarding who may vote and who may be a delegate candidate in the upcoming delegate election scheduled for November 2015 were decisions made by NA, *on its own*, and were not the decisions of NHRC, OHA or Akamai. Also, NHRC, OHA and Akamai did not compel, coerce, or cause NA to make these decisions. *See* Asam Declaration ¶28, Namuo Declaration ¶22 and Crabbe Declaration ¶19-22.

NA intends to proceed with the delegate election in November, and, in February to April 2015, the elected delegates will come together in a convention to consider matters relating to self-governance. *See* Asam Declaration ¶32.

## II. DISCUSSION

### A. Plaintiffs Will Not Succeed on the Merits of Their Claims

1. *Plaintiffs have not sustained their burden of establishing that NA is a state actor.*

Plaintiffs' claim for relief against NA under § 1983 requires a showing that: (1) they have been deprived of a right secured by the Constitution and the laws of the United States; <u>and</u> (2) NA deprived them of this right acting under color of Hawaiʻi law. *Flagg Bros. v. Brooks*, 436 U.S. 149, 155-56 (1978). Plaintiffs are required to prove both but have proven neither. First, for the reasons set forth in the OHA's and State Defendants' Oppositions, Plaintiffs have not been deprived of any Constitutional or federal legal right. Second, for the reasons set forth in

OHA's Opposition and below, NA was not acting under color of state law and NA, therefore, cannot be characterized as a state actor.

The Ninth Circuit, in *Naoko Ohno v. Yuko Yasuma*, 723 F.3d 984, 995-96 (9th Cir. 2013), stated:

> "'The Supreme Court has articulated four tests for determining whether a [non-governmental person's] actions amount to state action: (1) the public function test; (2) the joint action test; (3) the state compulsion test; and (4) the governmental nexus test.'"

*Id.* at 995-96 (internal citations and quotation marks omitted).

As indicated in the Statement of Facts, NA's control over elections, including setting voter and delegate eligibility criteria, is NA's *alone*, without any control by NHRC, OHA, or Akamai. Likewise, the decision by NA to enter into a grant agreement with OHA and to use NHRC's roll are NA's independent decisions. Thus, NA, under the joint action test, the state compulsion test, and the governmental nexus test, is plainly *not* a state actor with respect to those key decisions that are challenged by Plaintiffs in this case.[2]

Nor is NA performing a "public function" because the NA election is not for public officials. Contrary to Plaintiffs' assertion, *Flagg Bros.* does not support their case. There the Court held that elections of *public officials* was a public function:

---

[2] NA also adopts the arguments in OHA's Opposition at section I, B, 2 regarding the joint action test.

> While the Constitution protects private rights of association and advocacy with regard to **the election of public officials**, our cases make it clear that **the conduct of the elections themselves is an exclusively public function**. This principle was established by a series of cases challenging the exclusion of blacks from participation in primary elections in Texas. *Terry v. Adams,* 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953); *Smith v. Allwright,* 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944); *Nixon v. Condon,* 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984 (1932). Although the rationale of these cases may be subject to some dispute, their scope is carefully defined. <u>The doctrine does not reach to all forms of private political activity, but encompasses only state-regulated elections or elections conducted by organizations which in practice produce "the uncontested choice of *public* officials."</u> *Terry, supra,* 345 U.S. at 484, 73 S.Ct. at 820 (Clark, J., concurring).

*Id.* at 158 (emphasis added).  Here, since the NA election of delegates is not a state-regulated election and not an election of *public* officials, NA is clearly not performing a government function.  *Johnson v. Knowles*, 113 F.3d 1114, 1118-19 (9th Cir. 1997); *see also California Democratic Party v. Jones*, 530 U.S. 567, 572-73 (2000)  ("[W]e have not held . . . that the process by which political parties select their nominees are . . . wholly public affairs.")  NA is simply pursuing Native Hawaiians' inherent right to self-determination without control by OHA and NHRC.  Thus, the fact that NA is not performing an exclusive state function in this instance also supports finding NA to not be a state actor.

Moreover, courts may decline to find state action where there is "some countervailing reason against attributing activity to the government":

> What is fairly attributable is a matter of normative judgment, and the criteria lack rigid simplicity. From the range of circumstances that could point toward the State behind an individual face, no one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient, for there may be some countervailing reason against attributing activity to the government. See *Tarkanian,* 488 U.S., at 193, 196, 109 S.Ct. 454; *Polk County v. Dodson,* 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981).

*Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295-96 (2001). For example, in *Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 193 (1988), although the University of Nevada had some part in setting the NCAA's rules, the NCAA's policies were shaped not by the University alone, but by several hundred member institutions from many states, most of them having no connection with Nevada, and exhibiting no color of Nevada law.[3]

In this case, a countervailing reason against finding NA to be a state actor is that the Native Hawaiian election of delegates and convention process is part of Native Hawaiians pursuing their inherent right to self determination. NA's activities should not be considered state action because the potential outcome of the election and convention is the creation of a sovereign entity, **separate and distinct from the State**. In *Polk*, the Court found that countervailing reasons counseled against find a public defender was a state actor because, despite being paid by the state, her role was to be an "independent advocate" for her clients. 454

---

[3] In the NA election, seven of the forty delegates and the voters who elect them live outside of the State of Hawaii. *See* Asam Declaration ¶25.

U.S. at 320-21. So too here, NA's activities are related to the creation of an

independent entity, separate from the State.[4] NA's activities here are part of the

self-determination efforts of Native Hawaiians; that effort by an indigenous people

to form their own sovereign entity should not be considered state action even if

Native Hawaiians were viewed as having received some state support in their

effort.[5]

An additional countervailing reason against finding state action here is that

NA is engaging in its protected first amendment rights of association, activity that

is inherently private and not state action. *See Single Moms, Inc. v. Montana Power

Co.*, 331 F.3d 743, 748 (9th Cir. 2003). In *Single Moms*, the Ninth Circuit held

that when a private entity is engaging in "an exercise of its lawful First

Amendment right" "that is a countervailing reason against attributing" the entity's

activity to the state. *Id.* The court went onto to note that making a "citizen's

lawful and protected efforts to influence government" state action "would have a

---

[4] The Court in *Polk* also recognized that a public defender should not be considered a state actor because her job was to be adverse to the government at times. As an advocate for Native Hawaiians it is possible that a potential Native Hawaiian entity could be adverse to the State. This further counsels against finding NA's activities to be state action.

[5] Plaintiffs' argument would essentially make it impossible for the government to ever help an indigenous population organize and potentially form its own sovereign entity. But as described below, the Federal Government is required by the IRA to be involved in the organizing of tribal constitutions.

chilling effect on legitimate political expression in derogation of the First Amendment," which was "a significant countervailing reason against" finding state action. *Id.* at 749.

Indeed, in *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936-37 (1982), the Supreme Court set forth the policy that the state action doctrine should not unfairly restrict individual freedoms:

> Careful adherence to the "state action" requirement preserves an area of individual freedom by limiting the reach of federal law and federal judicial power. It also avoids imposing on the State, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed. A major consequence is to require the courts to respect the limits of their own power as directed against state governments and private interests. Whether this is good or bad policy, it is a fundamental fact of our political order.

Applying the state actor doctrine to NA would impede the exercise of NA's and Native Hawaiian's individual freedom of association by requiring a private actor to comply with Constitutional limitations that only apply to the government. As discussed in the next section, considering NA a state actor would therefore prevent NA from engaging in protected First Amendment activity.

Whether because NA is exercising the self-determination rights of a native people or because NA is engaging in protected first amendment activity, both counsel against finding state action here, even if Plaintiffs could establish one of the tests for state action (which they cannot). *See Brentwood Acad.*, 531 U.S. at 303 ("Even facts that suffice to show public action (or, standing alone, would

16

require such a finding) may be outweighed in the name of some value at odds with finding public accountability in the circumstances.")).

In sum, NA should *not* be deemed a state actor for several reasons. First, its actions in setting voter and delegate eligibility criteria were wholly independent of Act 195 and State Defendants and OHA. While the NHRC has provided a roll and OHA has provided funding, neither has controlled NA's decisions. The fact that NA agreed to use the NHRC's roll and OHA's funds does not establish that NA is a state actor, rather, NA merely made independent private decisions regarding how to conduct the election it intends to hold as part of the Native Hawaiian self-determination effort. Second, the election is not a state election or to elect state officials and therefore NA is not engaging in a public function. Third, deeming NA a state actor would frustrate Native Hawaiians' inherent right to self-determination and violate NA's First Amendment rights.

