DOUGLAS S. CHIN          6465
Attorney General of Hawaii

DONNA H. KALAMA          6051
GIRARD D. LAU            3711
ROBERT T. NAKATSUJI      6743
Deputy Attorneys General
Department of the Attorney
General, State of Hawaii
425 Queen Street
Honolulu, Hawaii 96813
Telephone:  (808) 586-1224
Facsimile:  (808) 586-1239
Email:  Donna.H.Kalama@hawaii.gov
        Girard.D.Lau@hawaii.gov
        Robert.T.Nakatsuji@hawaii.gov

Attorneys for *State Defendants:*
THE STATE OF HAWAI'I,
GOVERNOR DAVID Y. IGE, in his official
capacity, JOHN D. WAIHE'E III, Chairman,
Native Hawaiian Roll Commission, in his
official capacity, NA'ALEHU ANTHONY,
LEI KIHOI, ROBIN, DANNER, and MAHEALANI
WENDT, Commissioners, Native Hawaiian Roll
Commission, in their official capacities, CLYDE NAMU'O,
Executive Director, Native Hawaiian Roll Commission,
in his official capacity

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| KELI'I AKINA, et al., | CASE NO. CV15-00322 JMS-BMK |
|---|---|
| Plaintiffs, | STATE DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION [DKT No. 47]; CERTIFICATE OF COMPLIANCE |
| vs. | |

| | |
|---|---|
| THE STATE OF HAWAII, et al.,<br><br>Defendants. | WITH WORD COUNT LIMITATION; DECLARATION OF CLYDE NAMUʻO; EXHIBITS A – R; CERTIFICATE OF SERVICE<br><br>Hearing:<br><br>Date: October 20, 2015<br>Time:  9:30 a.m.<br>Judge: Hon. J. Michael Seabright |

# TABLE OF CONTENTS

**I.  Plaintiffs' claims fail across the board because NHRC has merely compiled data and does not set election eligibility criteria.**................................ 1

**II.  Plaintiffs' Claims Lack Merit as to each Count.** ........................................... 4

    A.  Counts 1, 2 and 3 challenging **Native Hawaiian** ancestry **voting** qualifications on Fifteenth Amendment, Fourteenth Amendment, and Voting Rights Act grounds, respectively, have no merit. ........................ 4

        1.  Neither Act 195, nor State Defendants, are Responsible for any Ancestry-based **Voting** Restrictions.................................................... 5

        2.  Even if Act 195 or State actors were Responsible for Ancestry-Based **Voting** Restrictions, there is No Merit to Plaintiffs' Three Challenges. ........................................................................................ 6

    B.  Counts 5 and 6 challenging **Native Hawaiian** ancestry **candidacy** qualifications on Fifteenth Amendment and Voting Rights Act grounds, respectively, have no merit. ........................................................................ 10

    C.  Count 7 challenging the "significant cultural, social or civic connection to the Native Hawaiian community" requirement for roll membership does not violate the Equal Protection Clause. ..................................................... 12

    D.  Count 9's claim that automatic roll membership for those **registered as verified Native Hawaiians through OHA** compels speech in violation of the First Amendment lacks merit. ................................................................. 14

    E.  Count 4 claim that requiring applicant to confirm the "unrelinquished sovereignty of the Native Hawaiian people," and "intent to participate in the process of self-governance" violates the First and Fourteenth Amendment, and Count 8 claim that requiring applicant to confirm all three declarations violates right to vote, have no merit. .......................................................... 16

**III.  In any event, plaintiffs' Equal Protection challenge to Act 195's Native Hawaiian ancestry requirement would still fail in light of the *Mancari* doctrine.** .......................................................................................... 18

    A.  The *Mancari* doctrine should apply to Native Hawaiians. ..................... 20

        1.  Like Indian tribes, Native Hawaiians, too, have a "unique legal status … under federal law." .............................................................. 21

        2. Congress has the same **authority** to treat Native Hawaiians uniquely. ....................................................................................... 23

        3. Existing Caselaw confirms that the *Mancari* doctrine applies to Native Hawaiians. .............................................................................. 30

    B.  There is strong **federal** footing for Hawai'i's Act 195, supporting reorganization of a Native Hawaiian governing entity. ............................... 32

    C.  Act 195's Hawaiian ancestry requirement easily satisfies the *Mancari* doctrine's "tied rationally" test. .................................................... 35

**IV.  The Balance of Harms and the Public Interest also require denial of the injunction.** ......................................................................................... 37

**CONCLUSION** .................................................................................. 38

# TABLE OF AUTHORITIES

**Cases**

Ahuna v. Dep't of Hawaiian Homelands,
  64 Haw. 327 (1982) ................................................................. 32

Alaska Chapter v. Pierce,
  694 F.2d 1162 (9th Cir. 1982) .............................................. 26

Alaska v. Native Village of Venetie,
  522 U.S. 520 (1998) .............................................................. 26

Arakaki v. Cayetano,
  314 F.3d 1091 (9th Cir. 2002) .............................................. 11

Chippewa Indians of Minnesota v. U.S.,
  307 U.S. 1 (1939) .................................................................. 27

Chisom v. Roemer,
  501 U.S. 380 (1991) ................................................................ 9

Cruz v. Ysleta Del Sur Tribal Council,
  842 F. Supp. 934 (W.D. Texas 1993) ..................................... 9

Gardner v. Ute Tribal Court Chief Judge,
  36 Fed.Appx. 927 (10th Cir. 2002) ......................................... 9

Hynes v. Grimes Packing Co.,
  337 U.S. 86 (1949) ................................................................ 26

Morales v. Daley,
  116 F.Supp.2d 801 (S.D. Tex. 2000) ...................................... 1

Morton v. Mancari,
  417 U.S. 535 (1974) ............................... 7, 8, 13, 18-20, 22-32, 35-36

Naliielua v. State of Hawaii,
  795 F. Supp. 1009 (D. Haw. 1990) ........................... 27-28, 30

Nordlinger v. Hahn,
  505 U.S. 1 (1992) .................................................................... 1

Orkin v. Taylor,
    487 F.3d 734 (9th Cir. 2007) ................................................ 3

Pence v. Kleppe,
    529 F.2d 135 (9th Cir. 1976) .............................................. 26

Prairie Band of Potawatomi Indians v. Pierce,
    253 F.3d 1234 (10th Cir. 2001), .......................................... 37

Rice v. Cayetano,
    963 F. Supp. 1547 (D. Haw. 1997).................................30-31

Rice v. Cayetano,
    146 F.3d 1075 (9th Cir. 1998) .........................................30-31

Rice v. Cayetano,
    528 U.S. 495 (2000).............................6, 7, 8, 11, 21, 24, 25, 29, 30, 31

South Dakota v. Yankton Sioux Tribe,
    522 U.S. 329 (1998) ........................................................ 28

Terry v. Adams,
    345 U.S. 461 (1953)....................................................... 7, 13

United States v. John,
    437 U.S. 634 (1978).................................................... 27, 28

United States v. Lara,
    541 U.S. 193 (2004)......................................................... 27

United States v. McGowan,
    302 U.S. 535 (1938)..................................................... 25, 28

United States v. New Hampshire,
    539 F.2d 277 (1st Cir. 1976)................................................ 2

United States v. Sandoval,
    231 U.S. 28 (1913)..........................................22, 25, 28, 29

Washington v. Confederated Bands & Tribes of Yakima Indian Nation,
    439 U.S. 463 (1979)..................................................... 32, 35

Williams v. Babbitt,
    115 F.3d 657 (9th Cir. 1997) ........................................ 36

**Constitutional Provisions**

U.S. Const., art. I, §8, cl. 3 (Indian Commerce Clause) ............... 19, 23, 25

U.S. Const., amend. I ("First Amendment") ........................ 14, 15, 16

U.S. Const., amend. XIV ("Fourteenth Amendment") ............ 4, 16, 30, 31

    Due Process Right to Vote ........................................ 4

    Equal Protection Clause ........................... 1, 6, 8, 12, 17, 36

    Fourteenth Amendment's Equal Protection Clause ................. 7, 8, 36

U. S. Const., amend. XV ("Fifteenth Amendment") ....... 4, 6, 7, 8, 10, 11, 29, 30, 31

**Federal Statutes & Legislation**

20 U.S.C. §7512 ......................................................... 24

20 U.S.C. §7512(8) ..................................................... 23

20 U.S.C. §7512(12)(B) ................................................ 21

20 U.S.C. §7512(12)(D) (2002) ....................................... 22

20 U.S.C. §7512(16)(C) ................................................ 24

20 U.S.C. §7512(16)(G)(ii) & (iii) ................................... 24

20 U.S.C. §7902(13) ................................................. 22, 35

20 U.S.C. §7902(1) ................................................. 25, 26

25 U.S.C. . ............................................................. 19

25 U.S.C. §2 ........................................................... 33

25 U.S.C. §9 ........................................................... 33

25 U.S.C. §3001 et seq.
(Native American Graves Protection and Repatriation Act) ............................ 21

42 U.S.C. § 1973(a)
[now 52 U.S.C. §10301(a)]................................................................................. 9