2.    *An Injunction Would Violate NA's and Native Hawaiians Freedom of Association*

The injunction Plaintiffs seek would bring to a screeching halt activity by NA to create and administer an organization that intends to engage in expressive activity on behalf of qualified Native Hawaiians or, alternatively, to force NA—a private organization—to include in its membership individuals that NA does not

wish to include. The injunctive relief they request would violate the First Amendment in both respects.[6]

*First*, it would violate the First Amendment for the Court to enjoin NA from "the calling, holding, or certifying of any election" that it holds. Compl. at 32, ¶ 3. NA's election will serve as the basis for its selection of delegates and leadership who will formulate and express positions on the public issue of Native Hawaiian sovereignty. *See* Asam Declaration ¶ 29. The Supreme Court "has recognized that private expression on public issues 'has always rested on the highest rung of the hierarchy of First Amendment values." *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886 (1982) (citing *Carey v. Brown*, 447 U.S. 455 (1980); *see also Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984) ("Implicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends."). The injunction that Plaintiffs seek would directly impair NA's rights of First Amendment expression.

---

[6] Lest there be any doubt, while freedom of expressive association cases normally involve statutes or regulations, an injunction such as the one sought here by Plaintiffs can also constitute a violation of the right of freedom of expressive association. *See, e.g., Cousins v. Wigoda*, 419 U.S. 477, 489 (1975) (reversing injunction issued by state court that violated right to association); *see also Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 765 (1994) (noting that injunctions "require a somewhat more stringent application of general First Amendment principles" than statutes). The relief that Plaintiffs seek from this Court is inviting a direct intrusion on protected First Amendment activity.

*Second*, the alternative to Plaintiffs' requested injunctive relief would be for NA to include in its membership everyone who wanted to join, regardless of ancestry. This relief would deprive NA and Native Hawaiians who wish to participate in the NA convention of their constitutional right not to associate with non-Native Hawaiians as part of the pursuit of Native Hawaiian political, social, economic, and cultural ends.

It is well-settled that forced association likewise violates the Constitution, just as restrictions on association and expression violate the Constitution. "Freedom of association [ ] plainly presupposes a freedom not to associate." *Roberts*, 468 U.S. at 622. More recently, the Supreme Court in *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000), recognized that "[t]he forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints." *Id.* at 648; *see also California Democratic Party v. Jones*, 530 U.S. 567, 581-82 (2000) ("We can think of no heavier burden on a political party's associational freedom" than forcing political parties to allow "persons wholly unaffiliated with the party" to vote in primary.); *White v. Lee*, 227 F.3d 1214, 1227 (9th Cir. 2000) ("[t]he right to expressive association includes the right to pursue, as a group, discriminatory policies that are antithetical to the concept of equality for all persons"); *see also Affordable*

19

*Housing Develop. Corp. v. City of Fresno*, 433 F.3d 1182, 1198 (9th Cir. 2006)

("The exercise of these constitutional rights is not deprived of protection if the

exercise is not politically correct and even if it is discriminatory against others.").

*Dale* set out a two part test for determining whether the right of expressive

association was being infringed: (1) whether the group at issue is engaged in

"expressive association"; and (2) whether the inclusion of the person or group to be

excluded would "significantly burden" the group's expression. *Dale*, 530 U.S. at

648, 653. Notably, the Supreme Court instructed that a court should "give

deference to an association's view of what would impair its expressions." *Id.* This

test is plainly satisfied here. As to the first part of the test, there is no basis for

dispute that NA is engaged in "expressive association." As to the second part of

the test, it is a matter of common sense that NA's expression would be

substantially burdened were it required to include non-Native Hawaiians. The

entire stated purpose of the election and convention is to determine and then

express the will of Native Hawaiians only on the issue of sovereignty. *See* Asam

Declaration ¶¶6, 13, 29-32. The inclusion of non-Native Hawaiians in the vote and

convention would prevent NA and the convention from engaging in the expressive

activity of expressing the will of Native Hawaiians, and only Native Hawaiians, on

this issue because the positions of the Native Hawaiians would be diluted by the

inclusion of non-Native Hawaiians. *See* Asam Declaration ¶¶6, 13, 29-32. Indeed,

the NPRM at 46 and FAQs at 3 state that federal recognition (if desired by Native Hawaiians) applies if members are limited to persons with Native Hawaiian ancestry. *See* Exhibit 15.