42 U.S.C. §2991 et seq. (Native Americans Programs Act of 1974) .................... 21

42 U.S.C. §11701(1)..................................................................................... 25, 26

42 U.S.C. §11701(17)......................................................................................... 27

42 U.S.C. §11701(22)......................................................................................... 24

42 U.S.C. §11701(13)..................................................................................... 22, 23

43 U.S.C. §1457 ................................................................................................ 33

52 U.S.C. §10310(c)(1) ....................................................................................... 9

Admission Act §4 .............................................................................................. 21

Admission Act §5(f)....................................................................................... 21, 32

Alaska Native Claims Settlement Act of 1971 .................................................... 26

Apology Resolution, 107 Stat. at 1512-13 ...................................................... 24, 34

Apology Resolution, Preamble ........................................................................... 34

Apology Resolution, Section 1(3)........................................................................ 34

H.R. Rep. No. 839, 66th Cong., 2d Sess. 4 (1920) .............................................. 23

Hawaiian Homelands Homeownership Act of 2000,
Pub. L. No. 106-568, Title II, Section 202(13)(D)............................................ 22

Hawaiian Homelands Homeownership Act, Subsection (E)(ii) ............................ 33

Hawaiian Homelands Homeownership Act, Section 202(13)(B)............................ 36

Hawaiian Homelands Homeownership Act, Section 512(13)(C)............................ 33

Hawaiian Homelands Homeownership Act, Section 512(13)(D)............................ 34

Hawaiian Homes Commission Act (**HHCA**), 42 Stat. 108 (1921) ............ 21, 22, 23

Pub.L. 106-569, Title V, §512, Dec. 27, 2000, 114 Stat. 2966................................ 24

Voting Rights Act.................................................................................4, 8, 9, 10, 11

**State Statutes & Legislation**

Haw. Rev. Stat. Chap. 10 ........................................................................... 37

Haw. Rev. Stat. §10-3(2)............................................................................ 37

Haw. Rev. Stat. Chap. 10H .............................................................. 1, 14, 15

Haw. Rev. Stat. §10H-2................................................................ 4, 17, 18, 37

Haw. Rev. Stat. §10H-3(a) ........................................................................... 3

Haw. Rev. Stat. §10H-3(a)(2)(A) ............................................................... 18

Haw. Rev. Stat. §10H-3(a)(2)(B) ............................................................... 12

Haw. Rev. Stat. §10H-3(a)(4) ..................................................... 14, 15, 17

Haw. Rev. Stat. §10H-4................................................................................ 3

Haw. Rev. Stat. §10H-4(b).......................................................................3, 5

Haw. Rev. Stat. §10H-5.....................................................................2, 3, 5, 10

Hawaii Act 195.......................................2-6, 10-12, 14, 16, 18, 32-37

2011 Haw. Session Laws ........................................................................... 18

**Other Authorities**

Declaration of Independence  (1776)........................................................ 26

Federal Register, Vol. 79, No. 119 at 35298 (2014)......................... 33, 34

Federal Register, Vol. 79, No. 119 at 35299 (2014)................................ 33

Federal Register, Vol. 79, No. 119 at 35300........................................... 35

Federal Register, Vol. 79, No. 119 at 35301........................................... 35

Felix Cohen, <u>Cohen's Handbook of Federal Indian Law</u> §3.02[4] (2012) ............ 28

Thomas Jefferson, Notes on the State of Virginia 100
    (William Peden ed. 1955) (1789) ...................................................................... 26

Thomas Sheridan, A Complete Dictionary of the English Language
    (2d ed. 1789) .................................................................................................. 26

The Native Hawaiian Roll commissioners and Executive Director ("NHRC"), together with the State of Hawai'i and Governor (collectively "State Defendants") incorporate herein the oppositions filed by the trustees and CEO of the Office of Hawaiian Affairs ("OHA"), and Na'i Aupuni/Akamai Foundation.

## I.  Plaintiffs' claims fail across the board because NHRC has merely compiled data and does not set election eligibility criteria.

NHRC's primary responsibility is to compile a **list** of people sharing certain characteristics prescribed by Chap. 10H.  It does not conduct elections, nor set election eligibility criteria.  **Na'i Aupuni** independently took those actions.  Thus, NHRC is simply collecting and maintaining **information**.

The government routinely collects information that is classified according to race, from the U.S. Census Bureau, to the Bureau of Labor Statistics.

**Collecting data** on race, which is constitutional, differs significantly from **treating people differently** based on race.  In Morales v. Daley, 116 F.Supp.2d 801 (S.D. Tex. 2000), the Court rejected an Equal Protection challenge to census questions regarding race, because plaintiffs "misunderstand[] the distinction between collecting demographic data" on race and "governmental **use** of suspect classifications." Id.

In Nordlinger v. Hahn, 505 U.S. 1, 10 (1992), the Supreme Court stated "[t]he Equal Protection Clause **does not forbid classifications**.  It simply keeps governmental decisionmakers from **treating differently** persons who are ... alike."

In United States v. New Hampshire, 539 F.2d 277, 280 (1st Cir. 1976), the Court upheld collection of racial employee data because "[s]tatistical information as such is a rather neutral entity[,] [a]nd any **positive steps** [the government] subsequently take[s] as a result ... of the data ... remain subject to ... judicial scrutiny."

The roll compiled by NHRC is just such a neutral collection of data. NHRC is <u>not</u> disparately **treating** anyone because NHRC does not act upon this information. Independent third parties like Na'i Aupuni may act upon the information, but not NHRC.

NHRC does not have any decision-making role in any subsequent election or convention. Act 195 does not authorize nor contemplate NHRC taking further action based upon the roll. Instead, Act 195 says that Native Hawaiians may "**independently** commence the organization of a convention." HRS §10H-5. This means that any election/convention must be organized and conducted by entities other than the State Defendants or OHA. **Na'i Aupuni**, a private organization, has undertaken that responsibility.

Because the role of NHRC has been confined to compiling the roll (which is constitutional, as explained above), and State Defendants are not responsible for the organizing or conducting of any election, such elections involve no state action.

It is the organizers of an election, like Na'i Aupuni, who would decide the election criteria, including whether or not to limit voters or delegate candidates to

only those on the roll. Although the State may have anticipated that those on the roll would have the most relevant characteristics for initially beginning the reorganization process, it is entirely up to **Native Hawaiian individuals or groups (such as Naʻi Aupuni)** to independently utilize the roll, or not (by, e.g., including those not on it), in any ensuing election. **State Defendants and OHA have no authority to establish election voting or candidate eligibility criteria, and did not do so; Naʻi Aupuni decided them solely on its own.** Namuo Decl. ¶22; see also Naʻi Aupuni Opp. at 11.

It is true that the compilation of the roll was anticipated to "facilitate the process" of Native Hawaiians organizing themselves. HRS §10H-5. It was a "basis" -- in other words, a proposed first step -- in the process leading to Native Hawaiians organizing. HRS §10H-4(b). However, other than compiling the roll, NHRC has no further responsibility. HRS §§10H-3(a), 10H-4. The mere expectation that information compiled by the government eventually be used is not enough to violate constitutional principles. Racial census data is intended to be used (otherwise, why collect it?), but that does not make it unlawful without the **government** taking additional "positive steps."

Language in Act 195 saying the roll was intended to "facilitate the process" and serve as a "basis" for qualified Native Hawaiians organizing is entirely precatory and aspirational. See Orkin v. Taylor, 487 F.3d 734, 739 (9th Cir. 2007)

(precatory provisions do not create individual rights or enforceable law). Act 195 does not provide any enforcement mechanism and does not create a cause of action to require Native Hawaiians to use the roll in organizing themselves. It is <u>not</u> up to the State, but to **others**, to utilize the roll (or expand beyond it) as they see fit. Indeed, further involvement by State Defendants would be inconsistent with the intent to "facilitate [Native Hawaiian] **self-governance.**" HRS §10H-2.