No compelling state interest of the sort outlined in *Roberts* is present here to justify government intrusion on the right to expressive association. *Roberts*, 468 U.S. at 623 ("[i]nfringements on that right may be justified by regulations adopted to serve compelling state interest, unrelated to the suppression of ideas, that cannot be achieved through means less restrictive of associational freedoms."). Plaintiffs cannot identify any compelling state interest that would support this Court enjoining Native Hawaiians from organizing and engaging in political expressive activity through a private election and convention. *See Rice v. Cayetano*, 528 U.S. 495, 521 (2000) ("If a non-Indian lacks a right to vote in tribal elections, it is for the reason that such elections are the internal affairs of a quasi-sovereign.").

In *Cousins v. Wigoda*, 419 U.S. 477, 489 (1975), the Court dealt with a dispute over delegates to the Democratic Party Convention and recognized that the Democratic Party had a right to expressive association to determine who to seat as delegates. The Court then determined that the State's "interest in protecting the integrity of its electoral process and the right of its citizens under the State and Federal Constitution to effective suffrage" was not a sufficient state interest to warrant an injunction interfering with the party convention. *Id.* at 489–91.

Likewise, in *California Democratic Party v. Jones*, 530 U.S. 567 (2000), the Court rejected California's arguments that its open primary requirements were justified limitations on the right the right of political parties to freely associate. California put forth seven state interest including producing candidates that better represented the electorate and "promoting fairness;" the Court rejected each of these as sufficient to warrant California's intrusion into protected First Amendment activity. *Id.* at 582-86. If there was not a sufficient state interest in protecting the suffrage of citizens and promoting fairness in an election of government officials to warrant state intrusion in *Cousins* and *Jones*, then there is certainly not sufficient state interest here to warrant the injunction sought by Plaintiffs.

      3.    *Any State Action Here Is Minimal When Compared To The Federal Government's Efforts In The IRA*

For all of the reasons set forth in State Defendants' Opposition at 18-36, the *Mancari* doctrine applies to Native Hawaiians and allows the minimal State involvement here. If this Court has any doubts in this regard, it may help to consider the strong historical precedent for the activities of the State Defendants in this case. In the past, the government has been actively involved in facilitating the organization of constitutional systems for native peoples and such actions have never been seriously questioned. Here, as described above and in the State and OHA briefs, the State's involvement in facilitating the organization of Native Hawaiians is limited to giving NA a grant and preparing a list of Native Hawaiians

that NA has decided to use as part of its voter list. This is a far cry from the heavy involvement of the Federal Government in prior organizing efforts by native peoples. If the Federal Government's activities pass Constitutional muster, there can be no doubt that the limited state activity here is Constitutional.

In 1934, Congress passed the Indian Reorganization Act ("**IRA**"), 48 Stat. 984 (1934) (codified as amended at 25 U.S.C. 461 et seq.). The IRA was intended in part to permit Indian tribes to set up legal structures designed to aid in self-government. *Kahawaiolaa v. Norton*, 386 F.3d 1271, 1273 (9th Cir. 2004). The IRA authorized any Indian tribe to "organize for its common welfare, and . . . adopt an appropriate constitution and bylaws[.]" IRA, 48 Stat. at 987. Such constitutions and bylaws were then subject to ratification by a majority of the adult members of the tribe "at a special election authorized and called by the Secretary of the Interior[.]" *Id.* The constitutions and bylaws then had to be approved by the Secretary. *Id.* Once adopted in this manner, the constitutions and bylaws could later be revoked or amended by the same procedures. *Id.*

Later amendments to the IRA made even clearer the extent to which the DOI was to assist Indian tribes in developing their constitutional systems. In 1988, Congress amended the IRA to provide that the Secretary was to "provide such technical advice and assistance as may be requested by the tribe or as the Secretary determines may be needed[.]" Act of Nov. 1, 1988, Pub. L. No. 100-581, § 101,

102 Stat. 2938 (1988). The Secretary was required to "review the final draft of the constitution and bylaws, or amendment thereto to determine if any provision therein is contrary to applicable laws" and "notify the tribe, in writing, whether and in what manner the Secretary has found the proposed constitution and bylaws or amendment thereto to be contrary to applicable laws[.]" *Id.*

The existence of the IRA, therefore, demonstrates that government can assist native peoples in establishing constitutional systems. The legitimacy of efforts by Indian tribes to organize under the IRA has not seriously been challenged. Ninety-nine tribes were ultimately organized under the IRA. *Kahawaiolaa*, 386 F.3d at 1273;[7] Alva C. Mather, *Old Promises: The Judiciary and the Future of Native American Federal Acknowledgement Litigation*, 151 U. Pa. L. Rev. 1827, 1831 (2003). In fact, even to this day, tribes who organized under the IRA and who now seek to revoke or amend their constitutions do so through the "secretarial elections" authorized by the IRA. *See Cohen's Handbook of Federal Indian Law* § 4.06[2] at 286-88 (Nell Jessup Newton ed., 2012).