In sum, NHRC's mere compiling of a **list** of "qualified Native Hawaiians" pursuant to Act 195 does not itself impose any discriminatory **treatment** that could violate the Fourteenth Amendment. And since the State Defendants and OHA have **no responsibility** for setting voting or candidate eligibility criteria, those criteria are **not** the product of state action, and therefore cannot violate the Fourteenth or Fifteenth Amendments, the Voting Rights Act, or any Due Process Right to Vote.

## II.  Plaintiffs' Claims Lack Merit as to each Count.

### A.  Counts 1, 2 and 3 challenging **Native Hawaiian** ancestry **voting** qualifications on Fifteenth Amendment, Fourteenth Amendment, and Voting Rights Act grounds, respectively, have no merit.

Plaintiffs' first three counts center on Act 195's requirement that to be eligible for the **roll**, one must have Native Hawaiian ancestry, and claim that this requirement thereby imposes ancestry-based **voting** restrictions on any subsequent **elections**. These counts fail for one or more reasons.

<u>1.  Neither Act 195, nor State Defendants, are Responsible for any
Ancestry-based **Voting** Restrictions.</u>

First, these 3 counts fail because, for the reasons provided in Section I,

neither **Act 195**, nor the **State Defendants**, are imposing any Hawaiian ancestry

voting requirement on any **elections**.  Act 195 only provides ancestry-based

requirements for **roll membership**.  But neither Act 195, nor State Defendants,

limit voters in any subsequent election (of delegates or otherwise) to persons on the

roll.  The decision as to who is eligible to vote in such elections is up to **Na'i**

**Aupuni,** or others who wish to organize a potential governing entity.  NHRC has

no authority under Act 195 to impose eligibility criteria for voters.  It is solely up

to organizers to develop those voting eligibility criteria.  The organizers are free to

expand eligibility to persons not on the roll, including those having no Native

Hawaiian ancestry.  Act 195 does <u>not</u> require any organizers to use the roll as is.[1]

_____

[1] It is true that HRS §10H-4(b) say the "rolls shall serve **as the basis** for the
eligibility of qualified Native Hawaiians ... to participate in the organization of the
Native Hawaiian governing entity."  However, this simply means that the roll may
serve as a starting point for organizers; ultimately, it is up to the organizers to set
their own criteria as to who participates in any reorganization effort.  Nothing in
Act 195 bars organizers from setting different voter eligibility requirements, by,
e.g., including persons not on the roll.  Indeed, it would violate organizers'
**freedom of association** to preclude them from organizing themselves, and any
internal elections, in any way they wish to organize.
    Similarly, although HRS §10H-5 says the "publication of the roll of
qualified Native Hawaiians ... is intended to facilitate the process under which
qualified Native Hawaiians may independently commence the organization of a
convention of qualified Native Hawaiians," nothing requires organizers to limit
themselves to those on the roll in organizing themselves.  That decision is the

Accordingly, because neither Act 195, nor the State Defendants, are responsible in any way for any ancestry-based requirements that Na'i Aupuni or others may impose on voting eligibility in any election, Counts I, II[2] & III must be rejected as against the State Defendants.

### 2. Even if Act 195 or State actors were Responsible for Ancestry-Based **Voting** Restrictions, there is No Merit to Plaintiffs' Three Challenges.

Putting aside the above point, which is otherwise dispositive, even if Act 195 or State actors <u>were</u> responsible for ancestry-based voting restrictions, Plaintiffs' three challenges to those restrictions would still be without merit. The absurdity of allowing non-Hawaiians to participate in a process designed to facilitate Native Hawaiian **self-governance** is so palpable that even strict scrutiny would be satisfied. But strict scrutiny is not warranted.

As to the Fifteenth Amendment challenge, the <u>Rice</u> decision itself firmly rejects this claim. What plaintiffs ignore is the fact that any election to be held will be the election of a quasi-sovereign entity (or a private election), <u>not</u> an election for state **public** office. The U.S Supreme Court made clear in <u>Rice</u> that:

---

**organizers'** decision, and theirs alone. Neither Act 195, nor State Defendants, can interfere with such decisions.

[2] As to the Equal Protection Clause, as explained earlier, Act 195's Hawaiian ancestry requirement for being on the <u>roll</u> (as opposed to being a voter eligibility requirement) does not violate that Clause because that requirement involves mere **classification**, but imposes no discriminatory **<u>treatment</u>**. <u>See</u> discussion, supra at 1-2.

If a non-Indian lacks a right to vote in tribal elections, it is for the reason that such elections are the **internal affair of a quasi sovereign**. The OHA elections, by contrast, are the **affair of the State of Hawai'i**. OHA is a **state agency**, established by the **State Constitution**, responsible for the **administration of state laws** and obligations.

....

Although ... OHA has a unique position under state law, it ... **remains an arm of the State**.

... [T]he elections for OHA trustee are **elections of the State, not of a separate quasi sovereign,** and they are elections to which the Fifteenth Amendment applies.

Rice, 528 U.S. at 520-22. Just like tribal elections, any Native Hawaiian elections held by Na'i Aupuni or others will be the "internal affair of a quasi sovereign," or, at minimum, "the internal affair of" a private organization. Such elections will certainly not be "the affair of the State of Hawai'i," and the organizing group, or the ultimate NHGE that arises out of it, will certainly not be a "State agency," established by the "State Constitution," nor will it be "responsible for the administration of state laws." It will surely not be "an arm of the State," and its elections are not "elections of the State." Rice makes abundantly clear, therefore, that the Fifteenth Amendment has no application to these elections, just as it has no application to tribal elections. Cf. Terry v. Adams, 345 U.S. 461, 467 (1953) (Fifteenth Amendment applies only to elections for "public officials").

As to the **Fourteenth** Amendment's Equal Protection Clause, any Equal Protection claim is wiped out by application of the Mancari doctrine. The detailed discussion in Section III, infra, make very clear that the Mancari doctrine applies to

Native Hawaiians, and justifies under the deferential "tied rationally" <u>Mancari</u> standard, provisions that support restoration of some measure of self-governance for Native Hawaiians (as a Hawaiian ancestry requirement surely would).

It cannot be overemphasized that, while <u>Rice</u> may have precluded the <u>Mancari</u> doctrine from applying to the **Fifteenth** Amendment and voting for <u>public</u> officials, <u>Rice</u> did <u>not</u> preclude that doctrine from applying in the **Fourteenth** Amendment **Equal Protection** context. <u>See</u> discussion infra at 29-30.[3] Indeed, the <u>Mancari</u> doctrine is used specifically to overcome **Equal Protection** challenges to programs for indigenous peoples.

Equally importantly, <u>Rice</u> made **no** distinction whatsoever between Native Hawaiians and tribal Indians, leaving the questions of whether Native Hawaiians "have a status like that of Indians in organized tribes" and "whether Congress may treat the [N]ative Hawaiians as it does the Indian tribes" for another day. 528 U.S. at 518-19 (choosing to "stay far off that difficult terrain"). This memorandum at 20-32 answers those questions with a clear "yes."

Finally, as to the Section 2 **Voting Rights Act** challenges to any Hawaiian ancestry voting requirement, because the election is an election of a quasi

---

[3] Even if the <u>Mancari</u> doctrine's application to **voting** for **public officials** is in doubt due to <u>Rice</u>, because the elections here do <u>not</u> elect **public** officials, but rather delegates to a **quasi-sovereign** or **private** entity, <u>Rice</u> does <u>not</u> preclude application of the <u>Mancari</u> doctrine to the **Fourteenth** Amendment Equal Protection challenge presented here to restrictions on voting for **non**-public officials.

sovereign, or at least of a private non-State entity, the Voting Rights Act simply has no applicability. See Gardner v. Ute Tribal Court Chief Judge, 36 Fed.Appx. 927, 928 (10th Cir. 2002) ("section 2 of the Voting Rights Act, by its terms, does not apply;" citing 42 U.S.C. 1973(a) [now 52 U.S.C. §10301(a)], as "limiting [its] provisions" to elections of "States and their political subdivisions"); Cruz v. Ysleta Del Sur Tribal Council, 842 F. Supp. 934 (W.D. Texas 1993) ("Nothing in the [Voting Rights] Act indicates that Congress intended it to apply to Indian tribal elections, and the Court finds it is not so applicable.").