---

[7] NPRM at 34 states: "*Kahawaiolaa v. Norton*, 386 F.3d at 1283. The court expressed a preference for the Department to apply its expertise to determine whether the United States should relate to the Native Hawaiian community 'on a government-to-government basis.' *Id.* The Department, through this proposed rule, seeks to establish a process for determining how a formal Native Hawaiian government can relate to the United States on a formal government-to-government basis, as the Ninth Circuit suggested." *See* Exhibit 15.

If neither Equal Protection principles nor the Fifteenth Amendment were impediments to Indian tribes organizing for self-government under the IRA, then nothing in Act 195 runs afoul of those principles either. Act 195 explicitly states that the Roll is "intended to facilitate the process under which qualified Native Hawaiians may *independently* commence the organization of a convention of qualified Native Hawaiians, established for the purpose of organizing themselves." Haw. Rev. Stat. § 10H-5 (emphasis added). Unlike under the IRA where elections were called by the Federal Government, it is Native Hawaiians, through NA, that are independently convening an election and convention to consider a constitution for a Native Hawaiian entity. Moreover, Act 195 contains no requirement that the State review or approve the constitution that may be produced by the Native Hawaiian convention, as the IRA requires that Secretary of the Interior to do. In short, the IRA, which involves substantial government involvement, provides strong historical and persuasive precedent that the limited State steps here are constitutionally permissible. [8]

---

[8] Although Act 195 is state law, it was expressly based on the delegation of authority from the federal government to the State of Hawai'i to address the conditions of the indigenous, native people of Hawai'i, including self-determination. State Defendants' Opposition III, B. Thus, since federal authority was delegated to the state, under *Yakima* the State's efforts to facilitate Native Hawaiian self-governance are analogous to the federal government's efforts in the IRA. Moreover, the practice of state-recognition of tribes is longstanding. At least 15 states have collectively recognized over 60 tribes. Alexa Koenig & Jonathan Stein, 48 Santa Clara Law. Rev. 79 (2008).

Additionally, the parallel between Native Hawaiians today and the Indian tribes who organized under the IRA is extremely strong. The Kingdom of Hawai'i had full diplomatic relations with the United States just as the federal government had treaty relations with Indian tribes. 42 U.S.C. § 11701(6). Congress has recognized that Native Hawaiians have a trust relationship with the United States and a political status comparable to American Indians and Alaska Natives. See Hawaiian Homelands Homeownership Act of 2000, Pub. L. No. 106-569, 114 Stat. 2968-69 (2000). Indeed, Congress has enacted more than 150 statutes based on this political and trust relationship with the Native Hawaiian community. See 79 Fed. Reg. at 35298. The fact that Indian tribes were allowed to organize their constitutions under the IRA serves as a strong precedent that the Native Hawaiians attempts to self-determination here should be allowed to proceed unimpeded.

B.    The Balance of Hardships Tips Greatly in NA's Favor

Because each of Plaintiffs' claims has no merit at all, see Defendants' Oppositions that alone requires denial of Plaintiffs' motion.

> "The irreducible minimum [to obtain a preliminary injunction] ... is that the moving party demonstrate a fair chance of success on the merits or questions serious enough to require litigation. **No chance of success at all will not suffice.**" *Sports Form, Inc. v. United Press Int'l, Inc.,* 686 F.2d 750, 753 (9th Cir.1982).

*E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984, 990 (9th Cir. 2006).

Consequently, there is no need to conduct any balancing of harms. *See Global*

*Horizons, Inc. v. U.S. Dep't of Labor*, 510 F.3d 1054, 1058 (9th Cir. 2007) ("When

... a party has not shown any chance of success on the merits, **no further**

**determination of irreparable harm or balancing of hardships is necessary**.").

Accordingly, Plaintiffs' motion for preliminary injunction must be denied without

further inquiry.