Furthermore, the Act specifies that "[t]he terms 'vote' or 'voting' shall include all action necessary to make a vote effective in any primary, special, or general election, including ... other action ... with respect to candidates for **public** or party office ...." 52 U.S.C. §10310(c)(1); cf. Chisom v. Roemer, 501 U.S. 380, 391 (1991) (Section 2 applies to "votes cast with respect to candidates for **public** or party office"). Because the elections here do not involve election to a "public" office, but election of delegates to a quasi-sovereign organization (or to a private non-public office),[4] the Act is inapplicable.

In sum, Counts 1, 2 and 3 have no merit.

_____

[4] This is to be distinguished from electing delegates to, say, a "private" party convention selecting party nominees to run for **public** office.

B.  Counts 5 and 6 challenging **Native Hawaiian** ancestry **candidacy**
qualifications on Fifteenth Amendment and Voting Rights Act grounds,
respectively, have no merit.

Plaintiffs in counts 5 and 6 shift their attack to delegate **candidacy**

prerequisites requiring Native Hawaiian ancestry.  These counts fail for the same

reasons their challenges to the similar **voter** prerequisites failed.  See Section II.A.

First, neither Act 195, nor State Defendants, are responsible for any

Hawaiian ancestry requirements imposed for becoming a delegate candidate.  Act

195 only sets ancestry requirements for **roll** membership, but does not limit

delegate candidates in any way.  Delegate candidacy eligibility is prescribed by

Na'i Aupuni, and/or other organizers.  Although HRS §10H-5 does mention that

the roll is "**intended** to facilitate ... the organization of a convention of qualified

Native Hawaiians," nothing precludes Na'i Aupuni from choosing to expand

eligibility to run as a delegate candidate to **non**-Native Hawaiians.  The statutory

language simply reflects a reasonable expectation that a Native Hawaiian

governing entity would ultimately be organized by Native Hawaiians.  But the

language does not mandate any such outcome.  Whether Na'i Aupuni or other

organizers ultimately allow **non**-Native Hawaiians to run for delegate positions or

not is irrelevant; the critical point is that it is ultimately **their** choice, not the State's

choice.

10

Accordingly, because neither Act 195 nor State Defendants are responsible for any ancestry-based candidacy requirements, Counts V & VI must be dismissed as to State Defendants.

**Second**, even **if** State actors **were** responsible for any ancestry-based candidacy requirements, for the reasons provided earlier, supra at 6-9, neither the Fifteenth Amendment nor the Voting Rights Act applies to these elections of a quasi-sovereign (or elections of private non-State officials). Thus, even if ancestry-based **candidacy** (as opposed to **voter**) requirements can also violate the Fifteenth Amendment and the Voting Rights Act, see Arakaki v. Cayetano, 314 F.3d 1091, 1094-97 (9th Cir. 2002) (striking down Native Hawaiian OHA **candidacy** requirements under both the Fifteenth Amendment and the Voting Rights Act), the dispositive difference here is that these elections, **unlike** the election of **OHA** trustees, are not the "affair of the State of Hawaiʻi," are not elections of officers of a "State agency," and any resulting governing entity will not "administer state laws," nor be an "arm of the State." In short, the elections do not involve "public office" and are not "elections of the State," and are thus exempt from both Fifteenth Amendment and Voting Rights Act scrutiny for the reasons provided earlier. Cf. Arakaki, 314 F.3d at 1095 (emphasizing Rice's reliance on the fact that **OHA** "is an 'arm of the State' and that the Fifteenth Amendment applies to elections for OHA trustees, which are 'elections of the State.'").

In conclusion, plaintiffs' Counts 5 and 6 have no merit.

### C. Count 7 challenging the "significant cultural, social or civic connection to the Native Hawaiian community" requirement for roll membership does not violate the Equal Protection Clause.

Plaintiffs argue in Count 7 that requiring persons to confirm that they "have a significant cultural, social or civic connection to the Native Hawaiian community," see HRS §10H-3(a)(2)(B), to be on the roll violates the Equal Protection Clause. Again, although this requirement may exist for regular **roll** membership, neither State Defendants, nor Act 195, imposes such a requirement for **voting** in the delegate elections. Whether any such voting prerequisite is imposed is the sole decision of Na'i Aupuni or other organizers. Accordingly, Count 7 simply cannot apply to either Act 195 or the State Defendants, who have no responsibility for imposition of any such requirement for **voting**. To the extent that Act 195 does impose such a requirement for **roll** membership, as opposed to as a **voting** prerequisite, Act 195's requirement does not violate the Equal Protection Clause because it imposes no discriminatory **treatment**. See discussion, supra, at 1-2.

But even if State actors did impose such a requirement for voting, it would easily survive Equal Protection scrutiny. The requirement does not involve a suspect racial classification at all. One need not be of any particular race; one need simply have a significant connection to the Native Hawaiian community. Nor does

this requirement impact a fundamental right. Although voting for **"public officials"** may be a fundamental right, see Terry, supra, voting for delegates to a **quasi-sovereign** entity, or voting for **private officers**, does not involve a fundamental right. Lacking either a suspect classification or impact upon a fundamental right, there only needs to be a **conceivable rational basis** for the significant connection requirement. That requirement is easily met, as explained in the next paragraphs.

Even if one wrongly found the classification potentially suspect, the requirement would survive under the Mancari doctrine. For reasons similar to why a **Hawaiian ancestry** requirement for voting would survive equal protection scrutiny under the Mancari doctrine, see Section III, infra, the **"significant connection to the Native Hawaiian community"** requirement, too, is **"tied rationally** to the fulfillment of Congress' unique obligation toward" Native Hawaiians. Mancari, 417 U.S. at 555. As explained infra at 32-35, 36, Congress has recognized that facilitating restoration of some measure of self-governance for Native Hawaiians is part of its unique obligation to Native Hawaiians. It is entirely rational to believe that self-governance is better promoted by requiring those who participate in reorganization to not only have Native Hawaiian ancestry, but also to have a "significant cultural, social or civic connection" to the Native Hawaiian

community. After all, such persons will almost by definition have a closer affinity to Native Hawaiians, their cultural, social, or civic identity, and their aspirations.

Furthermore, this additional requirement actually increases, rather than detracts from, the constitutionality of Act 195. That is because **narrowing** the eligible pool to only those with a significant connection to the Native Hawaiian community overcomes any conceivable concern with the group being defined too broadly.

Count 7 has no merit.

### D. Count 9's claim that automatic roll membership for those **registered as verified Native Hawaiians through OHA** compels speech in violation of the First Amendment lacks merit.

Plaintiffs' Count 9 claim that automatic placement of plaintiffs Gapero and Moniz on the roll compels their speech in violation of the First Amendment lacks merit. They can point to nothing that suggests that such roll placement indicates anything about plaintiffs' views on any subject. Nothing in Chapter 10H says anything about the views of a person automatically placed on the roll through HRS §10H-3(a)(4)'s automatic placement provision. Indeed, that provision makes clear that such persons are on the roll, not because they have any particular viewpoint, but solely because they were registered as verified Native Hawaiians through OHA. The allegation in Complaint ¶135 that such enrollment "implies that those

individuals have agreed to Declaration one" has no basis in fact, or in the statute. There is no compelled speech at all.

Nor do plaintiffs' cases recognizing a right to not register to vote support their claim. Gapero and Moniz are <u>not</u> being forced to register to vote in any election. They are simply being placed upon the **roll**, which in and of itself gives them no right to participate in any election. As discussed earlier, it is wholly up to **Na'i Aupuni and the organizers** whether to even hold an election, and if so, who will be allowed to vote in any election. It is **their** decision, not the State's, nor Chap. 10H's, whether to even hold an election, and if one is held, who will be allowed to vote in it. There is thus no state action registering anyone to vote, and thus the First Amendment claim fails.

But even if this Court were to reject the above point, and view **Chap. 10H** or **State Defendants** as granting plaintiffs a right to **vote in any elections**, there would still be no First Amendment violation. Nothing in Chap. 10H requires Gapero and Moniz to take any steps whatsoever to affirmatively register to vote in any election. Instead, HRS §10H-3(a)(4) would simply grant them the right to vote in any election, but would not force Gapero and Moniz to do anything in order to obtain those voting rights. Thus, unlike the cases cited by plaintiffs, wherein the person's **affirmative act** of registering conveys a political message, in this case Gapero and Moniz are not forced to do anything at all. One thus cannot infer any

speech from such **non**-action.