Even assuming, *arguendo*, that Plaintiffs had demonstrated "serious

questions" on the merits, the balance of harms does <u>not</u> tip sharply in their favor,

thus precluding preliminary injunctive relief. Though not necessary, the balance

actually tips sharply in favor of Defendants.

**Plaintiffs will not suffer any harm** if an injunction is denied. First, not

being allowed to participate in a **quasi-sovereign** or **private** election of native

indigenous people, when one is not a member of the native indigenous group

inherently imposes no harm to the excluded non-native person. Just as non-tribal

Indians experience no harm, in being excluded from voting in tribal elections, non-

Hawaiians will suffer no harm in being excluded from the elections for delegates to

a convention to potentially create a Native Hawaiian governing entity.

Plaintiffs, however, claim their harm from exclusion is significant because

the delegates are "likely ... to make recommendations to the State or federal

government concerning ... whether the law should be altered to provide sovereignty and self-government to Native Hawaiians," that "[t]hose who cannot register for the Roll [cannot] participate fully in the registration/election/convention process," and that, as a result, "non-Native Hawaiian citizens ... [with] real and weighty interests in ... the potential for [change in] the way ... their State is governed" will be denied "the opportunity to participate fully in the controversy over Native Hawaiian sovereignty." *See* Dkt. No. 47 at 28-29. Plaintiffs grossly misstate this alleged harm, however, because even if the convention results in the formation of a Native Hawaiian governing entity ("**NHGE**"), that NHGE *by itself* would not alter in any way how the State is governed.

Any such alteration of government **will require subsequent action (e.g., formal recognition) by the federal and possibly state governments**. Similarly, any alteration of inter-governmental structure will require subsequent Federal and State legislative and/or executive action with respect to the NHGE. As to such governmental actions, Plaintiffs, as voting-eligible citizens of Hawaii and the United States, will have equal ability -- equal to that of Native Hawaiian roll members -- to influence (via voting for elected federal and state representatives, or the President or the Governor) whether such federal and state action recognizing or otherwise dealing with the NHGE actually occurs. Thus, exclusion from the

process leading to formation of the NHGE ultimately imposes no harm upon Plaintiffs' interest in the structure of government within Hawaii.

Plaintiffs' citation to *Davis v. Guam*, 785 F.3d 1311 (9th Cir. 2015), finding **art. III standing** for plaintiffs excluded from a natives-only plebiscite (even though actual structural governmental changes would require additional changes in law to carry out the preference expressed in the plebiscite) does <u>not</u> contradict this. *Davis* speaks only to the question of when certain facts may satisfy the irreducible minimum "injury in fact" sufficient for standing. That case says nothing about when such injury qualifies as substantial harm for preliminary injunction purposes. Indeed, the case acknowledged that on the facts in that case there may have been no "tangible consequences" at all. 785 F.3d at 1315. Moreover, even as to standing, the majority relied in part on Guam's law **requiring** the plebiscite results to be transmitted "to the President, Congress and the United Nations," <u>id.</u>, thereby increasing the plebiscite's potential impact. Act 195, in contrast, does <u>not</u> require that any action be taken with respect to the published certified roll or that any election results be reported to any government entity. Indeed, HRS §10H-9 states that "[n]othing in this chapter is intended to … affect the rights of the Native Hawaiian people under state, federal, or international law." Thus, Plaintiffs lack standing as noted in OHA's brief, and thus also suffer no harm.

Each of the Plaintiffs has the same ability (as qualified Native Hawaiians on the roll) to campaign, lobby, or otherwise speak out against or in favor of federal recognition of any resulting NHGE, and against or in favor of federal and state law amendments to provide the NHGE with any sovereign powers. Thus, Plaintiffs' asserted harm is nonexistent.

*Smith v. Allwright* and *Terry v. Adams*, which Plaintiffs cite, also do not support their theory that people have a **Fifteenth Amendment** right to participate in any "political process that can influence a final political result." In *Smith* and *Terry*, the party primaries determined who would be on the general election ballot for public office. The Court thus refused to allow parties to thwart the Fifteenth Amendment -- applicable to "elections to determine **public governmental policies** or to select **public officials**, national, state, or local," *Terry*, 345 U.S. at 467 -- by simply running "private" primaries barring African Americans from participation. The elections here, in sharp contrast, are <u>not</u> elections to determine "public governmental policies," nor do they select "public officials." Rather, these elections are elections of a quasi-sovereign, or at least elections of a private organization that do not lead ultimately to the election of "public officials."