Furthermore, Gapero and Moniz were free to have their name removed from the roll altogether. See Decl. Namuo ¶¶5-15, 21 (regarding removal option). Indeed, NHRC individually informed Gapero and Moniz by letter dated September 10, 2015, that they could remove themselves from the roll by returning the enclosed form. Decl. Namuo ¶19. Consequently, any claim of compelled speech is especially without merit.

In sum, Count 9 lacks merit.

E.  Count 4 claim that requiring applicant to confirm the "unrelinquished sovereignty of the Native Hawaiian people," and "intent to participate in the process of self-governance" violates the First and Fourteenth Amendment, and Count 8 claim that requiring applicant to confirm all three declarations violates right to vote, have no merit.

First, for the same reasons provided multiple times above, neither Act 195, nor State Defendants, have required affirmation of any Declaration as a prerequisite to **voting** or **running** for delegate.  At most, the declarations are a prerequisite to **roll** membership; but as to **voting** or **candidacy** in any election, it is **Na'i Aupuni** or the organizers that may or may not require affirmation of such Declarations, by, for example, limiting voting or candidacy to those on the roll. There is thus no state action regarding the Declarations as to **voting** or **candidacy**; and any state action regarding the Declarations as a prerequisite to **roll membership** is a harmless classification that imposes no discriminatory

**treatment**. It is only when Na'i Aupuni uses that roll as the basis for voting or candidacy eligibility that differential treatment occurs; but that decision involves no state action. Both counts thus fail for that reason alone.

Putting aside the above point, as to the "unrelinquished sovereignty" portion of Declaration One, NHRC has <u>not</u> in fact required such a declaration in order to be a certified roll member. Decl. Namuo ¶23 (reconfirming NHRC's existing policy of allowing applicants to register and be certified without acknowledging unrelinquished sovereignty). Alternatively, one can simply register with OHA. <u>See</u> HRS §10H-3(a)(4).

As to the **"intent to participate in the process of self-governance"** portion of Declaration One, one can avoid affirming that and still be on the roll by simply registering through OHA instead. <u>See</u> HRS §10H-3(a)(4).

Even if one had to affirm that intent to get on the roll, that requirement would easily satisfy the Equal Protection rational basis standard, which is the proper level of scrutiny because the requirement involves no suspect classification, nor impact on fundamental rights (as voting in a **quasi-sovereign** or **private** election is <u>not</u> a fundamental right). Because any elections are ultimately designed to "facilitate [Native Hawaiian] self-governance," HRS §10H-2, it is undeniably **rational** to limit voters to those who would participate in the self-governance

process.[5]

As to Declaration **Two**, that essentially tracks plaintiffs' Count **7**, which was already disposed of earlier. See II.C.  As to Declaration **Three**, that essentially tracks plaintiffs' Counts, **1**, **2**, and **3** (and possibly Counts **5** and **6** on candidacy), which were disposed of in Section II.A (and possibly Section II.B).

In sum, Counts 4 and 8 have no merit.

## III.  In any event, plaintiffs' Equal Protection challenge to Act 195's Native Hawaiian ancestry requirement would still fail in light of the *Mancari* doctrine.

Although Section I alone renders plaintiffs' claims meritless, plaintiffs' equal protection challenge to HRS §10H-3(a)(2)(A)'s Native Hawaiian ancestry roll requirement independently fails in light of the *Mancari* doctrine.

The rule subjecting racial classifications to strict scrutiny does <u>not</u> generally apply with respect to **indigenous** peoples.  Instead, state programs for Native Hawaiians should be subject to the deferential *Mancari* "tied rationally" standard of review, applicable to Native American programs.

---

[5] Indeed, the requirement is not only rational (the applicable standard), but is even narrowly tailored to serve Hawai'i's compelling interest in facilitating Native Hawaiian self-governance.  (Facilitating Native Hawaiian self-governance is a compelling interest, given HRS §10H-2's purpose section, and Act 195's legislative history. See 2011 Haw. Session Laws at 647-48 (emphasizing importance of self-governance)).

Under the <u>Mancari</u> doctrine, an equal protection challenge does <u>not</u> invoke

strict scrutiny, but instead must be rejected "[a]s long as the special treatment can

be <u>tied rationally</u> to the fulfillment of Congress' unique obligation toward" the

native people. <u>See</u> <u>Morton v. Mancari</u>, 417 U.S. 535, 555 (1974). The underlying

rationale for this very deferential review of laws providing separate treatment for

native Americans was explained in <u>Mancari</u> as follows:

> Resolution of the instant issue turns on the **unique legal status of Indian tribes under federal law** and upon the **plenary power of Congress, based on a history of treaties and the assumption of a 'guardian-ward' status, to legislate on behalf of federally recognized Indian tribes**. The plenary power of Congress to deal with the special problems of Indians is drawn both explicitly and implicitly from the Constitution itself. **Article I, s 8, cl. 3, provides Congress with the power to 'regulate Commerce ... with the Indian Tribes,' and thus, to this extent, singles Indians out as a proper subject for separate legislation.** ... The Court has described the origin and nature of the **special relationship**:
>
> > ... the United States overcame the Indians and took possession of their lands, sometimes by force, leaving them a[] dependent people, needing protection against the selfishness of others .... Of necessity the United States assumed the duty of furnishing that protection, and with it the authority to do all that was required to perform that obligation** and to prepare the Indians to take their place as independent, qualified members of the modern body politic**.
>
> ....
>
> **Literally every piece of legislation dealing with Indian tribes** and reservations, and certainly all legislation dealing with the BIA, **single out for special treatment a constituency of tribal Indians** living on or near reservations. **If these laws,** derived from historical relationships and **explicitly designed to help only Indians, were deemed invidious racial discrimination, an entire Title of the United States Code (25 U.S.C.) would be effectively erased and the solemn commitment of the Government toward the Indians would be jeopardized.** It is in this

historical and legal context that the constitutional validity of the Indian preference is to be determined. ....

**Contrary to the characterization made by appellees, this preference does not constitute 'racial discrimination.' Indeed, it is not even a 'racial' preference. ....**

**On numerous occasions this Court specifically has upheld legislation that singles out Indians for particular and special treatment.** This unique legal status is of long standing, and its sources are diverse. **<u>As long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians, such legislative judgments will not be disturbed.</u>**

Mancari, 417 U.S. at 551-555.

As demonstrated below, Native Hawaiians fall within the Mancari doctrine enunciated above, and thus the challenged law must be upheld (even if the law is seen as creating more than a mere classification, contrary to Section I) as long as it can be "tied rationally to the fulfillment of Congress' unique obligation toward" Native Hawaiians.

A. The *Mancari* doctrine should apply to Native Hawaiians.

Mancari rests principally upon the "unique legal status of Indian tribes under federal law and upon the plenary power of Congress, based on a history of treaties and the assumption of a 'guardian-ward' status," to "single[] Indians out ... for special legislation." 417 U.S. at 551. Programs for Native Hawaiians fit this rationale very well.

1. Like Indian tribes, Native Hawaiians, too, have a "unique legal status ... under federal law."

It is clear that Native Hawaiians, like Indians, have a "unique legal status ... under federal law." As with Indians, Congress has frequently singled out Native Hawaiians for unique treatment. "Among the many and varied laws passed by Congress in carrying out its duty to indigenous peoples, more than 150 today expressly include Native Hawaiians as part of the class of Native Americans benefited." Rice, 528 U.S. at 533 (Stevens, J., dissenting). Congress has sometimes singled out Native Hawaiians for unique treatment not given to other Native Americans,[6] while at other times it has given Native Hawaiians separate treatment along with other Native Americans.[7] Either way, Native Hawaiians, like American Indians, plainly have a unique federal legal status. See 20 U.S.C. §7512(12)(B) ("Congress does not extend services to Native Hawaiians because of their race, but because of their **unique status** as the indigenous people of a once

---

[6] See, e.g., Hawaiian Homes Commission Act (**HHCA**), 42 Stat. 108 (1921) (creating homestead program for native Hawaiians); Admission Act §4 (requiring Hawaii to adopt the Hawaiian Homes Commission Act); Admission Act §5(f) (creating a ceded land trust for, among other things, "the betterment of the conditions of native Hawaiians").