"Public governmental policies" would involve whether the federal government decides to formally recognize the NHGE, and/or whether the federal or state governments amend their laws to grant sovereign rights or benefits to the

NHGE. As noted earlier, Plaintiffs have equal ability to weigh in on those policies. But the process leading to the internal formation of the NHGE by the organizers does <u>not</u> involve "public governmental policies."

For much the same reason, Plaintiffs' assertion of irreparable harm based upon deprivation of a constitutional right to vote, *see* Dkt. No. 47 at 30, is without merit. Because these elections are <u>not</u> "elections to determine public governmental policies or to select public officials, national, state, or local," *Terry*, 345 U.S. at 467, no constitutional right to vote is at stake. The Fifteenth Amendment, and the Voting Rights Act, simply have no application to these quasi-sovereign and/or wholly private elections. *See Rice*, 528 U.S. at 520-22, and State Defendants Opposition at 6-9 and OHA Opposition at 15-19.

Finally, Plaintiffs' claims of irreparable harm to their **First Amendment** rights depends upon the validity of those claims. But as explained in State Defendants' Opposition II.D & E, at 14-18, and OHA's Opposition at 17-19, there is no merit to those First Amendment claims.

In sum, Plaintiffs' harms are non-existent.

Turning to the harm to NA would suffer enormous irreparable harm if the injunction were granted.

NA is comprised of five directors who are Native Hawaiian, are active in the Native Hawaiian community and formed NA to provide a process for Native

Hawaiians to further self-determination and self-governance for Native Hawaiians. All of NA's decisions have been in furtherance of Native Hawaiians' right to "freely determine their political status" as stated in Article 3 of the United Nations Declaration on the Rights of Indigenous Peoples. *See* Asam Declaration ¶29.

Since the illegal overthrow of the Hawaiian Kingdom in 1893, Native Hawaiians have been unable to re-organize a Native Hawaiian governing entity. *See* Apology Resolution ("on the occasion of the 100th anniversary of the illegal overthrow of the Kingdom of Hawaii on January 17, 1893, acknowledges the historical significance of this event which resulted in the suppression of the inherent sovereignty of the Native Hawaiian people."); *see also* NPRM at 3-4, 13 (Exhibit 15). Corresponding with the loss of their monarchy in 1893, Native Hawaiians' socio-economic status has declined and for the last several decades has been the lowest of any ethic group residing in Hawai'i. *See, e.g.*, 20 U.S.C. §7512(16)(C) (education deficit); 42 U.S.C. §11701(22) (poor health); 20 U.S.C. §16(G)(ii) & (iii) (drug/alcohol use, child abuse and neglect); Pub.L. 106-569, Title V, §512, Dec. 27, 2000, 114 Stat. 2966 (low income). *See* Asam Declaration ¶30 and Crabbe Declaration ¶23.

The NA process is the first opportunity that Native Hawaiians have had since the overthrow whereby a near majority of Native Hawaiians residing in Hawai'i may vote for delegates to convene to discuss, and hopefully achieve, some

measure of self-governance.  If this process is stalled in the Courts, the NHRC's list will become stale, NA's funding may not be available and if history is a useful compass - it may be decades before funding, a similarly substantial roll, state and federal sensitivity and self-determination zeal among Native Hawaiians converge to bring about another such opportunity.[9]  Moreover, the structural change that self-governance will bring about is likely the best long lasting stimulus to reverse the persistent low socio-economic conditions that have plagued Native Hawaiians for decades.  *See Mauka to Makai Report* ("A Native Hawaiian Governing Body, organized against the background of established precedent, would serve as a representative voice for the Native Hawaiian people, focus community goals, provide governmental services to improve community welfare, and recognize the legitimate aspiration of the Native Hawaiian people to transmit their values, traditions, and beliefs to their future generations."); *see also* NPRM at 3-4, FAQs at 2 (Exhibit 15).  *See* Asam Declaration ¶31 and Crabbe Declaration ¶24.