[7] See, e.g., Native Americans Programs Act of 1974 (See 42 U.S.C. §2991 et seq.); Native American Graves Protection and Repatriation Act (25 U.S.C. §3001 et seq.).

sovereign nation as to whom the United States has established a trust relationship").

Moreover, Congress has expressly stated, **"the political status of Native Hawaiians is comparable to that of American Indians**." Hawaiian Homelands Homeownership Act of 2000 ("**HHHA 2000**"), Pub. L. No. 106-568, Title II, Section 202(13)(D); <u>see also</u> 20 U.S.C. §7512(12)(D) (2002) ("**the political status of Native Hawaiians is comparable to that of American Indians and Alaska Natives**").[8]

Finally, like the "special relationship" the United States has with Indians, <u>Mancari</u>, 417 U.S. at 552, the United States continues to have a "special relationship" with, and trust responsibility to, Native Hawaiians. <u>See, e.g.</u>, 20 U.S.C. §7902(13) ("**special relationship** ... exists between United States and the Native Hawaiian people"); 42 U.S.C. §11701(13) (the HHCA "affirm[s] the **trust relationship** between the United States and the Native Hawaiians").

---

[8] That the federal government's relationship with Native Hawaiians is <u>not</u> **precisely identical** to its relationships with Native American tribes does <u>not</u> mean Congress has not exercised its Indian affairs powers with respect to Native Hawaiians. Congress need not deal with all of the United States' indigenous peoples in precisely the same way. As <u>Sandoval</u> makes clear, infra at 28, "the question whether, [and] **to what extent** . . . [Indians] shall be recognized and dealt with as dependent tribes ... **are to be determined by Congress, and not by the courts**. 231 U.S. at 46.

Indeed, Congress has dealt with Alaska Natives in a different manner, too. <u>See</u> footnote 12, infra. There is no question, however, that Congress has recognized and effected a unique legal status for Native Hawaiians.

In sum, Congress has clearly accorded Native Hawaiians a unique legal status, comparable to that of American Indians.

### 2. Congress has the same **authority** to treat Native Hawaiians uniquely.

The only question remaining is whether Congress had the constitutional **authority** to recognize and effect Native Hawaiians' special status (as it has for other Native Americans).

As explained in <u>Mancari</u>, Congress' "plenary" power to deal specially with native peoples is rooted in "the assumption of a 'guardian-ward' status," and Congress' authority "to single[] Indians out ... for separate legislation," which comes primarily from the Indian Commerce Clause (art. I, §8, cl. 3). <u>Mancari</u>, 417 U.S. at 551-52.

First, the "assumption of a guardian-ward status" between the United States and Native Hawaiians is clear. That status is reflected in the scores of congressional laws providing separate treatment to Native Hawaiians noted earlier. In fact, Congress enacted the HHCA homestead program with the understanding that "the natives of the islands" were the United States' **"wards."** <u>See</u> H.R. Rep. No. 839, 66th Cong., 2d Sess. 4 (1920). <u>See also</u> 42 U.S.C. §11701(13) (Congress cites Interior Secretary Lane calling the "natives of the islands" our **"wards"**); 20 U.S.C. §7512(8) (Congress explains "special relationship" with Native Hawaiians by citing Lane's **"ward"** description).

Second, Mancari itself rests Congress's power to deal specially with Indians

upon the historical rationale that:

> the United States overcame the Indians and took possession of their lands,
> sometimes by force, leaving them [] dependent [] needing protection .... Of
> necessity the United States assumed the duty of furnishing that protection.

Mancari, 417 U.S. at 552. Native Hawaiians fit this rationale perfectly. The

United States participated in the forcible overthrow of the Hawaiian government,[9]

took possession of its lands,[10] and left Native Hawaiians at or near the bottom of

educational, health, financial, and other socioeconomic statistics.[11] Accordingly,

the United States, as reflected in congressional legislation providing assistance to

Native Hawaiians, "assumed the **duty** [and] **the authority** to do all that was

required" to "protect" and assist Native Hawaiians. Mancari, 417 U.S. at 552.

---

[9] See 20 U.S.C. §7512 ("Kingdom of Hawaii, was overthrown by a small group of
non-Hawaiians, including United States citizens, who were assisted ... by ...
armed naval forces of the United States."); see also Rice, 528 U.S. at 504-05 ("A
... Committee ... acting with United States Armed Forces, replaced the
monarchy").

[10] See, e.g., Apology Resolution, 107 Stat. at 1512-13 (acknowledging that
Hawaiians "never directly relinquished their claims to their inherent sovereignty as
a people or over their national lands," and that 1.8 million acres of land of the
Kingdom were taken "without" "consent" or "compensation"); Rice, 528 U.S. at
505 (United States annexes islands and takes control of former Crown,
government, and public lands).

[11] See, e.g., 20 U.S.C. §7512(16)(C) (education deficit); 42 U.S.C. §11701(22)
(poor health); 20 U.S.C. §7512(16)(G)(ii) & (iii) (drug/alcohol use, child abuse and
neglect); Pub.L. 106-569, Title V, §512, Dec. 27, 2000, 114 Stat. 2966 (low
income).

Third, "Congress possesses the broad power of legislating for the protection of the Indians **wherever they may be within the territory of the United States**," United States v. McGowan, 302 U.S. 535, 539 (1938), "whether within its original territory or **territory subsequently acquired**." United States v. Sandoval, 231 U.S. 28, 46 (1913).

Fourth, Native Hawaiians are "Indians" within the meaning of the above cases, and are "Indian tribes" within the meaning of the Indian Commerce Clause. They are "Indians" or "Indian tribes" first of all, because they fit the rationale for their inclusion within Congress's powers. As discussed above, they had their native lands and government stripped away by the United States, and were left in such a "dependent" condition as to give the United States the "authority," indeed the "duty," to provide them necessary protection and assistance. Mancari, supra.

Equally importantly, like American Indians, Native Hawaiians are "Indians" or "Indian tribes" because they are **indigenous aboriginal** peoples **native** to U.S. territory. See 20 U.S.C. §7902(1) ("Native Hawaiians are a distinct and unique indigenous people with a historical continuity to the original inhabitants of the Hawaiian archipelago"); 42 U.S.C. §11701(1) (same); Rice, 528 U.S. at 500 ("the first Hawaiian people … were Polynesians who voyaged from Tahiti and began to settle the islands around A.D. 750"). Moreover, the term "Indian," at the time of the founding (when the Indian Commerce Clause was enacted), referred to the

aboriginal "inhabitants of our Frontiers." Declaration of Independence paragraph 29 (1776); see also Thomas Jefferson, Notes on the State of Virginia 100 (William Peden ed. 1955) (1789) (referring to Indians as "aboriginal inhabitants of America"). Even today, "the word 'Indian' is commonly used in this country to mean 'the aborigines of America.'" Pence v. Kleppe, 529 F.2d 135, 139 n.5 (9th Cir. 1976).

The word "tribe" also should include Hawaiians, for at the time of the founding, "tribe" simply meant a "distinct body of people as divided by family or fortune, or any other characteristic." Thomas Sheridan, A Complete Dictionary of the English Language (2d ed. 1789). Congress has described Hawaiians as "a distinct and unique indigenous people." 42 U.S.C. §11701(1); 20 U.S.C. §7902(1). That "tribe" may mean something else today, in either legal or lay terms, is irrelevant to its meaning in 1789.[12]

It is clear, for example, that a tribal "government" of Native Hawaiians is not

---

[12] Indeed, although Alaska Natives are not organized into "tribes" in an anthropological sense, Hynes v. Grimes Packing Co., 337 U.S. 86, 110 n.32 (1949), the Supreme Court has never questioned Congress' authority to single out and deal with Alaska Natives as such. See, e.g., Alaska v. Native Village of Venetie, 522 U.S. 520, 523-24 (1998) (never questioning the validity of the Alaska Native Claims Settlement Act of 1971, which gave Alaska Natives 44,000,000 acres of land and almost $1,000,000,000, via newly created corporations whose shareholders were required to be Alaska Natives). Indeed, the Ninth Circuit has applied the Mancari doctrine to Alaska Natives even though they "have not historically been organized into reservations or into tribal units." Alaska Chapter v. Pierce, 694 F.2d 1162, 1168-70 & n.10 (9th Cir. 1982).

necessary to Congress's power to deal specially with Native Hawaiians. See, e.g., Chippewa Indians of Minnesota v. U.S., 307 U.S. 1, 4 (1939) (Even though "the tribe had been broken up into numerous bands," and "**[w]hether or not the tribal relation had [thus] been dissolved** prior to its adoption, the Act contemplates future dealings with the Indians **upon a tribal basis**. ... [I]t is plain that, in the interim [prior to full emancipation,] **Congress did not intend to surrender its guardianship over the Indians or treat them otherwise than as tribal Indians**"); United States v. John, 437 U.S. 634, 652-53 (1978) (Neither the "long lapse in the federal recognition of a tribal organization in Mississippi," "nor the fact that federal supervision over them has not been continuous, destroys the federal power to deal with them"); United States v. Lara, 541 U.S. 193, 203 (2004) (noting that Congress "has restored previously extinguished tribal status -- by re-recognizing a tribe whose tribal existence it previously had terminated").