The **Native Hawaiian people** would suffer immeasurable and irreparable harm from any delay caused by issuance of the preliminary injunction.  For an injunction would obviously prevent, and at minimum delay, their ability to achieve

---

[9] Although NA's election of delegates is not a state election like that the one plaintiffs in *Kostic v. Nago*, 878 F.Supp.2d 1124, 1147 (D. Haw. 2012) tried to enjoin, the balance of the equities similarly tip in favor of denial of this request for preliminary injunction because given the undisputed difficulty of re-organizing a NHGE, disruption of the imminent election may delay another such opportunity of Native Hawaiian self-governance for decades.

a measure of self-governance. *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250-51 (10th Cir. 2001) ("prospect of significant interference with [tribal] self-government" is "irreparable injury"). Such delay in achieving self-governance is irreparable, as no future ability to self-govern can make up for the loss of self-governance in the interim period. And this harm is widespread because it impacts hundreds of thousands of Native Hawaiians. *See* NPRM at 42 (Exhibit 15).

Thus, not only does the balance of harm <u>not</u> tip **sharply** in plaintiffs' favor, it tips sharply against them.

## C. The Public Interest Favors Denial of the Injunction

Finally, an injunction would also <u>not</u> be in the public interest. The public interest would actually be irreparably harmed, because the public, through their legislative and gubernatorial representatives, established Act 195, whose purpose of supporting Native Hawaiian self-governance would be obstructed by a preliminary injunction. *See also Prairie Band*, 253 F.3d at 1253 ("tribal self-government" is "matter of public interest"). Even if ultimately overturned, the injury to the public's support for Native Hawaiian self-governance in the interval would be irreparable.[10]

---

[10] Similarly, the public, through those same representatives also generated HRS Chap. 10, reflecting the public's support for "betterment of conditions of Hawaiians," §10-3(2), and passed Art. XII, Sections 4, supporting a public trust for

In *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 26 (2008) the "balance of equities and consideration of the overall public interest" tipped strongly against "forcing the Navy to deploy an inadequately trained antisubmarine force that jeopardizes the safety of the fleet" <u>even where</u> "possible injury would be harm to an unknown number of the marine mammals".  Here, the public interest in allowing the host culture to pursue its inherent right to self-determination is greater than non-Hawaiian Plaintiffs' interest in participating in a Native Hawaiian self-governance process where Congress in the Apology Resolution §1 (1) and (2) acknowledged "the suppression of the inherent sovereignty of the Native Hawaiian people" and commended the efforts of reconciliation initiated by the State of Hawaii," and the DOI's recent NPRM specifically acknowledged the validity of Act 195 process, and encouraged the re-organization of a NHGE.  *See* NPRM at 18 and 63 (Exhibit 15).

## III.  **CONCLUSION**

Plaintiffs have failed to satisfy *a single element* of the preliminary injunction criteria, much less satisfy *all* of them as is required.  For the foregoing reasons and authorities, and any adduced at the hearing on this Motion, NA and Akamai

---

"native Hawaiians."  Thus, the public's interest in generally supporting Native Hawaiians would be thwarted by an injunction as well.

Foundation respectfully request that the court deny the instant Motion in its

entirety.[11]

DATED: Honolulu, Hawaiʻi, September 30, 2015.

/s/ WILLIAM MEHEULA
WILLIAM MEHEULA
NADINE Y. ANDO
NATASHA L.N. BALDAUF

Attorneys for Defendants
NAʻI AUPUNI and THE AKAMAI
FOUNDATION

---

[11] Moreover, because Plaintiffs are seeking a preliminary injunction to **alter the status quo**, they are seeking a **mandatory** injunction, not a prohibitory injunction. *See Stanley v. Univ. of Southern Calif.*, 13 F.3d 1313, 1320 (9th Cir. 1994) ("A prohibitory injunction preserves the status quo."). Accordingly, Plaintiffs' request for a mandatory preliminary injunction is held to an even higher standard. Id. ("A mandatory injunction 'goes well beyond simply maintaining the status quo *pendente lite* [and] is particularly disfavored.'"); *LGS Architects, Inc. v. Concordia Homes of Nevada*, 434 F.3d 1150, 1158 (9th Cir. 2006) (same). This court must deny a request for a mandatory preliminary injunction "unless the facts and law clearly favor the moving party." *Stanley*, 13 F.3d at 1320. Because Plaintiffs' request does not satisfy the ordinary standard for preliminary injunctions, *a fortiori*, it surely fails the even higher standard for mandatory injunctions.