Fifth, Congress itself believes that its constitutional authority over Indian affairs extends to Native Hawaiians. See 42 U.S.C. §11701(17) ("The authority of the Congress under the United States Constitution to legislate in matters affecting ... indigenous peoples ... includes the authority to legislate in matters affecting **the native peoples of ... Hawaii**"). Indeed, this Court has ruled that attempts to argue that the Mancari doctrine "does not apply to Native Hawaiians because they are not 'Indians'" is **"meritless."** Naliielua v. State of Hawaii, 795 F. Supp. 1009, 1012-13

(D. Haw. 1990).

Sixth, and most importantly, Congress' power to deal specially with Native peoples is **extremely broad**. Mancari itself describes Congress's Indian affairs powers as being "plenary." 417 U.S. at 551-52; see also South Dakota v. Yankton Sioux Tribe, 522 U.S. 329, 343 (1998) ("Congress possesses plenary power over Indian affairs"). **Indeed, "[n]o congressional or executive determination of tribal status has been overturned by the courts."** Felix Cohen, Cohen's Handbook of Federal Indian Law §3.02[4] (2012).

Most critically, the Supreme Court has ruled that Congress has the complete unfettered discretion to recognize and deal specially with any indigenous people:

> Of course, it is not meant by this that Congress may bring a community or body of people within the range of [its Indian affairs] power by **arbitrarily** calling them an Indian tribe, but only that **in respect of distinctly Indian communities the question whether, to what extent, and for what time they shall be recognized and dealt with as dependent tribes requiring the guardianship and protection of the United States are to be determined by Congress, and not by the courts.**

United States v. Sandoval, 231 U.S. 28, 46 (1913) (emphases added). Thus, provided that Native Hawaiians are "distinctly Indian" -- which they certainly are, as they are distinctly indigenous, as explained above[13] -- Congress's decision to

---

[13] Congress's authority over Indian affairs includes the power to treat Indians uniquely even though the subject Indians are "scattered over the State." McGowan, 302 U.S. at 537, 538-39; see also John, 437 U.S. at 652-53 (being "fully assimilated into the political and social life of the State" and being "merely a

treat or not treat Native Hawaiians uniquely, and to what extent, <u>is beyond court review, and wholly within Congress's discretion</u>. Given that Native Hawaiians are distinct indigenous people of the United States, and, like the Indians, had their lands and government taken by the United States leaving them in a "dependent" condition, it is certainly not "arbitrar[y]" for Congress to "recognize[] and deal[] with [them] as dependent tribes." <u>Sandoval</u>, supra.

**In sum, Congress's authority over Indian affairs easily extends to Native Hawaiians. Indeed, to rule otherwise would jeopardize over 100 congressional laws that provide separate treatment for Native Hawaiians.**

<u>Rice</u> did <u>not</u> reach the issue of whether Congress's Indian affairs powers apply to Native Hawaiians. <u>Rice</u> merely decided that in the very specific context of **Fifteenth** Amendment **voting** rights for electing **public** officials, the <u>Mancari</u> doctrine was inapplicable, and thus a state could not restrict **voting** rights in elections of its **public** officials to Native Hawaiians **or to tribal Indians**. 528 U.S. at 520 ("It does not follow from *Mancari*, however, that Congress may authorize a State to establish a **voting** scheme that limits the electorate for its **public** officials to a class of **tribal Indians**, to the exclusion of all non-Indian citizens."). **Rice made no distinction whatsoever between Native Hawaiians or tribal Indians,** saying it would "stay far off that difficult terrain." <u>Id.</u> at 518-19. Accordingly,

---

remnant of a larger group of Indians, long ago removed from [the state]," did <u>not</u> "destroy[] the federal power to deal with them").

nothing in Rice precludes the applicability of the Mancari doctrine to defend Native Hawaiian legislation against **Fourteenth** Amendment challenges which have nothing to do with voting rights for electing public officials or the Fifteenth Amendment. Rice merely decided that when it comes to the unique context of the **Fifteenth** Amendment and **voting** rights for electing **public** officials, the Mancari doctrine could not be used to save restrictions on who may vote for **public** officials.

### 3. Existing Caselaw confirms that the *Mancari* doctrine applies to Native Hawaiians.

Existing caselaw supports the above analysis by holding that Native Hawaiians fall within the Mancari doctrine.

This very Court, in Naliielua, 795 F. Supp. 1009 (1990), expressly ruled that Native Hawaiians are subject to the Mancari doctrine, and that Congress's authority over Indian affairs extends to Native Hawaiians. Id. at 1012-13 (calling contrary view "meritless," Court rejects strict scrutiny).

In addition, both the Hawaii District Court, and the Ninth Circuit, in the Rice litigation found the Mancari doctrine to be applicable to Native Hawaiians and to justify the Hawaiian-only OHA voting restriction as against the **Fourteenth** Amendment Equal Protection challenge. See Rice v. Cayetano, 963 F. Supp. 1547, 1550-55 (D. Haw. 1997) ("the court finds that [Mancari] is equally applicable to Native Hawaiians as to formally recognized Native Americans"), and 146 F.3d

1075, 1080-81, 1082 (9th Cir. 1998) ("the special treatment of Hawaiians and native Hawaiians ... is similar to the special treatment of Indians that the Supreme Court approved in [Mancari]").  Although both courts vacated their decisions *in toto* in light of the Supreme Court's ruling striking down the voting restriction because it held the Mancari doctrine to be inapplicable to **Fifteenth** Amendment public office voting rights challenges, both the District Court's and the Ninth Circuit's reasoning applying the Mancari doctrine to Native Hawaiians in the **Fourteenth** Amendment context was never repudiated by the Supreme Court in Rice.  The Supreme Court majority, after all, never had to reach that issue, instead concluding that the Mancari doctrine has no applicability to **Fifteenth** Amendment public office voting challenges.[14]  Accordingly, the District and Ninth Circuit court Rice decisions provide guidance and persuasive reasoning supporting Mancari's applicability to Native Hawaiians in the **Fourteenth** Amendment context. See supra at 29-30 (explaining the narrow scope of the Supreme Court's Rice decision, and how it declined to distinguish Native Hawaiians from tribal Indians).

Finally, the Hawaii Supreme Court also supports application of the Mancari doctrine to Native Hawaiians because "we are dealing with relationships between the government and aboriginal people[;] [r]eason ... dictates that we draw the analogy between native Hawaiian homesteaders and other native Americans."

---

[14] See supra at 29-30.

31

Ahuna v. Dep't of Hawaiian Homelands, 64 Haw. 327, 339 (1982).

In sum, all cases directly on point affirmatively hold that the Mancari

doctrine applies to Native Hawaiians.

> B. There is strong **federal** footing for Hawai'i's Act 195, supporting
> reorganization of a Native Hawaiian governing entity.

Although Act 195 is a **state**, not a federal, law, as long as the state law was

"enacted in response to a **federal** measure," the state law is subject to the Mancari

doctrine.

> It is settled that "the unique legal status of Indian tribes under federal law"
> permits the Federal Government to enact legislation singling out tribal
> Indians, legislation that might otherwise be constitutionally offensive.
> *Morton*[], 417 U.S. 535, 551–552. States do not enjoy this same unique
> relationship with Indians, **but Chapter 36 is not simply another state law.**
> **It was enacted in response to a federal measure** .... The jurisdiction
> permitted under Chapter 36 is ... **within the scope of the authorization** of
> Pub.L. 280. ... **For these reasons, we find the argument that such**
> **classifications are "suspect" an untenable one.**

Washington v. Confederated Bands & Tribes of Yakima Indian Nation, 439 U.S.

463, 500-01 (1979). Thus, Yakima makes clear that even **state** legislation singling

out Indians for special treatment is subject to deferential Mancari review, **if the**

**state legislation is "enacted in response to a federal measure," and/or "within**

**the scope of the authorization of" a federal law.**

Act 195 is in response to, and authorized by, numerous federal measures.

First, Section 5(f) of the Admission Act authorizes, indeed requires, **the State** to

hold certain public ceded lands (over a million acres), and their proceeds, in trust

for five purposes including "for the **betterment of the conditions of native Hawaiians**." Facilitating a return of some measure of self-determination to Native Hawaiians surely falls within such a broad mandate to "better[] ... the conditions of native Hawaiians." Indeed, the Department of Interior, authorized by Congress to deal with Indian affairs, see 25 U.S.C. §§2 & 9, 43 U.S.C. §1457, has stated that "[s]trong tribal governments [are critical to] prosperous and resilient Native American communities," and that "government-to-government relationships ... have been enormously beneficial ... to Native Americans." See Federal Register, Vol. 79 No. 119 at 35298 (2014). Moreover, "[r]establishing a government-to-government relationship with a reorganized sovereign Native Hawaiian government ... facilitat[es] the preservation of their language, customs, heritage, health, and welfare." Id. at 35299.

Other congressional measures, too, provide sufficient federal "authorization" for the State to enact Act 195, facilitating self-determination. The Hawaiian Homelands Homeownership Act (**HHHA**), Section 512(13)(C), states that "Congress has ... **delegated broad** authority to administer **a portion of the Federal trust responsibility to the State of Hawaiʻi**." Subsection (E)(ii) states that "the aboriginal, indigenous people of the United States have ... an **ongoing right of self-determination and self-governance** that has never been extinguished." Together, the two provisions express **federal** congressional

**authorization** to the **State of Hawai'i** to promote the **self-determination and self-governance** of the indigenous Native Hawaiian people. Act 195 does exactly that.

Third, the Apology Resolution, too, expressly authorizes the **State of Hawai'i** to enact laws like Act 195. Acknowledging "the suppression of the inherent **sovereignty** of the Native Hawaiian people, the Resolution states that "it is proper ... for the Congress ... to support the reconciliation efforts of the **State of Hawai'i** ... with the Native Hawaiians." Preamble, last paragraph. Similarly, the Resolution "commends efforts of reconciliation initiated by the **State of Hawai'i** ... with Native Hawaiians," while "apologiz[ing] to Native Hawaiians ... for ... the deprivation of the rights of Native Hawaiians to **self-determination**." Section 1(3). These provisions clearly authorize the **State of Hawai'i** to engage in reconciliation efforts aimed at restoring some measure of **self-determination**. Act 195 is just such a reconciliation effort.

Congress has made very clear that "the political status of Native Hawaiians is comparable to that of American Indians and Alaska Natives." HHHA Section 512(13)(D). Indeed, pursuant to its Indian affairs authority, and as noted earlier, Congress has passed **over a hundred laws** singling out Native Hawaiians for separate treatment. See Federal Register, Vol. 79, No. 119 at 35298 ("Congress has

enacted more than 150 statutes recognizing and implementing a special political and trust relationship with the Native Hawaiian community.")

Finally, the Department of Interior has expressly stated that one option for formal federal recognition of Native Hawaiians is "[r]establishing a government-to-government relationship with a Native Hawaiian government reorganized through a process established by the Native Hawaiian community **and facilitated by the State of Hawai'i**," id. at 35300, and expressly provided, as an example, "the State of Hawai'i's **Act 195**, ... legislation designed to facilitate the reorganization of a Native Hawaiian government," id. at 35301.

In conclusion, there is ample **federal** authorization of Act 195 to easily satisfy Yakima. Consequently, the Mancari doctrine is fully applicable to Act 195.

C. Act 195's Hawaiian ancestry requirement easily satisfies the *Mancari* doctrine's "tied rationally" test.

Because the Mancari doctrine is applicable to Act 195, the deferential Mancari standard applies. That standard looks to whether the **"special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward"** Native Hawaiians. Mancari, 417 U.S. at 555.

Congress has clearly recognized its "unique obligation" toward native Hawaiians by acknowledging on numerous occasions the United States "special relationship" with, and trust responsibility to, Native Hawaiians. See, e.g., 20 U.S.C. §7902(13) ("**special relationship** ... exists between United States and the

Native Hawaiian people"); HHHA 2000 Section 202(13)(B) (Hawaiians have a "unique status as [a] people ... to whom the United States has established a **trust relationship**"). And as demonstrated by the federal provisions set forth supra at 32-35, a major part of the United States' trust relationship involves supporting efforts to restore some measure of **self-governance** to Native Hawaiians.

Thus, the operative <u>Mancari</u> test is whether the **Hawaiian ancestry** requirement is **"tied rationally"** to fulfilling the United States' "unique obligation" to support restoration of some measure of self-governance for Native Hawaiians. Because that requirement almost by definition furthers Native Hawaiians ultimately obtaining some degree of **self-governance**, it easily passes that test. Moreover, the Ninth Circuit, in <u>Williams v. Babbitt</u>, 115 F.3d 657 (9th Cir. 1997), expressly stated that "[l]egislation that relates to Indian land, tribal status, **self-government** or culture passes *Mancari*'s rational relationship test." <u>Id.</u> at 664.

In conclusion, Act 195's Native Hawaiian qualifications are subject to the <u>Mancari</u> doctrine, and easily satisfy the "tied rationally" operative test set forth in <u>Mancari</u>. Accordingly, even if **Act 195** or **State actors** had set forth Hawaiian ancestry requirements for **elections** participation (contrary to our argument in Section I), such actions would <u>not</u> violate the Equal Protection Clause of the 14th Amendment.

## IV.  The Balance of Harms and the Public Interest also require denial of the injunction.

The State and NHRC would be severely harmed by an injunction because Act 195 reflects the State's interest in "facilitat[ing] [Native Hawaiian] self-governance." §10H-2.  That State interest, and NHRC's roll in furthering that interest, would obviously be harmed by an injunction stopping the elections.  And that harm would be irreparable, because even if the injunction were later overturned, the loss of self-governance **in the interval** (which may last years) would be irreparable. Prairie Band of Potawatomi Indians v. Pierce, 253 F.3d 1234, 1250-51 (10th Cir. 2001) ("prospect of significant interference with [tribal] self-government" is "irreparable injury").

Furthermore, an injunction requiring **non**-Hawaiians to be allowed to participate in the organizing process would blatantly undermine the essence of Native Hawaiian self-governance.  Either way, State policy supporting Native Hawaiian self-governance would be irreparably harmed.[15]

The **public interest**, reflected in these state laws, would similarly be harmed. See also Prairie Band, 253 F.3d at 1253 ("tribal self-government" is "matter of public interest").  Importantly, Native Hawaiians, who make up a large

---

[15] State policy also supports improving the welfare of Native Hawaiians generally. See, e.g., HRS Chap. 10, creating OHA in part to provide for the "betterment of conditions of Hawaiians," §10-3(2).  An injunction would undermine this broader state policy of improving the welfare of Native Hawaiians generally.

segment of the public, would be harmed by their loss of self-governance as well. Co-Defendants' oppositions further elaborate on the public interest, defendants' harms, and the minimal harm, if any, **to plaintiffs** from denying an injunction.

## CONCLUSION

For the reasons provided above and in co-defendants' oppositions, Plaintiffs' preliminary injunction motion should be denied.

DATED: Honolulu, Hawaiʻi, September 30, 2015.

DOUGLAS S. CHIN
Attorney General of Hawaiʻi

 /s/ Girard D. Lau
GIRARD D. LAU
DONNA H. KALAMA
ROBERT T. NAKATSUJI
Deputy Attorneys General
Attorneys for State Defendants

## CERTIFICATE OF COMPLIANCE WITH WORD COUNT LIMITATION

I certify, pursuant to Local Rule 7.5(e), that the above memorandum uses Times New Roman, font size 14, and complies with the word count limitation of Local Rule 7.5(b) (allowing supporting or opposing memoranda to not exceed 9,000 words) because the memorandum contains 8,998 words, as determined by the word processing system.

DATED:  Honolulu, Hawaii, September 30, 2015.

 /s/ Girard D. Lau
GIRARD D. LAU
DONNA H. KALAMA
ROBERT T. NAKATSUJI
Deputy Attorneys General
Attorneys for State Defendants