```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF HAWAII

 3
     KELI'I AKINA, KEALII          )  CIVIL NO. 15-00322JMS-BMK
 4   MAKEKAU, JOSEPH KENT,         )
     YOSHIMASA SEAN MITSUI,        )  Honolulu, Hawaii
 5   PEDRO KANA'E GAPERO, and      )  October 20, 2015
     MELISSA LEINA'ALA MONIZ,      )  9:33 a.m.
 6                                 )
                  Plaintiffs,      )  [47] PLAINTIFFS' MOTION FOR
 7                                 )  PRELIMINARY INJUNCTION
            vs.                    )
 8                                 )
     THE STATE OF HAWAII;          )
 9   GOVERNOR DAVID Y. IGE, in     )
     his official capacity;        )
10   ROBERT K. LINDSEY, JR.,       )
     Chairperson, Board of         )
11   Trustees, Office of           )
     Hawaiian Affairs, in his      )
12   official capacity; COLETTE    )
     Y. MACHADO, PETER APO,        )
13   HAUNANI APOLIONA, ROWENA      )
     M.N. AKANA, JOHN D.           )
14   WAIHE'E, IV, CARMEN HULU      )
     LINDSEY, DAN AHUNA,           )
15   LEINA'ALA AHU ISA,            )
     Trustees, Office of           )
16   Hawaiian Affairs, in their    )
     official capacities;          )
17   KAMANA'OPONO CRABBE, Chief    )
     Executive Officer, Office     )
18   of Hawaiian Affairs, in his   )
     official capacity; JOHN D.    )
19   WAIHE'E, III, Chairman,       )
     Native Hawaiian Roll          )
20   Commission, in his official   )
     capacity; NA'ALEHU ANTHONY,   )
21   LEI KIHOI, ROBIN DANNER,      )
     MAHEALANI WENDT,              )
22   Commissioners, Native         )
     Hawaiian Roll Commission,     )
23   in their official             )
     capacities; CLYDE W.          )
24   NAMU'O, Executive Director,   )
     Native Hawaiian Roll          )
25   Commission, in his official   )
     capacity; THE AKAMAI          )
```

```
1    FOUNDATION; and THE NA'I      )
     AUPUNI FOUNDATION; and DOE    )
2    DEFENDANTS 1-50,              )
                                   )
3              Defendants.         )
     _____     )
4

5                    TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE J. MICHAEL SEABRIGHT,
6                  UNITED STATES DISTRICT JUDGE

7    APPEARANCES:

8    For the Plaintiffs:       MICHAEL A. LILLY, ESQ.
                               Ning Lilly & Jones
9                              707 Richards Street, Suite 700
                               Honolulu, Hawaii  96813
10

11                             ROBERT D. POPPER, ESQ.
                               Judicial Watch, Inc.
12                             425 Third Street, SW
                               Washington, DC  20024
13

14                             H. CHRISTOPHER COATES, ESQ.
                               Law Office of H. Christopher Coates
15                             934 Compass Point
                               Charleston, South Carolina  29412
16

17   For Defendants Na'i       WILLIAM MEHEULA, ESQ.
     Aupuni and The Akamai     Sullivan Meheula Lee
18   Foundation:               745 Fort Street, Suite 800
                               Honolulu, Hawai'i  96813
19

20   For Defendant Na'i        DAVID J. MINKIN, ESQ.
     Aupuni:                   McCorriston Miller Mukai MacKinnon
21                             Five Waterfront Plaza, 4th Floor
                               500 Ala Moana Boulevard
22                             Honolulu, Hawai'i 96813

23
     For Defendant Office      ROBERT G. KLEIN, ESQ.
24   of Hawaiian Affairs:      McCorriston Miller Mukai MacKinnon
                               Five Waterfront Plaza, 4th Floor
25                             500 Ala Moana Boulevard
                               Honolulu, Hawai'i  96813
```

```
 1    APPEARANCES (Cont'd.):

 2    For Defendant Office        KANNON SHANMUGAM, ESQ.
      of Hawaiian Affairs:        ELLEN E. OBERWETTER, ESQ.
 3                                Williams & Connolly LLP
                                  725 Twelfth Street, N.W.
 4                                Washington, D.C.  20005

 5

 6    For the State              DONNA H. KALAMA, ESQ.
      Defendants:                ROBERT NAKATSUJI, ESQ.
 7                               Deputy Attorneys General
                                 Department of the Attorney
 8                               General, State of Hawai'i
                                 425 Queen Street
 9                               Honolulu, Hawai'i  96813

10

11    Also Present, for         WALTER R. SCHOETTLE, ESQ.
      Proposed Intervenor-      Walter R. Schoettle, a Law Corp.
12    Defendants Samuel L.      1088 Bishop Street, Suite 1304
      Kealoha, Jr., Virgil      P.O. Box 596
13    E. Day, Josiah L.         Honolulu, Hawaii  96809-0596
      Hoohuli, Patrick L.
14    Kahawaiolaa and Melvin
      Hoomanawanui:

15

16

17

18

19

20    Official Court           Cynthia Fazio, RMR, CRR
      Reporter:                United States District Court
21                             P.O. Box 50131
                               Honolulu, Hawaii  96850
22

23

24
      Proceedings recorded by machine shorthand, transcript produced
25    with computer-aided transcription (CAT).
```

1                                I N D E X

2

3    EXAMINATIONS                                              PAGE

4    CLYDE NAMU'O.......................................
        CROSS-EXAMINATION BY MR. COATES...................   8
5
     KAMANA'OPONO CRABBE................................
6       CROSS-EXAMINATION BY MR. COATES...................  20

7    JAMES KUHIO ASAM..................................
        CROSS-EXAMINATION BY MR. COATES...................  31

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    TUESDAY, OCTOBER 20, 2015                        9:33 A.M.

2            THE CLERK:  Civil Number 15-322JMS-BMK, Keli'i Akina,

3    et al., versus The State of Hawaii, et al.

4            This case has been called for a hearing on a Motion

5    for Preliminary Injunction.

6            Counsel, please make your appearances for the record.

7            MR. POPPER:  Robert Popper for plaintiffs.

8            MR. COATES:  Christopher Coates for plaintiffs.

9            MR. LILLY:  Good morning, Your Honor.  Michael Lilly

10   for plaintiffs.

11           THE COURT:  Yes, good morning to all three of you.

12           MR. POPPER:  Good morning.

13           MR. MEHEULA:  Good morning, Your Honor.  Bill Meheula

14   and David Minkin for Na'i Aupuni.

15           THE COURT:  Yes.

16           MR. MEHEULA:  I'm also here for The Akamai Foundation.

17           THE COURT:  Okay.

18           MR. KLEIN:  Good morning, Your Honor.  Robert Klein

19   and Kannon Shanmugam representing the Office of Hawaiian

20   Affairs.

21           THE COURT:  All right.

22           MS. KALAMA:  Good morning, Your Honor.  Deputy

23   Attorneys General Donna Kalama and Robert Nakatsuji for the

24   State defendants.

25           THE COURT:  All right.

1          MR. SCHOETTLE:  Good morning, Your Honor.  Walter

2    Schoettle for proposed intervenor Samuel Kealoha, et al.

3          THE COURT:  All right.  Thank you.

4          MS. OBERWETTER:  Good morning, Your Honor.  Ellen

5    Oberwetter also for the Office of Hawaiian Affairs.

6          THE COURT:  Okay.  Thank you.

7          All right.  You may be seated.  And good morning to

8    everyone.  And welcome to federal court, those of you that have

9    joined us here today.

10          All right.  So we did meet yesterday and had some

11    discussion about the plaintiffs' request to call some

12    witnesses.  I did grant the Motion to Quash as to one, but

13    denied it as to three.  I understand from my clerk that you

14    have some notebooks here for each of these witnesses, it

15    appears; is that right?

16          MR. POPPER:  Yes, Your Honor.

17          THE COURT:  All right.

18          MR. MINKIN:  And, Your Honor, for the record, it's the

19    original declaration from September 30th with all exhibits

20    attached to that declaration.

21          THE COURT:  All right.  So it's the same as what's

22    really in the materials I've already received, but just in an

23    organized fashion.

24          MR. MINKIN:  Yes, sir.

25          THE COURT:  All right.  Thank you.  I appreciate

1    whoever put those together for me.  All right.  They're

2    pointing over to you, Mr. Minkin.  So thank you.

3            All right.  So you can call your first witness then.

4            MR. COATES:  Thank you, Your Honor.  The plaintiffs

5    call Mr. Clyde Namu'o.

6            THE COURT:  Now, is the rule against witnesses

7    invoked, that is are the other two witnesses outside the

8    courtroom?

9            MR. MEHEULA:  Your Honor, Mr. Asam is --

10           THE COURT:  You're just going to have to just be

11   really careful to speak into the microphone, Mr. Meheula.

12           MR. MEHEULA:  Okay.  Your Honor, Dr. Asam is the

13   representative of Na'i Aupuni.

14           THE COURT:  Okay.  All right.

15           MR. MEHEULA:  So I believe he can stay here.

16           THE COURT:  Yes.

17           MR. KLEIN:  Similarly, Your Honor, Dr. Kamana'o Crabbe

18   is a named defendant, a party in the case.

19           THE COURT:  All right.

20           MR. COATES:  We have no rule of sequestration motion

21   to make, Your Honor.

22           THE COURT:  Okay.

23           MR. COATES:  I'm sorry.  We have no rule of

24   sequestration, no motion to invoke the rule.

25           THE COURT:  All right.  So you're fine with them

```
 1   staying in the courtroom.

 2              MR. COATES:  Yes, sir, we are.

 3              THE COURT:  In plain English.  Thank you.  All right.

 4                CLYDE NAMU'O, DEFENDANT'S WITNESS, SWORN

 5              THE CLERK:  Please state your name, and spell your

 6   first and last name for the record.

 7              THE WITNESS:  Sure.  Clyde Namu'o.  C-L-Y-D-E,

 8   N-A-M-U-O.

 9                         CROSS-EXAMINATION

10   BY MR. COATES:

11   Q    Good morning, sir.

12   A    Good morning.

13   Q    I'm Chris Coates and I'm one of the attorneys representing

14   the plaintiffs in this case and I'd like to ask you some

15   questions this morning.

16   A    Sure.

17   Q    It's nice to meet you.

18   A    Same here.

19   Q    During what period of time have you served as the

20   executive director for the Roll Commission?

21   A    Since January of 2012.

22   Q    Okay.  And was there an executive director before you?

23   A    No, there was not.

24   Q    Okay.  So, it would be correct to say that you've been the

25   executive director since the formation of the Roll Commission
```

1    in 2012.

2    A    That is correct.

3    Q    Do you have access, I think you have access to the

4    declaration that you have filed in this case?

5    A    I don't have it in front of me.

6    Q    Okay.

7              THE COURT:  I think you do.  You just don't know it.

8              THE WITNESS:  Oh, okay.  Well, I saw it there.

9              THE COURT:  Okay.  Well, we'll get it if it's not --

10   it's not right out.  Okay.

11             THE WITNESS:  I do have access to it.

12             THE COURT:  All right.  It should be in that binder

13   right there.

14             THE WITNESS:  Thank you.

15   BY MR. COATES:

16   Q    Would you turn to your declaration, sir?

17   A    Yes.

18   Q    And let me ask you to turn specifically to Paragraph 23 --

19   A    Okay.

20   Q    -- of your declaration at Pages 9 and 10.

21   A    Yes.

22   Q    I want to ask you a couple of questions about that, but

23   I'd like to give you an opportunity to refresh your

24   recollection concerning that paragraph in the declaration if

25   you so desire.  So just let me know when you're ready to go.

1   A     Sure.  I'm ready.

2   Q     Okay.  At Paragraph 23 in your declaration, you tell about

3   checking with your staff to see how many people had wanted to

4   register for the Roll but refused to attest to Declaration

5   Number 1?

6   A     That's correct.

7   Q     And your staff reported back to you that there was one

8   person they could recall who wanted to register but did not

9   attest; is that correct?

10   A     Are you referring to the issue of unrelinquished

11   sovereignty?  I just want to be correct.

12   Q     Yes.

13   A     That's correct.

14   Q     Okay.  In Paragraph 23 is it correct to say, sir, that you

15   are reciting what your staff told you and not what you know of

16   your own personal knowledge?

17   A     I confirmed all the information with my staff, but I did

18   not review the actual document.  That is correct.

19   Q     Okay.  And it would be correct to say that in reporting

20   this information in your declaration, that you did not know of

21   all personal experiences that your staff had had regarding

22   persons who may not have been willing to attest to Declaration

23   One?

24   A     It is our practice that when these incidents occur, if

25   there is a particular individual who has raised a question

1    about the registration, the staff will report that to me.  So

2    whether they have reported every single incident or not, I'm

3    not absolutely certain.  But I am certain that in the majority

4    of cases where these instances may have occurred, it was

5    reported to me.

6    Q     Okay.  But there is a possibility that instances of that

7    kind occurred and were not reported to you, correct?

8    A     That is possible.

9    Q     Second, you checked with your current staff as you -- in

10   your declaration at Paragraph 23, you said you checked with

11   your current staff.  Does that mean that there were people who

12   worked on your staff between 2012 at the time of the inception

13   of the Roll until the present who you did not check with

14   because they had left their employment?

15   A     There are two staff individuals that have been with the

16   commission since its inception and they remain with the

17   commission today.  The office manager and the volunteer

18   coordinator.  So, if I'm going to check with a staff member,

19   it's really one of those two individuals.

20          So, to the issue of whether there are perhaps

21   part-time employees who are no longer with the commission, I

22   would not have checked with the part-time employees, I would

23   have checked with either the office manager or with the

24   volunteer coordinator.  And those people have been staff

25   members of the commission since January of 2012.

1   Q     Specifically or approximately how many part-time employee
2   staff members did you have?
3   A     At one point in time we had a total of four full-time
4   employees and two part-time employees.
5   Q     Okay.  And during the entire period of time how many
6   different part-time staff would you have had?
7   A     Probably four.
8   Q     Four.  Okay.  And you did not check with them about
9   whether or not they had had occasions to talk with people who
10  did not want to attest to the unrelinquished sovereignty of the
11  Native Hawaiian people declaration?
12  A     The protocol was that the part-time employees needed to
13  notify one of the full-time staff members if there was a
14  question raised by an individual regarding the registration
15  form.
16  Q     But you did not check with the part-time employees
17  personally?
18  A     I did not.
19  Q     Okay.  Is it true that if a person attempted to register
20  on the Roll, register for the Roll online since 2012, saw the
21  declaration, they had to attest to on the Roll's website,
22  decided that they could not attest to those declarations, and
23  then went no further in the registration process, that neither
24  you nor any of your staff members or part-time staff members
25  would have had a way of knowing that those people existed?

1    A    So are you suggesting that somebody tried to apply online

2    and when they came to that declaration, they did not complete

3    the rest of the registration form?

4    Q    Yes, sir.

5    A    Is that what you're suggesting?

6         We would be able to tell if they started the

7    registration form and did not complete it.  We would be able to

8    tell at what point they stopped completing the registration

9    form.  Our IT people could track that.  But that of course

10   would not be counted as an actual registration because they

11   didn't complete the entire form.

12   Q    Yes.  And you did not specifically check with your IT

13   people to see how many people fell into that category for

14   purposes of preparing your declaration in this case?

15   A    I did not.

16   Q    Okay.  Indeed, your website was set up in 2012 so that if

17   the registrant did not attest to the declaration, the program

18   would not allow the applicant to go forward with the

19   registration process, correct?

20   A    I believe that is correct.

21   Q    Okay.  And the way that that worked is that the

22   affirmed -- there was an "affirmed" button on the website of

23   the Roll Commission, correct?

24   A    That is correct.

25   Q    And if a person did not answer or attest to all three

1   declarations and hit that "affirmed" button, then there was no

2   way that that registrant could go forward with the online

3   registration, correct?

4   A    That is correct.

5   Q    So would you agree with me, sir, that the declaration's

6   requirement -- talking about Declaration One, Two and Three, on

7   your website, used for purposes of registering for the Roll --

8   could have deterred many Native Hawaiians who wanted to

9   register for the Roll?

10          MS. KALAMA:  Objection.  Calls for speculation.

11          THE COURT:  Overruled.

12          THE WITNESS:  I'm not sure that I would say that there

13   were many Hawaiians that did not complete the registration form

14   because of the issue of the affirmation.  I really couldn't say

15   for sure.

16          I think that people were -- Native Hawaiians were

17   familiar with the issue of unrelinquished sovereignty.  The

18   Akaka Bill had been around for at least 10 years by the time

19   the Roll Commission started its work.  The issue of

20   unrelinquished sovereignty has been -- has been included in

21   every version of the Akaka Bill since its inception.  So the

22   notion of unrelinquished sovereignty is not that foreign to

23   Native Hawaiians.

24   BY MR. COATES:

25   Q    Okay.  Well, but my question is not whether or not the

1    concept of Native Hawaiian sovereignty is foreign.  My question
2    is, as far as you personally know, and as far as you personally
3    knew in preparing your declaration in this case, isn't it true
4    that there could have been a number of Native Hawaiians who
5    attempted to register to be placed on the Roll, were not
6    willing to attest to the three declarations and therefore
7    stopped the registration process?
8             THE COURT:  I think the record is clear it's possible
9    and he doesn't know if it happened.
10            MR. COATES:  Okay.
11            THE COURT:  So move on.
12            MR. COATES:  Thank you, Your Honor.
13   BY MR. COATES:
14   Q    Would you look at Paragraph 23, please, sir, Page 10 of
15   your declaration.
16            THE COURT:  That's the same paragraph you had him look
17   at before.
18            MR. COATES:  Okay.
19            THE COURT:  So he's already looked at it.
20            MR. COATES:  I have another question for him.
21            THE COURT:  Ask it then.
22            MR. COATES:  Okay.
23   BY MR. COATES:
24   Q    You state there that on September the 11th, 2015, the Roll
25   Commission -- Commission voted to reconfirm the administrative

1   policy of staff.  You see that?

2   A     Mm-hmm.  I do see it.

3   Q     Okay.  Which allowed Native Hawaiians to register and to

4   be certified for the Roll without acknowledging the

5   unrelinquished sovereignty of the Hawaiian Nation as been

6   applied throughout.  Is that -- did I read correctly?

7   A     You did.

8   Q     Okay.  In that portion of the -- of the declaration,

9   you -- well, let me ask it another way.

10          When you use the term "administrative policy of staff

11   changed," what are you referring to there?

12   A     The policy of not denying any individual the opportunity

13   to register regardless of whether they agreed with the notion

14   of unrelinquished sovereignty was an administrative procedure

15   that had not been codified.  And so the purpose for the

16   September 11th action by the commission was to codify an action

17   that had been operating administratively since the inception of

18   the Commission.

19   Q     Okay.  And so between 2012 and 2015, your testimony is

20   that people were allowed to register with the Roll Commission

21   even if they did not affirm the unrelinquished sovereignty?

22   A     That is correct.

23   Q     But that was done by administrative policy and not by a

24   vote of the board of directors of the Roll Commission?

25   A     So that we're clear, the practice was acknowledged by the

1  commissioners.  So it is not as if the administration took it

2  upon themselves to just do this.  The Commission was aware that

3  the practice with the administration was to allow people to

4  register even if they refused to acknowledge the unrelinquished

5  sovereignty of the Native Hawaiian community -- the Hawaiian

6  Nation, excuse me.

7  Q    Was that policy written?

8  A    No, it was not.

9  Q    And it was not confirmed by the board of directors until

10  September the 11th, 2015?

11  A    They're called commissioners, sir.

12  Q    Commissioners.

13  A    Yes.

14  Q    Okay.  And during that entire period from your inception

15  of the board, of the Commission in 2012 until September the

16  11th, 2015, you on your website, the Roll Commission on its

17  website listed the three declarations that a registrant had to

18  attest to?

19  A    That is correct.

20  Q    Okay.  So if someone went to the Roll Commission website

21  and read what it said, then the information provided there

22  would have informed them that they had to attest to all three

23  declarations to continue with the registration process?

24  A    That is correct.

25  Q    Okay.  And that website is still unchanged today as we

1   stand here, is it not?

2   A    That is correct.

3   Q    If you went to the website, the three declarations will be

4   listed as of today?

5   A    That is correct.

6   Q    Okay.  And the action that was taken on September the

7   11th, 2015, by the Roll Commission, was taken approximately --

8   or let me ask you, do you know that it was taken approximately

9   1 month after the filing of this lawsuit?

10  A    That's correct.

11  Q    Okay.  In 2012 did you play a part in making the decision

12  to create a website posting that informed Native Hawaiians who

13  wished to register for the Roll that they had to affirm or

14  attest to the three declarations?

15  A    There's a little bit of background.  I'm not sure how much

16  you want me to go into it.

17  Q    Well, my question simply is, did you play a part in that?

18  A    The decision for including that -- that statement was made

19  by the Commission earlier than 2012, the Commission actually

20  was seated in October of 2011.

21  Q    Okay.

22  A    And that -- during that period the discussion of whether

23  to include the issue of unrelinquished sovereignty was

24  discussed by the Commission.

25          So, did I decide to put into the website all of those

1    policies that had been adopted by the Commission?  The answer

2    to that question is yes.

3    Q    Okay.  And when you say policies, you're talking about the

4    three declarations?

5    A    Any policy that was adopted by the Commission in September

6    of 2011 was included in the website.

7    Q    Okay.  And so after the -- after the Commission voted to

8    include those three policies or declarations, you put it on the

9    website?

10   A    That is correct.

11   Q    And the website has never changed?

12   A    There have been modifications and --

13   Q    But not as to the declarations?

14   A    I don't think the substance of it has changed.

15   Q    Okay.

16        MR. COATES:  Excuse me, Your Honor.

17        THE COURT:  Yes.  Yes.

18        MR. COATES:  No further questions, Your Honor.

19        THE COURT:  All right.

20        MS. KALAMA:  No redirect, Your Honor.

21        THE COURT:  All right.  Anybody?  No?

22        MR. MEHEULA:  No, Your Honor.

23        MR. KLEIN:  No, Your Honor.

24        THE COURT:  You may step down, sir.  Thank you.

25                                         (Witness excused)

```
 1              THE COURT:  Next witness?
 2              MR. COATES:  The plaintiffs, Your Honor, call
 3   Dr. Crabbe.
 4           KAMANA'OPONO CRABBE, DEFENDANT'S WITNESS, SWORN
 5              THE CLERK:  Please be seated.
 6              THE COURT:  Shelli, just make sure he has the binder.
 7              THE CLERK:  Please state your name, and spell your
 8   first and last name for the record.
 9              THE WITNESS:  Kamana'opono Crabbe,
10   K-A-M-A-N-A-O-P-O-N-O, Crabbe, C-R-A-B-B-E.
11              THE COURT:  All right.  You may proceed.
12              MR. COATES:  Thank you, Your Honor.
13                      CROSS-EXAMINATION
14   BY MR. COATES:
15   Q    Dr. Crabbe, I'm Chris Coates.  I'm one of the attorneys
16   who's representing the plaintiffs in this case.  Nice to meet
17   you.
18   A    Good morning.
19   Q    Dr. Crabbe, how long have you been the president of OHA?
20   A    My official title is Ka Pouhana, the chief executive
21   officer for the Office of Hawaiian Affairs.
22   Q    Okay.
23   A    I was officially inducted at that position in January and
24   officially took office in March, April 2013 -- 12.  '12.
25   Q    2015?
```

```
 1   A    2012.
 2   Q    2012.  Thank you, sir.
 3        Do you have your declaration in front of you?
 4   A    Yes, I do, sir.
 5   Q    I'm going to ask you a question about Paragraph 14.  So if
 6   you want to, I'm going to ask you about the e-mail that's
 7   mentioned in the last sentence in Paragraph 14.  If you'd like
 8   to review that.  Just let me know when you're ready.
 9        THE COURT:  Wait, last sentence of Paragraph 14?
10        MR. COATES:  Yes, sir.
11        THE COURT:  "The true and accurate copy of these
12   e-mails," that sentence?
13        MR. COATES:  I'm sorry.
14   BY MR. COATES:
15   Q    Next to the last.  The sentence that starts:  "This e-mail
16   was sent."
17   A    I have read it, sir.
18   Q    All right.  Thank you.
19        Is it -- you state there, sir, that in Paragraph 14
20   you state that you sent out an opt-out letter to Plaintiff
21   Montez?
22   A    Moniz.
23   Q    Moniz?  Okay.  You do not say anything about sending out
24   an opt-out letter to Plaintiff Gapero, correct?
25   A    That's correct.
```

1   Q    Okay.

2   A    However, if -- based on the procedures in reference to

3   this paragraph, it was standard operating procedures for our

4   organization to send out all e-mails to individuals who were

5   part of any of the three databases in OHA's possession at the

6   time.

7   Q    But you looked and you found the e-mail sent to plaintiff

8   Moniz but not to Plaintiff Gapero, correct?

9   A    That's correct.  I don't have any specific knowledge

10  regarding to Mr. Gapero.  However, it would be a fair

11  assumption that we took measures to send information to all who

12  were on the list for the option to opt out.

13  Q    And if you don't make an assumption that that occurred,

14  then you do not have any basis or personal information about an

15  e-mail of that kind going out to Plaintiff Gapero, correct?

16  A    I don't have any specific knowledge, but I am confident

17  that we took the appropriate measures to inform all those who

18  were on the three databases in OHA's possession.

19  Q    But you did find specific confirmation of an e-mail sent

20  to plaintiff Moniz, correct?

21          MR. KLEIN:  Objection, Your Honor.  Asked and

22  answered.

23          THE COURT:  Sustained.

24          MR. COATES:  I'll go on, Your Honor.

25  BY MR. COATES:

1    Q    At Paragraph 23 of your declaration, you state that the

2    socioeconomic status of Native Hawaiians is lower than any

3    other ethnic group residing in Hawaii, correct?  Paragraph 23.

4    A    That is correct, sir.

5    Q    Okay.  And you -- in making that claim, you cite in the

6    declaration to the areas of educational deficiencies, poor

7    health, drug and alcohol abuse, child abuse and low income by

8    Native Hawaiians, correct?

9    A    That's correct.

10   Q    And you state in the declaration at Paragraph 24 that to

11   organize a governing entity crafted by Native Hawaiians, for

12   Native Hawaiians, is important for the betterment of Native

13   Hawaiian people.

14   A    That is true.

15   Q    Okay.  When you spoke about the betterment there in your

16   declaration of Native Hawaiian people, were you referring at

17   least in part to the betterment in the socioeconomic areas such

18   as health, alcohol and drug abuse, education and low income,

19   that you had previously cited in your declaration?

20        THE COURT:  Do you understand the question,

21   Dr. Crabbe?

22        THE WITNESS:  No, I didn't.  Could you clarify?

23   BY MR. COATES:

24   Q    Yes, sir.  I'm sorry I did not ask it in a clear way.

25        When you speak in Paragraph 24 about the betterment of

1    -- betterment of Native Hawaiian people, when you use that

2    term, were you referring at least in part to their betterment

3    in the socioeconomic areas such as health, education, alcohol

4    and drug use, low income?

5    A    I believe I -- in my testimony here in the declaration,

6    the Office of Hawaiian Affairs has a fiduciary duty and

7    obligation to all Native Hawaiians.  We -- we referenced these

8    particular areas as part of the -- our mission to improve, but

9    it's not specifically referring to any specific social class,

10   health, illness population.  It really was for all Native

11   Hawaiians throughout the state of Hawaii.

12   Q    Okay.  And, well, and I understand it was for all Native

13   Hawaiians and I was not suggesting by my question that it was

14   not.  But I'm simply asking, when you use the term of in

15   betterment of Native Hawaiians, were you talking about

16   improvement in the areas of education and health?

17   A    That's correct.

18   Q    And the ones that you listed in the declaration?

19   A    That's correct.

20   Q    All right, sir.

21        Dr. Crabbe, to your knowledge is there -- or are there

22   any socioscience literature that you are aware of that has

23   reached the conclusion that the establishment of a separate

24   self government by a group will have a beneficial impact upon

25   that group's socioeconomic status?

1   A    Can you ask the question again?

2   Q    Yes, sir.  To your knowledge, you, as I understand it, are

3   a highly educated person?

4   A    Correct.

5   Q    You have an undergraduate degree from Yale?

6   A    From University of Hawaii.

7   Q    Okay.  And --

8   A    My doctorate is from the University of Hawaii.

9   Q    Hawaii.  Okay.  Okay.  I'm sorry, there was another person

10  from Yale.

11  A    That's okay.

12  Q    And I confused it.  But you have a Ph.D. from the

13  University of Hawaii?

14  A    Yes.

15  Q    Okay.  And my question is, when you came to the conclusion

16  that you articulated in your declaration that betterment in

17  socioeconomic areas would occur for the Native Hawaiian people

18  if they were allowed a separate self-governance, did you rely

19  upon any socioscience literature that showed that the granting

20  or providing of self government to a group of people

21  necessarily results in the betterment of their socioeconomic

22  status?

23           MR. KLEIN:  Objection, Your Honor.  I'm confused by

24  what counsel means by socio literature.  What qualifies as

25  socio literature?

```
 1            THE COURT:  Let me ask a question, see if you're
 2    comfortable with the question, okay?
 3            MR. COATES:  Yes, sir.
 4            THE COURT:  Paragraph 24, you state:  "It is important
 5    for the betterment of the Native Hawaiian people to organize a
 6    governing entity, crafted by Native Hawaiians, for Native
 7    Hawaiians," and you say "the structural change that
 8    self-governance will bring about is likely the best stimulus to
 9    reverse the persistent low socioeconomic conditions that have
10    plagued Native Hawaiians for decades."  On what do you base
11    that opinion?
12            Is that a fair -- what you were trying to get at?
13            MR. COATES:  Yes, sir, I may have to follow up.
14            THE COURT:  That is fine.  That's fine.  I think as a
15    starting point that's a fair question.
16            MR. COATES:  Thank you.  Yes.
17            THE COURT:  On what do you base that statement?
18            THE WITNESS:  There are a number of key studies,
19    particularly the 1985 E Ola Mau Task Force report which
20    reported on socioeconomic, health, cultural, nutrition, dental
21    and cultural.  That was the foundational documents that was
22    submitted to Congress that was part of the Native Hawaiian
23    Healthcare Act.
24    BY MR. COATES:
25    Q    Let me ask you a question about that one before you go on
```

1    to the next one, with the permission of the Court?

2           THE COURT:  All right.

3    BY MR. COATES:

4    Q    Okay.  In the 1985 study that you just testified about, do

5    you recall whether or not it specifically made the finding that

6    if self-governance is provided to a certain group of people,

7    that that will result in the betterment of that group

8    socioeconomically?

9    A    I believe the recommendations from that study based on

10   Native Hawaiian history that self-governance for Native

11   Hawaiians would certainly -- would be a necessary step that the

12   Native Hawaiian community would consider to improve health,

13   education, socioeconomic and cultural conditions.

14   Q    Okay.  So that study had a recommendation about what may

15   occur if self-governance is provided to Native Hawaiians,

16   but -- but let me ask you this:  Is it correct to say on the

17   basis of your recollection of the 1985 study, there was no

18   study that looked at people who had been granted

19   self-governance and sought to determine whether or not the

20   granting of the self-governance resulted in an improved

21   socioeconomic status for people who had gotten self-governance?

22   A    I'm not -- I'm not familiar with any specific study

23   relevant to Native Hawaiians, but I'm aware of other literature

24   and research by other first nations people or Native Americans

25   that does suggest that through their self-governance that they

1    have improved their well-being.

2    Q    Okay.  Well, let me ask you about the Native Americans

3    because those are -- and some of the tribes do have quasi

4    sovereign status.

5         Do you know of any socioscience literature or evidence

6    that the socioeconomic status of American Indian tribes in

7    areas -- socioeconomic areas that you mentioned, such as

8    health, education, drug or alcohol abuse, for example, has

9    improved since those particular American Indian tribes have

10   achieved quasi sovereign status?

11        MR. KLEIN:  Your Honor, with respect, that I believe

12   goes beyond the scope of Dr. Crabbe's declaration.

13        THE COURT:  Overruled.  You can answer.

14        THE WITNESS:  Can you repeat the question, please?

15   BY MR. COATES:

16   Q    Yes.  In reaching your conclusion that the socioeconomic

17   status of Native Hawaiians would improve by the granting of

18   self-governance, did you find or did you rely upon any

19   socioscience evidence that the socioeconomic Indian tribes'

20   education, unemployment, drug and alcohol abuse had improved

21   since the American tribe or tribes had achieved quasi sovereign

22   status?

23   A    I did not rely on literature or research regarding Native

24   Americans with respect to my declaration.

25   Q    All right, sir.  I -- Dr. Crabbe, to say if I could, I

1   appreciate and congratulate your hope that self-governance will

2   result in an improvement of your people.

3   A      Mm-hmm.

4   Q      But in terms of a socioscience basis for that, it is --

5   isn't it correct to say that that is your hope as opposed to

6   what you have found in the socioscience literature to

7   substantiate that causal relationship?

8   A      I would have to disagree.  That is not my personal

9   aspiration.  If you look at the Kamehameha Schools Native

10  Hawaiian Education Assessment Project, they had put out a model

11  called Cultural Loss and Disintegration and they make reference

12  to the political disempowerment of Native Hawaiians as a

13  contributing factor to a host of health and social illnesses.

14          That's also a very similar theory or line of thought

15  that the E Ola Mau TASK force took.  It's also indicated in the

16  Hui Imi report that was sponsored by the Office of Hawaiian

17  Affairs that was submitted to Congress.  And then lastly the

18  Mauka/Makai report which I indicate here at Paragraph 24 with

19  respect to a Native Hawaiian governing body organized against

20  the background of established precedent would serve as a

21  representative voice for the Native Hawaiian people.

22          So those are major documents within Native Hawaiian

23  literature, both politically and health, that make those

24  assertions.

25  Q      That make those assertions about what will happen in the

 1    future with Native Hawaiians if self-governance is granted, but

 2    you don't know of any studies that show that in the past where

 3    self-governance has been granted that the socioeconomic status

 4    of certain peoples have improved, correct?

 5    A    I -- yes, I believe I stated I did not use any of that

 6    literature.  But if your -- you're asking with respect to

 7    Native Hawaiians, I would speak with confidence that the

 8    studies that I have shared with you all have highlighted the

 9    importance of self-governance as a very key piece to improving

10    and elevating the health and well-being of Native Hawaiians.

11    Q    One final question.  But since self-governance has not

12    been granted --

13    A    Correct.

14    Q    -- to Native Hawaiians, we don't know as we sit here today

15    what the result is going to be on the socioeconomic status of

16    Native Hawaiians, correct?

17    A    We don't know.  I can't speculate.

18              MR. COATES:  Okay.  Thank you, sir.

19              Excuse me just a second.

20                   (Pause in the proceedings.)

21              MR. COATES:  No further questions, Your Honor.

22              THE COURT:  All right.  Any redirect?

23              MR. KLEIN:  No, Your Honor.  Thank you.

24              THE COURT:  Anyone followup?

25              MR. MEHEULA:  No, Your Honor.

1          MS. KALAMA:  No, Your Honor.

2          THE COURT:  Thank you, sir.  He was leaving the stand

3    anyways.

4          THE WITNESS:  Excuse me?

5          THE COURT:  No, you're fine.  You got up a little

6    prematurely, but that's okay.  That's all right.  That's okay.

7    I understand the desire to get off that witness stand.

8                                    (Witness excused)

9          THE COURT:  All right.  So the last witness then would

10   be James Asam.

11         MR. COATES:  Yes, sir.

12         THE COURT:  All right.

13         JAMES KUHIO ASAM, DEFENDANT'S WITNESS, SWORN

14         THE CLERK:  Please state your name, and spell your

15   first and last name for the record.

16         THE WITNESS:  My name is James Kuhio Asam.  First name

17   J-A-M-E-S, middle name Kuhio, K-U-H-I-O, and last name Asam,

18   A-S-A-M.

19                         CROSS-EXAMINATION

20   BY MR. COATES:

21   Q    Dr. Asam, I'm Chris Coates and I represent -- one of the

22   lawyers who represents the plaintiffs in this case.  Nice to

23   meet you.

24   A    Aloha and good morning.

25   Q    Thank you.  Are you the present president of Na'i Aupuni?

1    A    Yes, I am the president of Na'i Aupuni.

2    Q    Na'i Aupuni.

3    A    Na'i Aupuni.

4    Q    Okay.  I will --

5              THE COURT:  Okay.  You're a little too close.  All

6    right.  Get that sort of feedback.  Just about 6 or 8 inches

7    away is perfect.  That may be too far away, just so you know.

8    All right.

9    BY MR. COATES:

10   Q    Dr. Asam, how long have you served in that capacity?

11   A    I've served in that capacity since December of last year.

12   Q    Okay.  And December of 2014 was when your organization was

13   incorporated, correct?

14   A    That is correct, yes.

15   Q    Would -- I want to ask you about Exhibit 1, which is

16   attached to your declaration, which is Act 195.

17             THE COURT:  For the record, this copy is Act 195 as

18   initially enacted; is that right?  In other words, it's not as

19   amended but just as initially enacted.

20             MR. MEHEULA:  Correct, Your Honor.

21             THE COURT:  Okay.

22   BY MR. COATES:

23   Q    Have you had a chance to find that exhibit?

24   A    Yes, I have.

25   Q    Okay.  And were you familiar with the legislative process

1    that went on which resulted in the enactment of 2000 -- of Act

2    195 in 2011?

3    A    Partially, but not fully.

4    Q    Okay.  Were you aware -- or let me ask you to turn to,

5    it's Page 7 in that -- in that Act, bottom of Page 7 and

6    through the big C paragraph on Page 8.  So I'm asking you to

7    look at Section 3, Subparagraph paren 2.

8    A    Sir, if you would clarify for me.  The way it's

9    enumerated, there's a Page 5 which is equal to Page 6 of 14.

10   So if you could help me with that, please.

11          MR. COATES:  Okay.  May I approach the witness, Your

12   Honor?

13          THE COURT:  Yes, you may.

14   BY MR. COATES:

15   Q    I'm going to be asking you about this page here.

16   A    Page 7.

17   Q    Page 7.

18          THE COURT:  It's the page number in the upper left

19   corner.

20          MR. COATES:  Yes.

21          THE WITNESS:  That would be Page 8.  Page 7.

22   BY MR. COATES:

23   Q    7 and then over to Page 8.

24   A    Thank you, sir.

25   Q    Thank you.  And if at any time I -- there's confusion

```
 1    about the sections I'm using, the sections that you see and

 2    page numbers, be sure and let me know just like you did this

 3    time.

 4    A    Certainly.

 5    Q    Okay.  And were you aware that document -- or that Act 195

 6    gave a definition for what "qualified Native Hawaiian" meant?

 7    A    Yes, I have read that.

 8    Q    Okay.  And when did you first become aware of that fact?

 9    A    Gosh, I don't recall exactly when I read Act 195 fully.

10    Q    Would it have been before December of 2014?

11    A    Yes.

12    Q    Okay.  And on Page 8 of the Exhibit 1 to your declaration,

13    in Paragraphs capital A small numeral one and small numeral --

14    Roman numeral II, it provides definitions of who qualifies as

15    Native Hawaiians, does it not?

16    A    That is my understanding, yes.

17    Q    Okay.  And did you become aware of those two definitional

18    paragraphs prior to December of 2014?

19    A    Yes, sir.

20    Q    Okay.  And then Paragraph number capital B also adds the

21    requirement concerning the significant cultural, social and

22    civic connections to the Native Hawaiian community?  See that?

23    A    Yes, I do.

24    Q    And were you also aware that that was in Act 195 --

25    A    Yes, sir.
```

1   Q    -- before December of 2014?

2         Okay.  So prior to becoming the executive director --

3   it was executive director, right, of your organization?

4   A    I am the president of Na'i Aupuni.

5   Q    Okay.  President.  Okay.  Prior to becoming the president,

6   you were aware that Act 195 had ancestry requirements, correct?

7   A    That is correct, yes.

8   Q    Okay.  Would you turn to Paragraph 13 of your declaration.

9   At Paragraph 13 you say that one of the initial decisions that

10  the Na'i Aupuni directors made was that the voter for election

11  of delegates and the delegates should be limited to Native

12  Hawaiians; is that correct?

13  A    That is correct, yes.

14  Q    In a number of the paragraphs in your declaration, you

15  provide a date for when the action was taken that you're

16  describing in the paragraph, but in Paragraph 13 you do not

17  provide a date.  Do you -- do you know specifically when the

18  decision was made by Na'i Aupuni referred to in Paragraph 13 of

19  your declaration was made?

20  A    Would you mind breaking that down for me, please?

21  Q    Okay.

22         THE COURT:  That first sentence of Paragraph 13, you

23  say one of the initial decisions was that the eligibility for

24  voting of delegates should be limited to Native Hawaiians.

25  He's just asking when that decision was made.

```
 1              THE WITNESS:  There's no specific date.  It was an
 2     evolution process that the directors made after considerable
 3     discussion.
 4     BY MR. COATES:
 5     Q    Okay.  Could it have been as late as September of 2015?
 6     A    No.  It would be much before that.
 7     Q    Okay.  But you can't give us a specific date?
 8     A    That is correct.
 9     Q    Did you review the minutes, the written minutes of your
10     organization's board of directors prior to writing the
11     declaration that was filed in this case?
12     A    No, I did not.
13     Q    Okay.  Are there written minutes?
14     A    There are not.
15     Q    There are no written minutes.  Okay.
16              Where were you able to get the dates for specific
17     actions that you provided in your declaration?  For example,
18     Paragraph 12 where you say that Ms. Akina stepped down as a
19     director on April 7th, 2015?
20     A    That was in an e-mail that we received from Ms. Michelle
21     Nalei Akina.
22     Q    Okay.  And were there -- well, let me go on.
23              MR. COATES:  Give me just a second, Your Honor.
24              THE COURT:  Yes, of course.
25                   (Pause in the proceedings.)
```

1    BY MR. COATES:

2    Q    Did you specifically check with any members of your board

3    concerning the contents of the information that you provided in

4    Paragraph 13 of your declaration?

5    A    I did not specifically check with them in terms of the

6    declaration.  What had happened over a period of time was this

7    was a discussion that was -- had taken place.

8    Q    Okay.  In making its decision concerning how to carry out

9    its responsibilities concerning the election of delegates in

10   the November 2015 election, is it fair to say that the Na'i

11   Aupuni board of directors wanted to comply with provisions of

12   Hawaiian law that might be applicable?

13   A    No, that is not correct.

14   Q    It's not.  So, are you describing a situation where your

15   organization would not comply with any requirements that

16   applied to them under Hawaii law?

17            MR. MEHEULA:  Objection, Your Honor.  Potentially

18   invoking the attorney-client privilege.  May I instruct the

19   witness that to the extent it does, do not answer.  But if it

20   doesn't, feel free to answer.

21            THE COURT:  Do you understand that, sir?

22            THE WITNESS:  The question or the objection?

23            THE COURT:  Well, no, what Mr. Meheula said.  Are you

24   familiar with the attorney-client privilege?

25            THE WITNESS:  Yes, I am, sir.

1          THE COURT:  All right.  Go ahead.

2          THE WITNESS:  Would you mind repeating the question,

3     would be helpful.

4     BY MR. COATES:

5     Q    Yes.  Would -- in response to my last question you said

6     no, Na'i Aupuni would not have wanted to know what Hawaiian law

7     provided.  And I'm asking, is that the way that Na'i Aupuni

8     conducts its regular business, to be oblivious to whether or

9     not state law would require members of its organization to do

10    particular things?

11         MR. MEHEULA:  Objection.  Same instruction.  If you

12    can answer it without revealing attorney-client privileged

13    communications, then please do.  If you cannot, so state.

14         THE COURT:  Well, I also have problems with the word

15    "oblivious."  He never said they were oblivious to state law.

16         MR. COATES:  Okay.  I'm going to ask you to rephrase

17    the question because I don't think it's a fair question.

18    BY MR. COATES:

19    Q    Okay.  My question is simply this:  If you as a director

20    of Na'i Aupuni determined that state law required everybody in

21    Hawaii, including you, to participate in a certain act, would

22    you feel compelled to comply with that law?

23    A    Na'i Aupuni is an independent and autonomous not for

24    profit group.  It makes its decisions based on what it believes

25    is best in order to serve its mission.

1   Q    Okay.  And as an independent organization do you

2   personally feel that it can make those decisions without

3   considering what Hawaiian law requires in a particular area?

4   A    The decisions that are made are those of the group itself

5   and not me as an individual.

6   Q    Okay.  Do you think that the group has the -- the group as

7   an independent organization is entitled to make decisions that

8   are in conflict with provisions of Hawaii law that apply to

9   everybody, including members of your board?

10  A    We made decisions based on what we believe is the right

11  thing to do given our vision and our mission to set the path

12  for the possible building of a Hawaiian nation.

13  Q    If Na'i Aupuni's board of directors' vision about what is

14  the right thing to do is in conflict with the law of Hawaii in

15  a particular area, would it be your position that the -- that

16  your organization's board could violate state law?

17           MR. MEHEULA:  Objection.  Speculation.  Argumentative.

18  There's no evidence of anything like that happening, so...

19           MR. COATES:  Your Honor --

20           THE COURT:  Go ahead.

21           MR. COATES:  Your Honor, with regards to the positions

22  that we have taken in our briefing is that I do believe that --

23  that this question is very relevant to the issues before the

24  Court.

25           THE COURT:  Well, what I'm concerned about is him

1   being able to answer on behalf of the entire organization.

2         MR. COATES:  Okay.  I -- I tried to ask him

3   individually because I was trying to avoid that, and his answer

4   was he can't answer.

5         THE COURT:  But he doesn't make the ultimate

6   decisions, right?  He's the president, as I understand it.

7         MR. COATES:  Yes.

8         THE COURT:  There's a board and the board makes the

9   decisions.

10         MR. COATES:  Okay.  Well, then I would move -- I

11   understand your point and I'll certainly comply with your

12   instruction.  But I would move that the Court instruct the

13   witness to answer what he would do in his own capacity if an

14   issue came before this independent body and he felt that to

15   comply with state law was -- was not the right thing to do.

16         THE COURT:  Well, you haven't established that such a

17   thing ever happened.  So I'll sustain the objection.  You can

18   follow up if you want, try to lay a foundation.

19         MR. COATES:  Okay.  Thank you, Your Honor.

20         THE COURT:  But you have these platitudes about Hawaii

21   state law and whether they follow it.  I mean I think you just

22   need to get specific if that's what you want to do.

23         MR. COATES:  Okay.

24         THE COURT:  Okay?  And then we'll see if there are

25   objections and where we go from there.

1   BY MR. COATES:

2   Q    Okay.  Dr. Asam, as a member of the Na'i Aupuni board, if

3   you felt that the right thing to do was contrary to what was

4   laid out in Act 195, would you do the right thing in your own

5   opinion or would you comply with the requirements of Act 195?

6   A    There is no indication on my part or the board's part that

7   we needed to comply with Act 195.

8   Q    Okay.  And so if you're wrong in that regard, then you

9   could be in violation of Hawaii law, correct?

10  A    I'm not aware of that.  I don't know that.

11  Q    Okay.  You're not a lawyer?

12  A    Excuse me?

13  Q    You're not a lawyer?

14  A    That is correct.  I'm not a lawyer.

15       THE COURT:  Okay.  But if I understand what you're

16  saying is, you didn't feel Act 195 controlled the

17  decision-making of your organization, you could act

18  independently of Act 195.

19       THE WITNESS:  That's absolutely correct, Judge.  Thank

20  you.

21       THE COURT:  And is it fair to say or not that you

22  felt, without telling me specific attorney-client

23  communications, but at least after those communications, if you

24  had any, that the organization felt as a whole that it could do

25  so without violating state law.

```
 1              THE WITNESS:  It was our intent to do what we believed
 2    would be best in advancing our goals and they were not driven
 3    by Act 195.
 4              THE COURT:  Okay.  But did you and/or the
 5    organization, if you can answer this, believed in doing so you
 6    were -- you were not in fact violating Act 195?
 7              THE WITNESS:  That was not part of any discussion.
 8              THE COURT:  That was not part of any discussion.  All
 9    right.  Okay.
10              So you're really saying you weren't driven by Act 195
11    at all.
12              THE WITNESS:  Absolutely correct.
13              THE COURT:  That's essentially the bottom line of what
14    you're saying.
15              THE WITNESS:  Yes.
16              THE COURT:  All right.
17              MR. COATES:  Okay.  Thank you, Your Honor.
18    BY MR. COATES:
19    Q    In Paragraph 13 of your declaration, if you could turn to
20    that please, sir?
21    A    Yes, I have.
22    Q    You're already there?
23    A    Yes.
24    Q    About the middle of the paragraph you have a -- it says:
25    "Furthermore, prior to entering into the below described grant
```

1  agreement, Na'i Aupuni informed OHA that it intended to use the

2  Roll, but that it might also look into whether there were other

3  available lists of Native Hawaiians that it could also use to

4  form the voter roll -- voter list."  See that sentence?

5  A    Yes, I do.

6  Q    Okay.  The term "voter list" is your characterization of

7  the Roll that was provided to you by the Roll Commission,

8  correct?

9  A    Would you repeat that, please?

10  Q    The term --

11        THE COURT:  The sentence ends with "voter list," do

12  you see that?

13        THE WITNESS:  Yes.

14        THE COURT:  He's asking, is that -- did you mean the

15  Roll by that, is it the same thing?

16        THE WITNESS:  No, the Roll is something else.  Excuse

17  me.  The Roll is what was provided as a certified list from the

18  Native Hawaiian Roll Commission.  The voter lists that I'm

19  referring to is the list of voters that would be able to

20  participate in the election and perhaps become delegates,

21  candidates for delegacy.

22  BY MR. COATES:

23  Q    And the certified voter list, voter Roll that you

24  mentioned that was certified by the Roll Commission, it's

25  supplemented by OHA's Hawaiian Registry, forms the list that

```
 1   you will use in determining who can vote in the November 2015
 2   elections, correct?
 3   A     If I'm hearing you correctly, the certified list from the
 4   Native Hawaiian Roll Commission was inclusive of lists from the
 5   Office of Hawaiian Affairs and would be used as a basis for the
 6   election, the -- for those able to vote.
 7   Q     Okay.  That's not just a census roll that has been
 8   provided you, correct?
 9   A     Did you say census roll?
10   Q     Yes, sir.
11   A     That is correct.  It's a list of certified persons from
12   the Native Hawaiian Roll Commission.
13   Q     And will Na'i Aupuni use that certified list in November
14   to determine which Native Hawaiians can vote in elections for
15   delegates?
16   A     That determination has been made, and those who are
17   certified by the Native Hawaiian Roll Commission will be
18   eligible to participate in the election.
19   Q     Okay.
20         THE COURT:  Let me ask you a couple questions.
21         MR. COATES:  Sure.
22         THE COURT:  So as I understand the Roll Commission and
23   the initial Act 195 was going to sort of create their own list,
24   if you will, organically create their own list.  And then a
25   decision was made later and the law was amended so that OHA
```

1    generated lists could essentially be incorporated into the Roll

2    Commission list.  Is that accurate?

3              THE WITNESS:  That's my understanding, yes.

4              THE COURT:  Okay.  And somewhere today someone

5    mentioned there were three separate OHA lists.  Are you aware

6    of that or not?  Do you know how many different OHA lists there

7    were?

8              THE WITNESS:  There was the Kau Inoa, there is that

9    Hawaiian Registry, and something Ohana.

10             THE COURT:  Okay.  So it sounds like three.

11             THE WITNESS:  Yes.

12             THE COURT:  Okay.  Do you know as you sit here today

13   how many of those that are on the list that will be used for

14   the voting, in other words, as I understand it from earlier

15   discussions with counsel some will be mailed or e-mailed

16   November 1st --

17             THE WITNESS:  That is correct.

18             THE COURT:  -- to begin this election process.

19             How many of those came from that initial Roll list,

20   that is the one the Roll Commission created without the

21   reference to the three OHA lists, and what percent comes from

22   the OHA list?

23             THE WITNESS:  Yeah, I don't know exactly.  If I gave

24   you a number it would be a guesstimate and a guess.

25             THE COURT:  It would be a guess.  All right.  I don't

1    want you to guess.  All right.

2    BY MR. COATES:

3    Q    You mentioned in Paragraph 13 that there are other

4    available lists of Native Hawaiians that it, meaning Na'i

5    Aupuni, could also use to form its voter's list, correct?

6    A    Basically, a bit different.  Looked into whether there are

7    other available lists, not that there are available lists.

8    Q    Have you been able to, has your organization been able to

9    identify any other additional lists that may be used in the

10   future?

11   A    We were aware that there were other lists that people had

12   an interest in having been utilized as part of the election,

13   yes.

14   Q    Yes.  You were aware that there were other lists, but

15   they're not going to be used for the November election,

16   correct?

17   A    That is absolutely correct.  As part of our

18   decision-making we thought that the list that was provided by

19   the Native Hawaiian Roll Commission was the best list, and that

20   was based on a number of factors that the board looked at,

21   including the methodology of the list from the Native Hawaiian

22   Roll Commission, the fact that it was verifiable, that it was

23   comprehensive, that those who were forming the list actually

24   had funding and staff to do it, and it was a list that was well

25   known to the community.  None of the other lists actually lived

1    up to any of -- to any of those -- substantial degree to any of

2    those criteria that we had discussed.

3    Q    So it would be correct to say that the two state agencies

4    that provided you lists, the Roll Commission and the OHA

5    registry, that those two State created lists were better than

6    and more reliable than other lists that you looked at?

7    A    To -- we requested the list and therefore it was provided

8    after we requested it.

9    Q    Okay.

10   A    In going through the criteria that the board discussed in

11   terms of which lists to use, the one that we understood would

12   be the Native Hawaiian Roll Commission list was the one that we

13   chose.

14   Q    Okay.  And you've mentioned verification and the expenses

15   that surround that.  Did the fact that the Roll Commission and

16   OHA have the financial means to do a verifiable list, was that

17   one of the factors that led you to decide to use that combined

18   list for the November elections?

19   A    Not specifically in terms of the source of their funding,

20   but that there were resources, including people and funds

21   available.

22   Q    And you thought that the resources made those two lists,

23   OHA and Roll Commission, a better list and a more reliable list

24   than other lists that you looked at?

25   A    It was certainly a factor among the six or seven that I

```
 1   actually mentioned.

 2   Q    Okay.

 3            MR. MEHEULA:  Your Honor, we're at 24 minutes.

 4            THE COURT:  How much more do you have?

 5            MR. COATES:  I have about 10 minutes more I think.

 6   Ten to 15 minutes more.

 7            THE COURT:  Well, I'll give you 10 minutes.  Okay?

 8            MR. COATES:  Okay.

 9            THE COURT:  I'm trying to keep time, but I'm not doing

10   a very good job of it on my iPhone.

11            MR. COATES:  Sure.

12            THE COURT:  I would, Counsel, like an answer to my

13   question.  I don't know if one of your clients has an answer to

14   my question.  But -- we can talk about it later, but just I

15   don't want to forget.  I do want to get an answer to that

16   question.

17            MR. MEHEULA:  Sure.  Sure.

18            THE COURT:  Okay.  All right.

19   BY MR. COATES:

20   Q    Paragraph 13, you say prior to entering into the grant

21   agreement, Na'i Aupuni informed OHA that it intended to use the

22   Roll, correct?

23   A    That is absolutely correct, yes.

24   Q    On what date did Na'i Aupuni inform OHA that it intended

25   to use the Roll -- the Roll Commission certified list?
```

1   A     I would say that it was not a notification specifically,

2   but it came up during the course of a conversation when I was

3   speaking before the board of the Office of Hawaiian Affairs in

4   January of this year.

5   Q     Okay.  And at that time you told OHA that you would use

6   the certified list by the Roll Commission and by OHA --

7   A     We mentioned at that time it was the intent to use the

8   Native Hawaiian Roll Commission list as well as looking into

9   other lists that might be available to be used as well.

10  Q     So that time when you spoke to the board, the OHA board is

11  what you were referring to when you said in your declaration

12  that Na'i Aupuni informed OHA that it will use a certified

13  list?

14  A     That is correct.

15  Q     And you were the only person on that board to speak?

16  A     I was representing the directors that were there, yes.

17  Q     Okay.  And the grant agreement that you referred to was

18  the agreement under which Na'i Aupuni was eventually provided

19  two-and-a-half million dollars to oversee the holding of the

20  delegate election in November, the holding of the convention of

21  delegates and any referendum to be held on the question of a

22  new governing document?

23  A     Yes, that was the intent of the grant agreement, yes.

24  Q     Okay.  At the meeting in January in which you informed as

25  a representative of your organization that Na'i Aupuni intended

1    to use the Roll, did you bring up that subject first or did OHA

2    bring it up?

3    A     Gosh, I don't recall.

4    Q     Okay.  Isn't it true that Na'i Aupuni informed through you

5    in January, I think you said, of 2015, informed OHA what list

6    Na'i Aupuni intended to use before the agreement was entered

7    into for the two-and-a-half million dollars because OHA

8    officials had indicated to Na'i Aupuni officials that OHA

9    wanted the list that it had spent time and money on to be used?

10   A     No, that is not correct.

11   Q     In your -- in Paragraph 14 of your declaration, if you

12   would refer to that now, please.

13         In Paragraph 14 -- I'm sorry, after you've had an

14   opportunity to look at that paragraph.

15   A     Thank you.

16   Q     You're welcome.

17   A     (Perusing document.)  Yes, I've reviewed it.

18   Q     Okay.  The Na'i Aupuni autonomy provision says essentially

19   that you can do what you wish, right?

20   A     We have maintained our autonomy and independence when it

21   comes to decision-making.  It's the responsibility, kuleana of

22   the directors to make those decisions.

23   Q     Okay.  But not withstanding that autonomy provision, you

24   felt a need in January and before the agreement was signed to

25   tell OHA that Na'i Aupuni was going to use OHA and the Roll

1   Commission's list if you were allowed to hold the election,

2   correct?

3   A    Would you repeat -- I'm going to listen to your words

4   again.

5   Q    Okay.  Notwithstanding the autonomy provision that says

6   that you can exercise your independent judgment, that in

7   January of 2015 as a representative of NAHA -- I mean of Na'i

8   Aupuni is that you felt a need to inform OHA that if they made

9   the grant, entered into a relationship with you to allow your

10  organization to run the election, that you would use the OHA

11  combined Roll Commission list in that election?

12  A    It was actually not a need on my part.  It was an attempt

13  to share our thoughts at that particular time.

14  Q    Okay.  And you shared it prior to the agreement?

15  A    Shared prior to the agreement, yes.

16  Q    Look at Paragraph 19, please, sir.

17  A    (Perusing document.)  Yes, I have completed it.

18  Q    You state in Paragraph 19 that Na'i Aupuni noted on its

19  website that Hawaiian natives may register through the Roll

20  Commission or OHA's Hawaiian Registry, and provided links for

21  both of those registration options.  Correct?

22  A    That is correct, yes.

23  Q    On what date did that action occur?

24  A    You know, I'm not aware of exactly when that actually took

25  place.

1   Q    Could it have been after the filing of this lawsuit?

2   A    It could have been.  I don't know.

3   Q    Okay.

4        MR. COATES:  Beg your pardon for just a moment, Your

5   Honor.  I'm just about finished.

6        THE COURT:  Sounds good to me.

7              (Pause in the proceedings.)

8   BY MR. COATES:

9   Q    Well, we know that posting had to be sometime after May

10  27th, 2015, do we not, because you did not launch your website

11  until May 27th of this year?

12  A    The website was introduced in May.

13  Q    Okay.  Is May -- May 27th, the latter part of May, was it

14  not, according to your declaration?

15  A    According to my declaration, yes, that's correct.

16  Q    Has Na'i Aupuni ever asked the Native Hawaiian Roll

17  Commission to change its registration website so that it does

18  not contain Declarations One and Two which require applicants

19  to attest to the unrelinquished sovereignty of Native Hawaiian

20  people?

21  A    No.

22  Q    Do you believe that -- do you believe that that

23  requirement, the unrelinquished sovereignty of Native Hawaiian

24  people, attesting to that is a prerequisite to registration

25  today?

1                  THE COURT:  Registration with whom?

2      BY MR. COATES:

3      Q     With the Roll Commission.

4      A     It's my understanding that that is no longer a part of

5      something that needs to be done in order to --

6      Q     Have you checked to see whether or not that's been taken

7      off their website?

8      A     I did not.

9      Q     Would you be surprised to know that it is still on their

10     website?

11     A     No, I would not be surprised to know that.

12     Q     Would you feel that if you post something like that, that

13     requirement on the website, that to register you have to attest

14     to the unrelinquished sovereignty of the Native Hawaiian

15     people, that that may tend to exclude some Native Hawaiians

16     from registering?

17                 MR. MEHEULA:  Objection.  Speculation.

18                 THE COURT:  Sustained.  We've covered this.  Anything

19     further, counsel?  You have 20 seconds.

20                 MR. COATES:  Okay.  Just one second.

21                      (Counsel conferring.)

22                 MR. COATES:  No further questions, Your Honor.

23                 THE COURT:  All right.  Mr. Meheula?

24                 MR. MEHEULA:  No questions, Your Honor.

25                 THE COURT:  Anybody?

1              MS. KALAMA:   None, Your Honor.

2              MR. KLEIN:   No, Your Honor.

3              THE COURT:   All right.   You may step down, sir.

4                                    (Witness excused)

5              THE COURT:   Before we take a recess, I did have a

6    question about, because it may have been in the papers

7    somewhere, but I didn't see it if it was, about that split.

8              MR. MEHEULA:   I think I can add something on that,

9    Your Honor.

10             THE COURT:   All right.   And just use the mike again,

11   Mr. Meheula.   The microphone, get a little closer.

12             MR. MEHEULA:   Sorry.   I believe that the Roll

13   Commission's, Mr. Namu'o's declaration has a number of transfer

14   letters starting in September of 2014 to the Commission where

15   the Office of Hawaiian Affairs sent information over as far as

16   registrants and they had numbers on there.

17             THE COURT:   Okay.

18             MR. MEHEULA:   Like the first one was 94,000 or

19   something, and then it went -- so I think it might have been --

20   the exact number is there in one of those and it might have

21   been about 100,000.   And then if you look at the Roll

22   Commission --

23             THE COURT:   I'm sorry, just so I understand what

24   you're saying.   100,000 aggregate of the three different lists

25   that OHA provided to the Roll Commission?

1           MR. MEHEULA:  Yes.

2           THE COURT:  Now, but what we don't know in that number

3    is how many are duplicates, right, because there could have

4    been more than one person -- one person could be on more than

5    one OHA Roll.

6           MR. MEHEULA:  Right.

7           THE COURT:  Okay.  So, but that was an aggregate that

8    was sent over.

9           MR. MEHEULA:  Right.

10          THE COURT:  All right.

11          MR. MEHEULA:  And then what they say is that -- on

12   their website, on the Roll Commission's website, they say that

13   they have like 120,000 registrants.  But the number -- but the

14   number that was certified that came over to Election America

15   was about 95,000.

16          So you can't really tell exactly, but it gives you at

17   least a feel for it.

18          THE COURT:  Okay.

19          MR. LILLY:  Your Honor, I think I can help here.

20   Mr. Popper and I were involved in a FOIA case where we sought

21   access to the Native Hawaiian Roll Commission lists and we got

22   an order to produce them.  But in the course of that, what we

23   had learned, and someone on the defense side might be able to

24   confirm this, but that the numbers of people that -- that went

25   through and -- went through the three declarations amounted to

```
 1   40,000 people.  And then --

 2              THE COURT:  So 40,000 registered, succeeded in

 3   registering on the Native Hawaiian Roll Commission website.

 4              MR. LILLY:  Yes.

 5              THE COURT:  Okay.

 6              MR. LILLY:  And then the three lists that came from

 7   OHA came up to something like one hundred -- anywhere somewhere

 8   between 123 and hundred -- that augmented that number to 123 or

 9   124,000.

10              THE COURT:  Okay.  You're confusing me a little bit

11   now.  You say augmented that number, so do you mean the OHA

12   number plus 40 equals 123?

13              MR. LILLY:  Came up to 123 or 124,000.

14              THE COURT:  Okay.  So let's say that's 83,000 then or

15   so.

16              MR. LILLY:  Yes.  And then the list that finally got

17   certified was the one that Mr. Meheula's talking about.  The

18   list was pared down to something like 95,000.

19              THE COURT:  All right.  And we don't know where that

20   came from, the paring necessarily.

21              MR. LILLY:  It's the same list, it's just a pared down

22   list.

23              THE COURT:  Presumably because you had duplicate --

24   the same person on multiple lists.

25              MR. LILLY:  Well, no, they went through a process of
```

 1   certification.  Some people were dead, I think some were

 2   children.  So they had to -- they had to certify the list and

 3   that was something that the Native Hawaiian Roll Commission

 4   did.

 5           THE COURT:  All right.  So it's a little unclear, but

 6   at a minimum it looks like a two to one ratio would be

 7   ballpark.  I mean I understand we're not going to get, you

 8   know, scientific sort of, you know, figures here.

 9           MS. KALAMA:  If I may, Your Honor.  I asked Mr. Namu'o

10   to see if he could get us the numbers real quick and he

11   provided me percentages of 38 percent Native Hawaiian Roll

12   Commission and 62 percent Office of Hawaiian Affairs.

13           THE COURT:  38 and 62.  And that is one hundred.

14           Okay.  Does that sound --

15           MR. LILLY:  That's consistent with what we found in

16   the --

17           THE COURT:  Okay.

18           MR. LILLY:  -- our FOIA case.

19           THE COURT:  All right.  So is there a stipulation that

20   is an estimate, the 38/62 percent is a rough estimate at least

21   at a minimum?  I mean it might be closer than that, but at a

22   minimum for my use.

23           MR. LILLY:  Yes, Your Honor.

24           THE COURT:  In understanding the breakdown.  Everyone

25   is fine with that?

1           MR. LILLY:  Yes, Your Honor.

2           MR. KLEIN:  Yes, Your Honor.

3           MR. MEHEULA:  Yes, Your Honor.

4           MS. KALAMA:   Yes, Your Honor.

5           THE COURT:  All right.  Very good.  So why don't we

6    take about a ten-minute recess and then we'll start up with

7    argument.  You're going to handle argument, Mr. Popper?

8           MR. POPPER:  Yes, Your Honor.

9           THE COURT:  All right.  We'll come back then.  You can

10   get set up at the lectern then as well.  Okay?  Thank you.

11      (A recess was taken from 10:51 a.m. to 11:04 a.m.)

12          THE COURT:  Please be seated.  We are back with all

13   counsel present and we're prepared for argument.

14          So I have -- earlier had said that, Mr. Popper, you

15   will be allowed 40 minutes split as you see fit.  Okay?

16          MR. POPPER:  Okay.

17          THE COURT:  So I will hear from the plaintiffs first.

18          MR. POPPER:  Good morning, Your Honor.  Robert Popper

19   for the plaintiffs.

20          Your Honor, where voting rights are at stake the

21   Supreme Court has shown a complete willingness to look past

22   form to substance.  In fact, I would say it even has shown an

23   intolerance for arrangements like the kind of arrangement that

24   we are seeing here, as I'll describe.

25          What is going on here?  Na'i Aupuni was formed 3 years

1   after Act 195 in order to carry into effect the mandate of Act

2   195 and in order to do it in a way, as the trustees of OHA

3   discussed in their minutes, that would not subject them to

4   legal liability like the kind we seek to inflict on them.

5           There were a series of contracts in which Na'i Aupuni

6   made agreements to carry out OHA's purposes.  There was another

7   contract in which OHA was in what you would call I guess in a

8   private contract, a third-party beneficiary.  It had

9   termination rights, it had particular rights under the

10  agreement for reporting and for other needs.  Na'i Aupuni's own

11  by-laws refer to OHA and discuss how OHA is in fact -- that

12  there's a relationship and referred to the fact that OHA's

13  purposes implicitly are their purposes.

14          OHA is referred to in the minutes of a trustees'

15  meeting as an ex-officio member of Na'i Aupuni's board.  And

16  why are all these steps being taken?  Why is this being done?

17  Because of Act 195.

18          Act 195 envisions the kind of election that Na'i

19  Aupuni seeks to hold, using the kind of Roll that Na'i Aupuni

20  seeks to use.  And it envisions that that election would be

21  prepared by the Native Hawaiian Roll Commission, and it was.

22          Your Honor, Act 195 created the Native Hawaiian Roll

23  Commission and told it to create that list.  And it did.  State

24  law requires OHA to make grants that are consistent with its

25  purposes.  And it did in this case, we would submit.

1        One of the equities the defendants cite when they're

2   arguing that the balance of equities favors their position is

3   that there's an interest in implementing Act 195.  If that's an

4   equity, if that weighs in their favor because that's an

5   important consideration, then isn't this election carrying out

6   the purposes of Act 195?  We would submit that it is, Your

7   Honor.

8        And the Department of the Interior now weighs in and

9   says that they will use an election based on such a

10  race-qualified roll as a basis for determining whether an

11  entity can be created that will self-govern and will represent

12  Native Hawaiians.

13       Your Honor, it is nothing less than audacious to argue

14  that all the Native Hawaiian Roll Commission did was create a

15  list the way the Census creates a list or takes data from

16  people.  The Native Hawaiian Roll Commission created a

17  race-qualified and viewpoint-qualified list and it did so to

18  carry out its legislative purpose, which it admirably did.

19       It is equally audacious, Your Honor, to argue as the

20  State defendants argued that "shall" means "may" in that

21  provision.  It's Section 10H-4(b) of the Act 195.

22       THE COURT:  Shall serve is sort of the basis, right,

23  the starting point.

24       MR. POPPER:  That's what they argue, the starting

25  point.  But consider, Your Honor, that the statute says the

1   updated and initial -- excuse me, the initial and updated Roll,
2   which suggests that it's not just the initial Roll that will be
3   the basis.  The updated Roll suggests that that Roll will
4   continue to be the basis in the -- what I would submit, Your
5   Honor, is the plain meaning of basis.  It will serve as the
6   Roll that's used in the election.
7           Consider, Your Honor, if it were -- if the statute
8   meant that the basis was merely the starting point, at what
9   point is the basis violated?  If 50 percent of the Roll is
10  thrown out, if three-quarters is thrown out, the whole thing is
11  thrown out and they start over, have they used it as the basis?
12  I don't think the legislature meant that.  I think they meant
13  that the Roll will be used, and it is.
14          Your Honor, Terry versus Adams is probably -- and that
15  and Rice versus Cayetano, I'm occasionally asked what's your
16  good case?  Those are our best cases.  The situation in Terry
17  was way more sophisticated than this arrangement.  In Terry you
18  had the Jaybirds, which is a private institution that existed
19  since 1889, and they elected a candidate.  And that candidate
20  didn't have to run for the democratic primary, but he did.  He
21  wasn't a public official, arguably.  He was a member of the
22  Jaybirds.  And then he ran for the democratic nomination.  He
23  usually did.  And then he won the democratic nomination,
24  usually.  And then he ran for office.  He was at least two
25  elections removed from being a public official.  The Supreme

1    Court saw what was going on and said the Fifteenth Amendment is
2    too important for that, Your Honor.
3           THE COURT:  Well, but in that case the Supreme Court
4    said the Jaybird primary essentially has become the elected
5    process.
6           MR. POPPER:  Yes, Your Honor.
7           THE COURT:  That determines who is elected to county
8    office.  This election, if it goes forward, it seems to me
9    what's critically important for me to take into account is what
10   is the result of it.
11          MR. POPPER:  Yes, Your Honor.
12          THE COURT:  Right?  So we have, you know, state action
13   cases that provide a lot of different tests as to how to look
14   at state actions.  Some say step back a little bit and look at,
15   you know, the overall picture, that not one single test can
16   really apply, there could be exceptions.  But I look at cases
17   like Caviness, 590 F.3d 806, it's a charter school case where,
18   you know, employment decisions made by a charter school are not
19   subject to 1983 action.  And the Ninth Circuit said you look
20   very specifically, you know, at the function you're talking
21   about, right?  Charter school is doing a very public function,
22   there's no question about that.  It's educating kids.
23          MR. POPPER:  Right.
24          THE COURT:  Perhaps with a, you know, different
25   framework, you know, a different approach to learning.  But

1    it's regulated, it's a public school essentially, public

2    students go to the school, to the charter schools, but they're

3    saying you look at the function.

4              So here what is the result of this election?

5              MR. POPPER:  Well, Your Honor --

6              THE COURT:  Let me finish.  I'll just give you my

7    thoughts and then ask you to comment on this.

8              The results of the election are not by themselves

9    self-effectuating.  There's no public office holder.  There's

10   no public entity.  What it does is results in a group coming

11   together in a convention that may form a governing document of

12   some sort, but as both Na'i Aupuni points out and OHA, as OHA

13   says on Page 9 of their brief, the resulting Native Hawaiian

14   entity would have no official legal status unless otherwise

15   recognized by the state or federal government.  And Mr. Meheula

16   points out that any such alteration of government will require

17   subsequent action by the federal and possibly state

18   governments.

19             So at most -- first, it may be nothing, we don't know,

20   that comes out of it.  And at most it would be an aspirational

21   document essentially that will require further state or federal

22   action before anything happens.

23             MR. POPPER:  Well, Your Honor --

24             THE COURT:  So what is -- what is public about that?

25             MR. POPPER:  Well, Your Honor, to break that question

```
 1    down, and that is probably the question, but it's going to
 2    require me to break it down into a couple of sections.  But
 3    first is just to start with the notion, the kind of election
 4    that is entitled to constitutional protections is one where, as
 5    Terry put it, it involves elections to determine governmental
 6    policies.
 7              THE COURT:  Well, okay, but Terry --
 8              MR. POPPER:  Or, or --
 9              THE COURT:  Wait, let me stop you.  The facts of Terry
10    are so different though where the Jaybirds were running the
11    elective process.  That's the context in which the Supreme
12    Court made that statement.
13              MR. POPPER:  Your Honor, the facts were not different
14    in Guam.  In Guam, Your Honor --
15              THE COURT:  That's just a standing case. It's nothing
16    more than a standing case.
17              MR. POPPER:  At this point, Your Honor, it's nothing
18    more than a standing case.
19              THE COURT:  That's right.  So we don't know how the
20    Ninth Circuit will rule if in fact the Guam plebiscite goes
21    forward.  But it's nothing more than a standing case.  And I
22    think it maybe answers the standing questions raised on the
23    other side, but that's separate from a merits discussion.
24              MR. POPPER:  I would disagree, Your Honor, and say
25    it's hard to imagine how the district court could come out
```

1    differently given the Ninth Circuit's ruling.

2            But for me the most important part of the Ninth

3    Circuit's ruling was where it indicated that in finding there

4    was standing, this change will affect Davis who doubtless has

5    views as to whether a change is appropriate and if so, what the

6    change should be.

7            If it's the kind of election where that is in play for

8    all of Hawaii's citizens, it should be the kind of election

9    that's entitled to constitutional protection.

10           THE COURT:  But I'm not ruling on a challenge if

11   Department of Interior enters into some

12   government-to-government relation with a Native Hawaiian

13   entity.

14           MR. POPPER:  Not yet.

15           THE COURT:  That could be a separate lawsuit.  And I

16   don't know what happens with all of that.  And I don't know if

17   the unrelinquished sovereignty declaration will be a problem in

18   the future.  I don't know any of that.  But I'm certainly not

19   ruling on any of that right now.

20           And what I see is something that appears to me to be

21   more akin to a private election than a public election for

22   Fifteenth Amendment purposes.

23           MR. POPPER:  Your Honor, let me tell you why I don't

24   think that's the case.

25           THE COURT:  All right.

1          MR. POPPER:  With all respect, we're talking about an

2     election where there are 527,000 Native Hawaiians throughout

3     the country, there are 290,000 in the islands of Hawaii.  There

4     are 1.3 million people in these islands.  To create a

5     government-to-government relationship is going to change so

6     many things in this island -- in these islands with respect to

7     how people live their lives.  There is going to be so much that

8     is going to be under a different government.

9          In fact, Your Honor, what about the fact that they

10    were talking about that they might contact the United Nations

11    directly at one point.  How can this not be -- this is not like

12    a charter school, Your Honor.

13         THE COURT:  Well, it's no surprise here there is no

14    one voice.  When you say "they" say they may contact the United

15    Nations.

16         MR. POPPER:  I'm talking about briefs.  I'm sorry, I

17    was talking about a declaration we submitted and also briefs

18    that refer to the United Nations declarations.

19         THE COURT:  All right.  Well, I mean they refer to a

20    United Nations declaration, I understand that.  But I'm still

21    trying to understand how it is this election qualifies under

22    the Fifteenth Amendment given the result of the election.

23         MR. POPPER:  Well, Your Honor --

24         THE COURT:  Which really is a starting point and

25    nothing but a starting point that may get nowhere.

1          MR. POPPER:  Your Honor, that would be what I would

2     consider to be a pre-October 14th argument.  Because on

3     October 14th the Department of the Interior issued its brief in

4     this case, its amicus brief.  And at Pages 1170 to 72 of that

5     brief, it talks about how the process it proposes is going to

6     go forward.  And it describes that in the event an election,

7     like the kind that is looming, is held, it will consider that

8     election along with additional paperwork requirements regarding

9     narratives and various other things that have to be submitted,

10    it will regard that as the basis for creating a Native Hawaiian

11    self-governing entity and it doesn't talk about state --

12         THE COURT:  It may do so.  It may do so.  And it's a

13    proposed rule.  But I understand what you're saying.  But it

14    may do so, it's not that it will do so.

15         MR. POPPER:  Your Honor, the proposed rule hasn't

16    changed, to my understanding from the advance notice of

17    proposed rule making and presumably it may get enacted as is.

18    And this may actually turn out to be the ball game.  If this

19    election goes forward and there is a ratification of that rule

20    and that rule is applied, there will be a Native Hawaiian

21    governing entity and this will have been my plaintiffs'

22    opportunity to say something about it and it will be gone.

23         THE COURT:  I think that's just speculation at this

24    point in time.

25         MR. POPPER:  Well, Your Honor, we're 90 days away from

1   the -- less than 90 days away from the point at which that rule
2   will become --
3           THE COURT:  I don't know if the Department of
4   Interior, if the rule becomes final after comment, will accept
5   the results of whatever comes out of the convention.  That's
6   not clear at all.
7           MR. POPPER:  But, Your Honor, what you're ruling on
8   today is whether a race-based election held by Na'i Aupuni, who
9   we contend is a government actor, whether that race-based
10  election can go to the Department of the Interior, can be used
11  for any purpose.  I mean one of the things that was discussed
12  in Guam --
13          THE COURT:  Why can't a group of blue-eyed people get
14  together and say let's have an election, and with that we want
15  to go to the governing entity and try to get special
16  recognition as blue-eyed people.  It may happen, it may not
17  happen.  I don't know.  That may be for later to determine if
18  that's appropriate.
19          MR. POPPER:  Your Honor, in voting law it's typical
20  that you will waive your rights if you wait for an election to
21  occur and try to upset its results.  And that's a very tough
22  row to hoe.  It makes sense where an election like this is
23  planned, and we all know --
24          THE COURT:  But see, you're assuming it's a public
25  election.

 1              MR. POPPER:  Well, Your Honor --

 2              THE COURT:  In my view it's not a public election from

 3      what I'm seeing here.

 4              MR. POPPER:  Your Honor, it's a public election in its

 5      effect.  Its effect is so enormous and affects such -- the

 6      economic status, the political status, the interrelations of

 7      people, of so many people.  And to think that there are

 8      2 million tribal members in this country and this would expand

 9      it by 500,000 and it would expand it based on a standard that

10      has never been used, as Justice Breyer notes in Rice versus

11      Cayetano, to qualify any tribe.  Even in Mancari the quantum of

12      blood was one-quarter.  In the Hawaiian Homes Commission Act

13      the quantum of blood was 50 percent.  Here we have, as Justice

14      Breyer points out, a single drop of blood standard unironically

15      put forward in which one out of 500 ancestors could qualify a

16      person as Hawaiian.  And that is so arbitrary and contrary to

17      the gist of what has traditionally been recognized that that

18      cannot qualify as a Native Hawaiian tribe.

19              But perhaps I'm getting ahead of myself.  If that is

20      the result, though, Your Honor, if that's what we're looking at

21      is not just the creation of this enormous entity within the

22      sovereign United States and all that that entails, and we're

23      looking at in fact, the fact that this is imminent now, more

24      imminent than it was before October 14th, I think that we have

25      stated a public interest in this election that quantifies,

1   mandates or warrants application of the Fifteenth Amendment.

2           Your Honor, the Fifteenth Amendment is one of the

3   central constitutional protections in our Constitution.  Strict

4   scrutiny under the Fourteenth Amendment likewise.  To set those

5   things aside in an election of this importance, just isn't

6   right.  It isn't right legally and it isn't right.

7           Your Honor, in Guam they had a plebiscite that was

8   possibly never going to take place and they had a -- that

9   plebiscite may never take place to this day.  And they made it

10  -- may never meet the registration numbers.  And it only made a

11  recommendation to the legislature, that's all that was

12  threatened.  And that was held to confer standing.

13          If Your Honor were -- if the position that Your Honor

14  is describing whereby that's not important enough, that's a

15  private club, these are private Chamorrians or Native

16  Guamanians, if all of that were true they wouldn't even have

17  had standing.  They wouldn't even have had standing in Guam.

18  The fact that they had standing indicates that there's an

19  injury.  And in fact, you know, the best description of injury

20  I've ever heard is that if you wouldn't want it to happen to

21  you, right?

22          We have plaintiffs who would like to participate in

23  this process and they can't.  And they can't because they're

24  the wrong race or they can't because they won't agree with this

25  unrelinquished sovereignty notion written by a governmental

1    official and put on a form.  Your Honor, what could be more
2    important than that?
3            And, you know, the effect of the election would be far
4    more significant than what occurred in Guam.  And the effect of
5    the election would determine arguably the relationship of the
6    Native Hawaiian people to certain trust lands.  At least OHA on
7    its website indicates that it thinks that this election will
8    affect that.  OHA in its newsletters notified Native Hawaiians
9    that if they don't get onboard with this, if they're not part
10   of this -- and these documents, these newsletters were
11   submitted both by plaintiffs and defendants, if they don't
12   agree to do this, then they could lose their rights under a
13   future sovereign entity, including rights to land.  Including
14   rights to property.
15           And so, they -- you know, and again, this is part of
16   what we've seen since the inception of this case.  When they're
17   talking about whether in fact this is a public election, they
18   diminish it.
19           But when they talk about balance of equities and when
20   they communicate with people who are Native Hawaiians, they
21   don't talk that way.  Your Honor, they say -- defendants say in
22   their briefs that this is a matter of public interest.  They
23   cite cases saying that the establishment of a Native American
24   tribe is a matter of public interest.  We agree.  We agree.
25   This is not like the charter school example, Your Honor.

1              THE COURT:  I hear your argument.

2              MR. POPPER:  Okay.

3              THE COURT:  Do you want to move on to the Fourteenth

4    Amendment?

5              MR. POPPER:  Before I do, Your Honor, I just wanted to

6    identify for you as well the argument we make under Romer

7    versus Evans, where there was an amendment prohibiting

8    government action regarding sexual orientation.  And even under

9    the diminished rational relationship test, which has been

10   described occasionally as a rubber stamp or the government

11   wins, even under a rational relationship test the plaintiffs in

12   that case -- or the amendment failed because it made it more

13   difficult, more difficult for one group to affect the process.

14             We have groups, we represent groups and we have

15   plaintiffs who are shut out from the process.  And so they have

16   zero chance to effect that process.

17             Now, moving on to the Fourteenth Amendment, Your

18   Honor.  All right.  Is the Native Hawaiian community a tribe?

19   It is not.  There's no statute that establishes it as a tribe.

20   There's no regulations, it's cut out from the regs 83.1, it's

21   cut out from the IRA.  You know, before I get to this, none of

22   this matters if there's a Fifteenth Amendment violation

23   because --

24             THE COURT:  I understand that.

25             MR. POPPER:  Yeah.  Okay.  But, Your Honor, I would in

 1    addition identify the Akaka Bill, which would have created a
 2    path to nationhood that the defendants seek, which was first
 3    introduced in 2000, and whichever witness referred to this was
 4    correct, it was last reintroduced in 2012.  And here's a
 5    question:  Was Senator Akaka wasting his time?  And I don't
 6    mean wasting his time because the bill never passed, I mean was
 7    he engaged in superfluous activity.  Because according to the
 8    defendants you look at the Hawaiian Homes Commission Act, you
 9    look at certain government programs concerning the health or
10    education of Native Hawaiians.  And from this amorphous mass
11    you draw a tribe.  That's not how it works.
12            And, you know, I'm not saying it has to be a federally
13    recognized tribe in every instance.  Hynes versus Grimes shows
14    an instance or under Section 2 of the Howard Wheeler Act, if I
15    get the name right, you could indicate a reservation, which
16    wasn't a tribe but it was a reservation.  And the way you would
17    do that, and Hynes is mentioned in one of the defendant's
18    briefs, the way you would do that is the Department of the
19    Interior would make -- or take a request or make a designation,
20    and then there would be a vote.  And the vote could be
21    restricted to the members of that reservation, and then you
22    have a reservation.
23            All right.  So, but what you need is a statute.  A
24    statute creating the pathway.  The Akaka Bill was that and it
25    was never passed.

1          So you can't take, I respectfully submit, Your Honor,

2     an amorphous mass of statutes and create an entity that is the

3     equivalent of an Indian tribe and then set aside the

4     protections of the Fourteenth Amendment.

5          And you know, the distinction itself I think is

6     specious.  I think if the only claim before Rice versus -- the

7     Rice versus Cayetano court was under the Fourteenth Amendment,

8     the court would have ruled the same way.  It's simply -- I

9     don't know this, but what I do know that we can't say that the

10    fact that the Fourteenth Amendment wasn't raised by the Supreme

11    Court in Rice versus Cayetano means that they felt that the

12    exception under Mancari did apply.  We don't know.  At the most

13    we don't know.

14          THE COURT:  Difficult terrain.

15          MR. POPPER:  Difficult terrain, yes, Your Honor, as

16    they pointed out.

17          Your Honor, I would also point out that in the same

18    vein, everything that they're referring to here was tried in

19    Rice versus Cayetano.  With respect to the Fifteenth Amendment

20    there was a reference to the Hawaiian Homes Commission Act,

21    there was a reference to all the different statutes.  There was

22    a specific reference to guardian-ward relationship, and all

23    these arguments failed.  All the arguments that are being

24    pressed upon Your Honor today.  And they were not sufficient to

25    establish a Mancari exception to the Fifteenth Amendment and

1    then I would submit they're not sufficient to establish a

2    Mancari exception to the Fourteenth Amendment.

3           THE COURT:  Well, I mean I don't know if anyone is

4    arguing on this side there's a Mancari exception to the

5    Fifteenth Amendment.  I think they're arguing there's a Mancari

6    exception to the Fourteenth Amendment.  I mean are you -- is

7    there an argument before me that I should utilize Mancari for

8    both the Fourteenth and Fifteenth Amendment?

9           MR. POPPER:  No, not at all, Your Honor.

10          THE COURT:  No.  Okay.  I didn't think so either.

11   That's why I just wanted to make sure I understood --

12          MR. POPPER:  No, I'm saying they should be treated

13   equivalently in a different way, Your Honor, which the

14   Fourteenth and the Fifteenth Amendment, both are violated.  And

15   there's no Mancari exception to either one of them in this

16   case, not when it concerns voting.  There can be an exception

17   with respect to a statute that talks about an exception to

18   property, there could be -- like the Hawaiian Homes Commission

19   Act.  There could be an exception, Your Honor, to voting if

20   there was a statute.  But there's no statute.  The bill failed.

21   So, there isn't a Fourteenth Amendment exception because there

22   isn't the quasi sovereign that the defendants are now trying to

23   cobble together from various federal statutes in the absence of

24   the Akaka Bill.

25          Your Honor, with respect to the First Amendment

1    claims, the fact that there is an unpublicized or little

2    publicized work around to the ability of a person to avoid

3    affirming Declaration One doesn't establish that there isn't a

4    First Amendment violation and that there wasn't a First

5    Amendment violation affecting the plaintiffs.

6             To this day the Native Hawaiian Roll Commission

7    website includes Declaration One.  Presumably they've put it

8    there for a reason.  Presumably it deters people.  Presumably

9    it deterred plaintiffs as they testified in their declarations.

10   When they got to that point and they couldn't confirm it, their

11   registration process stopped.

12            Now, after litigation has commenced, possibly after

13   litigation has commenced, I believe Dr. Asam was not sure,

14   there is an indication that you could, if you understood the

15   process, you could have signed on with the Office of Hawaiian

16   Affairs registry, which then would have been brought over in

17   its entirety and you would have thereby avoided Declaration

18   One.  And then there's also an understanding that the staff

19   just wouldn't have tossed that out.

20            But 40,000 people signed up through the website.

21   40,000 people saw Declaration One, had to confirm it -- pardon

22   me.  And how many people were deterred?  We don't know.  But,

23   Your Honor, it's not a cure for a First Amendment violation to

24   say that it could have been avoided if you were in the know

25   when they didn't publicize this when -- in fact, Dr. Akina

```
 1    testifies that he wrote an article in which he referred to this
 2    process and published it.  And no one ever contacted him and
 3    said you know you don't have to do that.
 4              So I would submit, Your Honor, that there still is
 5    that First Amendment violation.  And while --
 6              THE COURT:  But he -- those two plaintiffs have been
 7    offered to register without that declaration, correct?
 8              MR. POPPER:  The two plaintiffs concerning --
 9              THE COURT:  Yeah, I mean Akina and -- I'm not sure who
10    the other is -- Makekau maybe, who would not affirm Declaration
11    One?
12              MR. POPPER:  Yes.
13              THE COURT:  They have been offered.
14              MR. POPPER:  They have.
15              THE COURT:  So this isn't a class action.  How does
16    that play out in my analysis?
17              MR. POPPER:  Well, the way it plays out is, we didn't
18    brief this but this is a Laidlaw situation.  Friends of the
19    Earth versus Laidlaw, it's 528 U.S. 167.  In a case where
20    post-litigation action remediates an injury.  In Laidlaw the
21    Supreme Court set down a stringent test that a defendant must
22    show that it is absolutely clear that the conduct will not
23    recur.
24              They can't show that if this Declaration One is still
25    on their website.
```

  1          THE COURT:  Well, won't reoccur as to whom?  Because

  2     if it's your clients, it won't reoccur once they're on the

  3     list.

  4          MR. POPPER:  I believe the proper reading is that the

  5     action won't recur and that it's not restricted to our clients.

  6          THE COURT:  Well, I mean this isn't a class action

  7     though, right?

  8          MR. POPPER:  It is not.

  9          THE COURT:  Right.  So I have to think about that.  I

 10     mean I don't know the answer myself, but it seems to me if they

 11     have been offered, I don't know if they accepted or turned it

 12     down, but if they have been offered, seems to me it's not

 13     likely to reoccur as to them at least.  But I'm familiar with

 14     the document -- it's not a document -- the doctrine you're

 15     referring to in general.

 16          MR. POPPER:  I can't speak definitively on it right

 17     now, Your Honor, but it would seem to me strange that you could

 18     grease the skids for the two plaintiffs who understand the

 19     process now that they have a lawyer in court representing them

 20     and they could get in and that this would be acceptable.

 21          And I would add too, while it is not part of our claim

 22     directly, this is a very strange way to run an election.  To

 23     ideologically qualify the people who are going to vote, what

 24     kind of an outcome do you think you're going to have?  If you

 25     restrict it to people who already agree with you, then you're

1   probably going to get an affirmative vote.  There's something

2   not straightforward about that.

3          Your Honor, the second kind of standing I would argue

4   is with respect to Plaintiffs Moniz and Gapero.  They have --

5   they were forcibly put on the Roll.

6          THE COURT:  This is the compelled speech argument.

7          MR. POPPER:  Compelled speech.  They were allowed the

8   opportunity to remove themselves, they had that opportunity to

9   this day and they were notified at various points that they

10  could do so, at least they received e-mails that said that they

11  could.  With respect to Mr. Gapero we don't know that, but with

12  respect to Ms. Moniz we do.

13         In that respect there's still a compelled speech

14  element that cannot be got rid of because now the Roll has been

15  published.  And for them to go forward and go to that Roll and

16  remove their names is for them to reveal sentiments and beliefs

17  that they should have the right not to utter.

18         THE COURT:  Are their names on the Roll?

19         MR. POPPER:  Yes.

20         THE COURT:  Is that in the paperwork somewhere?

21  Where?

22         MR. POPPER:  They both received notification, Your

23  Honor, that they had been placed on the Roll.  I haven't

24  checked --

25         THE COURT:  You're talking about a public roll that

1    people can see.  So my question is, you know, when that Roll is

2    made public are their names on that Roll?

3              MR. POPPER:  Your Honor, I would assume it to be true

4    because they've been told that they --

5              THE COURT:  You would assume so?  Well, I don't assume

6    anything.

7              MR. POPPER:  We have to assume what's reasonable, Your

8    Honor, what's likely.

9              THE COURT:  No, no, no.  The evidence before me is

10   people were given the opportunity to opt out.

11             MR. POPPER:  Yeah.

12             THE COURT:  Right?  I understand that to mean before

13   the Roll is public.  So if you opt out before the Roll is

14   public, your name is not on the Roll.

15             MR. POPPER:  Oh, right.  Yes, Your Honor.  But the

16   opportunity now --

17             THE COURT:  I'm not talking about the opportunity now.

18   There's evidence before me even though there wasn't a specific,

19   you know, mention of Mr. or Miss Gapero --

20             MR. POPPER:  Right.  I understand, Your Honor.

21             THE COURT:  -- the declaration, the normal course is

22   they did get the information and the e-mail.  So --

23             MR. POPPER:  Right, Your Honor.

24             THE COURT:  -- I'm just saying if you're given that

25   before the Roll is public, that's not compelled speech.  You

1    would agree with that.

2              MR. POPPER:  I wouldn't because when they were placed

3    on the Roll, they were placed on the Roll without their

4    knowledge or consent and it would take affirmative effort for

5    them to remove themselves from the Roll.  That's a burden on

6    their speech

7              THE COURT:  And that's a First Amendment violation.

8              MR. POPPER:  Yes, Your Honor.

9              THE COURT:  All right.

10             MR. POPPER:  Well, Your Honor, I don't know how much

11   time I've used.

12             THE COURT:  I can tell you.  You have 10 minutes left.

13   Do you want to reserve that time or --

14             MR. POPPER:  Your Honor, I would like to say this:

15   Surely a Supreme Court that looked at the common sense of a

16   situation in determining whether people have been deprived of

17   their Fifteenth Amendment rights by an offensive, racial,

18   government-run racial election, surely the Supreme Court in

19   Terry and Rice would view an election of this magnitude as the

20   kind of election subject to protection.  It was in Terry itself

21   that it referred to governmental issues or government policies

22   being determined.  Unquestionably such policies are being

23   determined.  They would be determined what the shape of this

24   entity would be, what its relationship to the United States

25   would be, what the relationship would be therefore between

1    Hawaiians, Native Hawaiians and non-Native Hawaiians.  All of
2    these things will be affected.  It is a game.  It is a kind of
3    game that the Supreme Court has shown no tolerance for.  To say
4    that that doesn't affect non-Native Hawaiians, that that's not
5    the kind of important election to which the 15th and the
6    Fourteenth Amendment can and should apply.
7              THE COURT:  All right.  Thank you.
8              All right.  So, I believe I said an hour total to be
9    split up.  Have you folks discussed and how you want to do
10   that?
11             MR. MEHEULA:  Yes, Your Honor.
12             THE COURT:  So why don't you tell me, Mr. Meheula, so
13   I know how --
14             MR. MEHEULA:  Okay.  I'm going to go for 25 minutes
15   and Ms. Kalama is going to go for 15 and Mr. Klein for 20.
16             THE COURT:  All right.
17             MR. MEHEULA:  In that order.
18             THE COURT:  So why don't we do this then:  Why don't
19   we take you now and then we'll break and come back at 1 o'clock
20   for the final arguments.  Okay?
21             And you have about 9 minutes left, Mr. Popper, in that
22   range.
23             Okay.  So this will take us right to about noon,
24   Mr. Meheula.
25             MR. MEHEULA:  Thank you.  May it please the Court,

1    Bill Meheula for Na'i Aupuni and The Akamai Foundation.

2         Your Honor, I'm going to speak on the facts and law

3    concerning state action and also touch on the Fifteenth

4    Amendment.  I'm also going to talk about the Gapero and Moniz

5    claim, First Amendment claim, and also the Akina and Makekau

6    claim and touch a little bit on the balance of harms.

7         THE COURT:  All right.

8         MR. MEHEULA:  I'm going to start off with the facts

9    concerning state action because the reply, I think,

10   misconstrued the situation a little bit.  Na'i Aupuni is a

11   private entity, it's not a state -- it's not a state agency or

12   anything like that.  They point to Exhibit B of Mr. Akina's

13   reply declaration, and that's the January 8, 2015, minutes of

14   the Office of Hawaiian Affairs board meeting.  And on Page --

15   on Page 11 of that one, there's a reference to -- there's a

16   reference to a consortium now calling themselves Na'i Aupuni.

17   That's not our statement, that's a staffer for the Office of

18   Hawaiian Affairs.  And then there's a statement that the

19   consortium is an autonomous independent -- and independent only

20   with OHA providing funding and sitting as an ex-officio member.

21        From that they conclude, the plaintiffs conclude that

22   the Office of Hawaiian Affairs is an ex-officio member of Na'i

23   Aupuni.  And there's no evidence of that.  The consortium was

24   that loose organization that was -- that preceded Na'i Aupuni.

25   But Na'i Aupuni is a nonprofit corporation.  We have the

1    by-laws, Exhibit 4, attached to Mr. Asam's declaration and it

2    says in there who are the members and how people vote on it.

3    There is absolutely no testimony, no evidence that the Office

4    of Hawaiian Affairs has made any kind of decision regarding the

5    election of delegates or the convention.  There's no evidence

6    of that at all.

7             More so, in the grant agreement we've got -- which is

8    Exhibit 5 to Mr. Asam's declaration, in Section 3 there's a

9    really clear statement that the Office of Hawaiian Affairs

10   committed that they would not control the Office of Hawaiian

11   Affairs or even require them to consult.  There's also a

12   commitment in there by Na'i Aupuni that they would not allow

13   the Office of Hawaiian Affairs to control them.

14            And if you go back to that, and that's in April of

15   2015, end of April, that's when the grant agreement was.  But

16   if you go back to the January 8, 2015, minutes of the board

17   meeting --

18            THE COURT:  Which board, the --

19            MR. MEHEULA:  The Office of Hawaiian Affairs board.

20            THE COURT:  OHA meeting.  Okay.

21            MR. MEHEULA:  Yeah.  And then that's the one that's

22   Exhibit B to Mr. Akina's.  Okay.  There's -- on Page 14 there's

23   a statement by Corporate Counsel Kimoto.  Corporate Counsel

24   Kimoto is the corporate counsel for the Office of Hawaiian

25   Affairs.

1              THE COURT:  Okay.

2              MR. MEHEULA:  Okay.  What he says there is, Corporate

3      Counsel Kimoto advised the board that they must be very careful

4      and not step over the line by directing Na'i Aupuni to do or

5      desist from certain activities.  They will have total

6      discretion on how they manage their tasks as will be sounded in

7      their contract.

8              And then the grant agreement where they say that

9      they're not going to control us, it was signed by Mr. Kamana'o

10     Crabbe, Dr. Crabbe who testified today, also signed by their

11     corporate counsel Mr. Kimoto.  So we've got Mr. Kimoto telling

12     his clients, advising his clients at a public meeting of the

13     Office of Hawaiian Affairs that you will not be controlling

14     Na'i Aupuni and it's going to be in an agreement, and it is in

15     the agreement, and we have no testimony that they ever did

16     control us.

17             So, that's a very -- I think that's a very important

18     fact concerning state action.

19             THE COURT:  So Mr. Popper seems to argue that there's

20     an effort, you know, to pass Act 195 with a clear path forward

21     and that your client was just fulfilling that path going

22     forward.  And clearly, I mean what we all can agree there

23     definitely is state action, is Act 195 a state action, I don't

24     think anyone disputes that.

25             MR. MEHEULA:  Right.

1          THE COURT:  And OHA funding is state action.  Although
2    maybe that's disputed, I'm not sure.  But I mean just the
3    giving of money, the two-and-a-half million dollars.
4          MR. MEHEULA:  They are a state agency.
5          THE COURT:  They are a state agency.  Okay.
6          So what is the -- help me with the funding and Act 195
7    and how that plays into my analysis on state action.
8          MR. MEHEULA:  Well, I think you have to take --
9          THE COURT:  For your client.
10         MR. MEHEULA:  Yeah, for my client I think you have to
11   take a look at the test.  And the two tests that they advocate
12   apply here are the government function one and then also the
13   joint action one.  The joint action one basically says, has
14   there been control by the State.  And that's why I spent a lot
15   of time on there's no control.  Okay.  And the government
16   function one goes to the question of, you know, what is this
17   election?  Is it a state election or not.
18         I mean Mr. Popper talks about this, Well, it's an
19   important public issue.  There's no law that says that an
20   important public issue is enough to satisfy the Fifteenth
21   Amendment and to also qualify as for a government function for
22   purposes of state action.  I mean Terry versus Adams concerned
23   a state election.  And anything -- anything related to, Well,
24   you know, Fifteenth Amendment might apply to an election for a
25   government policy.  The government they're talking about there

1    is state, federal, local government.  What we've got here is

2    indigenous people trying to pursue self-determination which is

3    their inherent right under federal law.

4           And so -- and if you look at what --

5           THE COURT:  So I mean I assume you agree with me, in

6    your brief, I mean I'm reading partly from your brief, you say

7    that even if the convention results in the formation of a

8    Native Hawaiian governing entity, that entity by itself would

9    not alter in any way how the State is governed.  Such

10   alteration of government will require subsequent action.

11          In other words, your view is, you're a private entity,

12   your client's a private entity, this is a private election.

13          MR. MEHEULA:  Correct.

14          THE COURT:  That will result in presumably the

15   formation of an entity that wants to then engage in the future

16   in negotiations, whether it be with the state or the federal

17   government.

18          MR. MEHEULA:  That's all possible.  Correct.

19          THE COURT:  Right?

20          MR. MEHEULA:  Collect.  Correct.  But there's no

21   determination made of any kind of state policy or state law by

22   this process.  That's later.

23          THE COURT:  Right.  That's what I'm getting at.

24   That's what I'm getting at.  It's all later.

25          MR. MEHEULA:  Correct.

1          THE COURT:  In other words, and I know there may be

2     some in the Hawaiian community, and I only say this in reading

3     the newspaper and watching the news, who disagree with this.  I

4     understand that.

5          MR. MEHEULA:  Correct, Your Honor.

6          THE COURT:  With what you're telling me and what I'm

7     talking to you about because some are of the view that they're

8     a sovereignty today and we don't need to go through this

9     process.  I mean I've heard that at least espoused by some.

10          But the reality, the legal reality of this entity from

11     my perspective is it is a private entity that may establish the

12     framework for a governing entity, but they need to negotiate

13     with the federal government and perhaps the state going

14     forward.

15          MR. MEHEULA:  Actually it's even one more removed.  I

16     mean what we're doing, what Na'i Aupuni is doing is we're

17     trying to hold an election whereby Native Hawaiian leaders can

18     come together and discuss future self-governance for Native

19     Hawaiians, and it's for them to freely decide what they want to

20     do.  We don't know what they want to do, but --

21          THE COURT:  If that's where they go.

22          MR. MEHEULA:  Right.

23          THE COURT:  If that's where they go that we want to

24     have some form, we as this group want to recommend some form of

25     self-governance, whatever that might look like.

1          MR. MEHEULA:  Whatever the delegates may propose.
2     Yeah.
3          THE COURT:  Yes.  Exactly.
4          MR. MEHEULA:  Yeah.
5          THE COURT:  I don't think anyone here today knows  if
6     it goes forward what exactly will happen, if anything, or if
7     they do have and create a Constitution or a governing document,
8     what it might look like.  At least I don't have a sense of that
9     sitting here today.
10         MR. MEHEULA:  That's right.  No, no one knows.  Right.
11         THE COURT:  Right.  Okay.  And how narrow or broad
12     that might be.
13         MR. MEHEULA:  Correct.
14         THE COURT:  Incremental or not incremental, I don't
15     know.
16         MR. MEHEULA:  Correct.
17         THE COURT:  But in and of itself if a document is
18     created out of this convention.
19         MR. MEHEULA:  Okay.
20         THE COURT:  Whatever you call it, it is in and of
21     itself of no legal significance.  There has to be negotiations
22     with the federal government and perhaps the state as the next
23     step.
24         MR. MEHEULA:  Or some, yeah, someone -- whoever they
25     seek recognition from, they are going to have to apply there

1    and try and advocate there, correct.

2              THE COURT:  Okay.  And then there could be a whole

3    host of legal challenges down the road that we don't know about

4    right now, but that's not before me now.

5              MR. MEHEULA:  That's correct.

6              THE COURT:  All right.

7              MR. MEHEULA:  That's correct.

8              But I think some of the statements, Your Honor, that

9    the DOI in their brief made is important to this question of

10   state action, and one of them -- and one of them is this:  It's

11   on Page 6.

12             THE COURT:  Page 6 of the amicus?

13             MR. MEHEULA:  Correct.  Toward the bottom of it.

14             THE COURT:  Mm-hmm.

15             MR. MEHEULA:  There's a sentence, toward the end of

16   that big paragraph, it says:  The community could but is not

17   required to use the Roll certified by a state commission such

18   as the Native Hawaiian Roll Commission as a basis for

19   determining who may participate in the referendum, if the

20   community conforms the Roll to certain requirements and the

21   proposed rule.  So they're talking about the proposed rule

22   there.

23             But what -- but what this brief tells us is that the

24   DOI feels like there's nothing wrong with an independent group

25   like Na'i Aupuni using the Roll that was created by the Native

1   Hawaiian Roll Commission.  And I think that's important because
2   what the Ninth Circuit asked in the Kahawaiola'a case was that
3   they requested that the DOI use its agency expertise to
4   determine whether or not federal recognition or Native
5   Hawaiians could pursue self-determination.  And the response
6   from the DOI was to pursue this rule-making process.
7        Their conclusion in this is that the Native Hawaiian
8   Roll Commission's Roll and an independent group like Na'i
9   Aupuni using it, there is no violation of law, number one.  And
10  then number two they go on to say on Page 21 of their brief,
11  and this is toward the last sentence of the big middle
12  paragraph, it says -- and they're contrasting the situation in
13  Rice to what we have here.  And they say:  By contrast, this
14  case is about Native Hawaiian elections for Native Hawaiian
15  delegates to a convention that might propose a constitution or
16  other governing document for the Native Hawaiian community.
17  This election has nothing to do with the governing of state --
18  the State of Hawaii.  So they're saying this is not any kind of
19  election that is a government election for government officials
20  or determining government policy.  This is the internal affairs
21  of the Native Hawaiian community.
22        And so I think for that reason the government function
23  test doesn't apply, so you don't have the joint action test
24  applying, you don't have the government function test applying,
25  and you also, I think, have a situation, Your Honor, where if

1    you at look Page -- Page 20 of -- the end of Page 20 of the

2    Department's brief, it says, quote:  Any ruling that purports

3    to require the Native Hawaiian community to include non-natives

4    in organizing a government could mean in practice that a native

5    group could never organize itself, impairing the right -- its

6    right to self-determination and frustrating its eligibility for

7    a government-to-government relationship with the United States.

8            So if that's in the agency expertise of the DOI's

9    position, then basically what they're saying is that if we did

10   allow non-natives to participate in this election, then it

11   would foreclose federal recognition.  And that's foreclosing

12   self-determination because it's for Native Hawaiians to

13   determine whether or not they want to pursue federal

14   recognition or a different type of self-governance.

15           And so they -- similar cases, state action cases talk

16   about the countervailing reason.  So they're saying basically,

17   you know, you have all these tests, but if it results in

18   something that just doesn't make sense then you have to look at

19   that.  That's like the Polk case, the Tarkanian case.

20           But -- and that's what you have here.  I mean if this

21   is state action such that -- such that this is some sort of

22   government function that we're providing and therefore we have

23   to allow non-natives in, so that doesn't make sense because

24   then we could never do this.  So, that's sort of, you know, the

25   other argument for why it is that this can't be state action.

1          As far as the -- as far as the Akina, Makekau
2     viewpoint, Your Honor, they were both provided the opportunity.
3     And so not only therefore is there no First Amendment violation
4     for that because they were provided the opportunity, but they
5     didn't take it.  But also, you know, this is a Motion for
6     Preliminary Injunction and what kind of balance of harm do they
7     have?  They don't have any harm.  I mean they're the
8     plaintiffs.  It's balance of harm between plaintiffs and
9     defendants.  They don't have any harm because they were
10    provided this opportunity.
11         With respect to Gapero and Moniz, you know, they talk
12    about, well, we're upset about their OHA registrations being
13    transferred without their consent.  But in the complaint in
14    Paragraphs 38 and 39, they talk -- I mean 138 and 139, they
15    talk about why it is they're upset.  And they're upset, they
16    say, because the fact that they are on the Roll implies to the
17    world that they agree with Declaration One, which they don't
18    they say.  They say they don't agree with Declaration One,
19    unrelinquished sovereignty.  And they said but, you know, they
20    didn't attest to that because they registered with the Office
21    of Hawaiian Affairs which doesn't require that.  But they say
22    that, you know, their -- they have a First Amendment violation
23    because it implies to the world now that they're on the Roll
24    that they did.  But we have in the opp. that we submitted on
25    August 30th, which is Exhibit 13 -- we have in our opposition

```
 1   which we submitted on September 30th, we've set forth that no,
 2   if you are someone who has registered with OHA and that, you
 3   know, you didn't make that declaration.  And they put
 4   themselves out in the public in this case, so everyone knows
 5   now that they registered with OHA and therefore they didn't
 6   make those declarations.  And therefore, Your Honor, any kind
 7   of injunction would not increase --
 8            THE COURT:  Well, 62 percent came from OHA or
 9   thereabouts.
10            MR. MEHEULA:  Right.  Right.
11            THE COURT:  So I don't know that it says anything.
12            MR. MEHEULA: Right.
13            THE COURT:  You're on the list.  No one has any idea
14   how you got on the list.  Just the fact of being on the list.
15            MR. MEHEULA:  Correct.
16            THE COURT:  Right?
17            MR. MEHEULA:  Correct, Your Honor.
18            THE COURT:  Through Declaration One or through OHA.
19            MR. MEHEULA:  Correct.  Correct.  Yup.
20            THE COURT:  So...
21            MR. MEHEULA:  And then finally, Your Honor, I wanted
22   to just talk a little bit about the balance of harms.  You
23   know, you have these -- you have non-Hawaiian plaintiffs,
24   Mr. Kent and Mr. Mitsui, and their harm is that they can't
25   participate in this process.  This process that the DOI says
```

1    that they cannot participate in because if they do it's going
2    to make it an illegal process.  So, their harm is that they
3    can't participate in the process that they're legally not
4    entitled to participate in.  So, I don't see what kind of harm
5    there is.
6              THE COURT:  Let me ask you another question because
7    you only have about 5 minutes left and one that I'm more
8    interested in than that.
9              If I get to the heart of the Fourteenth Amendment, in
10   other words, I have layers here, right, there's the state
11   action issue.
12             MR. MEHEULA:  Right.
13             THE COURT:  And just hypothetically --
14             MR. MEHEULA:  Right.
15             THE COURT:  -- if there were a state action in the
16   election itself, okay.  And if I don't apply the Morton --
17   Mancari versus Morton doctrine, strict scrutiny would apply.  I
18   think that seems to be understood.
19             Give me -- articulate for me, because it's been argued
20   in the briefs in general terms, whether or not you satisfy --
21   you could satisfy, I understand the hypotheticals you don't
22   like behind that.
23             MR. MEHEULA:  Right.
24             THE COURT:  I mean I'm really doing this purely
25   hypothetically.

1          MR. MEHEULA:  Yeah.

2          THE COURT:  But would the -- is there a compelling

3    state interest to allow an election of Native Hawaiians with

4    the whole history we don't need to go into but that we all know

5    about.

6          MR. MEHEULA:  Right.

7          THE COURT:  And that's been reported in many, many

8    cases of the treatment of the Native Hawaiian population.

9          MR. MEHEULA:  Right.

10          THE COURT:  Is there a compelling interest to have

11    that election limited to Native Hawaiians?  Or I'm sorry, to

12    have an election, to bring together a group that hopefully

13    would be a unifying voice.

14          MR. MEHEULA:  Correct.

15          THE COURT:  Which has had problems finding that

16    unified voice in the past.

17          MR. MEHEULA:  Correct.

18          THE COURT:  And is it narrowly tailored by limiting it

19    to Native Hawaiians.  So, in other words, make your strict

20    scrutiny argument for me.  You may not have prepared for this,

21    but I want to hear what your --

22          MR. MEHEULA:  I just had one question first before.

23          THE COURT:  Sure.

24          MR. MEHEULA:  And that is, because of your assumptions

25    before I just want to make sure I understand the assumption on.

1          And so are you also finding that -- that Native

2     Hawaiians are not -- that Congress is not in its -- Indian

3     commerce power doesn't apply to Native Hawaiians?

4          THE COURT:  I'm saying, right, if we get it past all

5     of that, if strict scrutiny does apply.

6          MR. MEHEULA:  Yeah.

7          THE COURT:  It's not obvious to me you can't meet that

8     standard here, is what I'm getting at.

9          MR. MEHEULA:  Right.  Right.

10          THE COURT:  But I want help in trying to, if I get to

11     that point.

12          MR. MEHEULA:  Right.

13          THE COURT:  In getting your view as to why strict

14     scrutiny -- you would survive a strict scrutiny analysis here.

15     That's what I'm getting at.

16          MR. MEHEULA:  Well, I think it starts with Act 195.

17     It also, I think, starts with the 1978 constitutional

18     convention that created the Office of Hawaiian Affairs.  And it

19     also, I think, starts with the fact that this is the host

20     culture.  And the host culture is the culture that thrived

21     before but is having serious difficulties thriving in this

22     environment now, this political environment.  And it has for a

23     long time and that there's -- and that there's documented

24     proof, as Dr. Crabbe talked about today, that self-governance

25     is the type of structural change that could help Native

1   Hawaiians in that regard.

2          And you have the State of Hawaii that always supported

3   the Akaka Bill.  The State of Hawaii that always supported

4   Native Hawaiian self-determination and that history is set

5   forth I think nicely in the NPRM.  And so you have the

6   community here saying that this is -- this is what we want for

7   the State of Hawaii to move forward in a more positive way for

8   all of the State of Hawaii.  And there is no alternative to

9   this and it's tailored right to helping Native Hawaiians and

10  not hurting others.

11         THE COURT:  All right.  And I understand, as I

12  understand it, the whole opinion was vacated by the Supreme

13  Court decision in Rice, but Judge Rymer wrote the three-judge

14  opinion in the Ninth Circuit Rice case.

15         MR. MEHEULA:  Right.

16         THE COURT:  Judge Rymer was not known to be most of

17  liberal judges on the court and she found at the very end of

18  Rice that the OHA process, looking at Fourteenth Amendment

19  challenge, would survive strict scrutiny.  And she goes

20  through, not in great detail, an analysis there.  So I'm just

21  interested in hearing from people as to how that would apply if

22  I get to that point in this case.

23         MR. MEHEULA:  I think that -- that Ms. Kalama has

24  prepared for that one, so I --

25         THE COURT:  All right.

1            MR. MEHEULA:  I will leave it there.

2            THE COURT:  All right.  Thank you.

3            MR. MEHEULA:  Thank you.

4            THE COURT:  So we will take a break until 1 o'clock

5    and we will pick up with arguments.  Thank you all.

6            MR. MEHEULA:  Thank you.

7        (A recess was taken from 12:00 p.m. to 1:02 p.m.)

8            THE COURT:  All right.  We're back with all counsel.

9            Ms. Kalama, you have 15 minutes.

10           MS. KALAMA:  Good afternoon, Your Honor.  I feel like

11   we're heading down the home stretch here, so I'm going to limit

12   my remarks to a couple of points about level scrutiny and then

13   I'm going to answer any questions the Court may have and then

14   I'm going to sit down.

15           THE COURT:  All right.

16           MS. KALAMA:  So let's start where we left off before

17   the break.  Is there a compelling state interest to allow an

18   election limited to Native Hawaiians, that was the question the

19   Court posed, and the answer of course is yes.

20           THE COURT:  And if so, is it sufficiently tailored.

21           MS. KALAMA:  Right.  And that would be the next point.

22           And to find that compelling state interest, the Court

23   need only look at Act 195 itself.  In the preamble section of

24   the Act it talks about the legislature's identification of

25   self-governance as an important -- a compelling state interest,

```
1    one that was so important that the legislature wanted to enact
2    195.  And it goes on, you know, a little bit at length about
3    the process, about self-governance, about reorganization of a
4    Native Hawaiian entity and why that is so important for the
5    State of Hawaii.
6           We have also, as the Court referenced earlier, the
7    analysis in the Ninth Circuit decision in Rice, Judge
8    Rymer's --
9           THE COURT:  I don't think --
10          MS. KALAMA:  Which is slightly different but it --
11          THE COURT:  Well, it's different and it's been
12   vacated.
13          MS. KALAMA:  Yes.  No, I understand that, Your Honor,
14   but at the same time it does sort of articulate a lot of what
15   we've been saying in this case and we point to that as -- as
16   support for the proposition that there is in fact a compelling
17   state interest for the acts at issue here.
18          Is the election of Native Hawaiians the least
19   restrictive alternative, however the Court may want to phrase
20   that part of the test.  Yes, it is.  And it's real simple.  An
21   election about Native Hawaiian self-governance should be
22   limited to Native Hawaiians.  It really is as simple as that.
23   That is the least restrictive way of -- of forming the group
24   who would participate in an election for that purpose.
25          THE COURT:  So you're saying to fulfill that
```

1    compelling state interest the only way to do that meaningfully

2    is to restrict it to Native Hawaiians.

3         MS. KALAMA:  Yes, I think that that is the least

4    restrictive alternative and the Department of Interior talks a

5    little bit about that in its amicus brief about the fact that

6    it makes sense, of course, for an election or a process about

7    self-governance to be by and for Native Hawaiians as opposed to

8    non-Native Hawaiians.

9         And as the Court pointed out a little bit when we were

10   here this morning, the process itself that Na'i Aupuni is

11   proposing or is going forward with, at this point in time it

12   doesn't affect the broader public.  What they're doing is

13   getting together to talk, to formulate, to come up perhaps with

14   a governing document or something that they might propose.

15   That process itself is not affecting the larger community at

16   this time.

17        And so for those reasons, Your Honor, we do think that

18   there is a compelling state interest and if the Court were to

19   apply that standard, it would be met.

20        Of course our position is that the Court should apply

21   the Morton versus Mancari standard in this case.  And

22   plaintiffs have argued that it doesn't apply because Native

23   Hawaiians are not tribes, they don't have a tribal government.

24   It's a little -- the fact that this process is about forming a

25   government, to say that, you know, Morton versus Mancari

1  shouldn't apply because, you know, they're not a government is

2  a little ironic.

3       But I think, you know, Your Honor, the point that

4  we've made at length in our brief and the Department of

5  Interior as well in its brief is that if you look at Native

6  Hawaiians and the recognition that Congress has given them, not

7  just in the many, many statutes it's enacted for Native

8  Hawaiians' benefit, but the explicit statement about the

9  special political and trust relationship between the Congress

10 and Native Hawaiians, it really is clear, Your Honor, that the

11 principles that form the basis for saying we're going to apply

12 a "tied rationally" standard to scrutinize your action should

13 apply to Native Hawaiians.

14      THE COURT:  So -- so if we get past that hurdle.

15      MS. KALAMA: Yes.

16      THE COURT:  There's a second hurdle that really is

17 almost glossed over that I'm having some problems with in this

18 case.  And that is, Mancari clearly would apply to federal

19 laws.  Congress enacts the laws and the Supreme Court looks at

20 Mancari to see its applicability.

21      Here, this sort of assumes some state action in the

22 election and asks, you know, does Mancari apply to state

23 action.  Your brief cites the Washington versus Confederated

24 Bands and Tribes of the Yakima Indian Nation, but leaves out

25 part of what that case says.  It talks about Chapter 36, which

1  is the state law, it says:  It's not simply another state law,

2  it was enacted in response to a federal measure explicitly

3  designed to readjust the allocation of its jurisdiction over

4  Indians.

5           As I say, you leave out some of that language, which

6  bothers me somewhat, but then you say therefore Mancari applies

7  to a state action if the state legislation is enacted in

8  response to a federal measure and/or within the scope of the

9  authorization of a federal law.

10          I haven't seen any case law that accepts the "and/or"

11  there.  I have not seen any.

12          Where it has been applied there has been very explicit

13  federal authorization for the state to engage in, whether it be

14  lawmaking, rulemaking, negotiations, whatever it may be.  So

15  Artichoke Joe's -- a great name for a case -- 353 F.3d 712,

16  there it was, as I recall, the Indian Gaming Regulatory Act

17  which specifically says the states can enter into negotiations.

18  Right?  Congress is giving that authority.  So, the state steps

19  in the shoes of Congress to get that.

20          And here what I want to ask you about and get help

21  with is, if you step back a little bit, Act 195 and what

22  follows here is really, can be viewed a response to the lack of

23  congressional direction.  It's, we're at this point because the

24  Akaka Bill was not enacted after probably almost a decade of

25  efforts to do so.

1              What you're trying to do, and I understand it, is take
2    this penumbra and say we fall under that penumbra of benefits
3    and recognition from Congress.  I'm not sure if Mancari can be
4    applied that way.  So even if I agree with you on the first
5    step, right, that there are parallels between the Native
6    Hawaiian community and Indians such that Mancari could apply to
7    a federal law, I'm having trouble with the application to state
8    law.  And the only case I found that really discussed that --
9    let me find it now -- is a First Circuit case, KG Urban
10   Enterprises, 693 F.3d Page 1, which certainly suggests you need
11   a pretty close nexus, right?  So I don't know how explicit the
12   congressional delegation has to be.  Maybe it doesn't have to
13   say as the Gaming Regulatory Act says, you know, Go for it,
14   States, you go legislate in this arena.  But maybe it requires
15   at least something from Congress more specific to the actual
16   state action that's taken than what we have here.  So that's my
17   question to you.
18              MS. KALAMA:  Sure.  Okay.  Well, I think that, first
19   of all, in the apology resolution and, you know, maybe it
20   has -- we have questions about what that means.  But
21   nevertheless --
22              THE COURT:  The Supreme Court clarified that, but go
23   ahead.  And I do listen to the Supreme Court on occasion.  Yes.
24              MS. KALAMA:  But it itself recognized that the state,
25   in addition to the federal government, should continue on in a

1    reconciliation process.  And this Act 195 is part of that

2    reconciliation process, that process to bring about the

3    righting of the wrongs of the past.  So that is there.

4         THE COURT:  Okay.  So that provides the explicitness I

5    may be looking for.  Is that what you're arguing?  In other

6    words, if I do need more of a nexus than just general 150

7    different enactments over a period of hundreds of years, if I

8    need more than that you're saying the apology resolution gives

9    me that more definitive statement I'm looking for.

10        MS. KALAMA:  It's more explicit, but I think that

11   the -- not just the 150 laws, Your Honor, but that the

12   statements that Congress has made and say a particular few that

13   are more explicit about the relationship between the Congress

14   and Native Hawaiians and the desire to bring about

15   self-governance and that as an important step or an important

16   goal for the long run.  And I certainly -- whether or not

17   Congress makes explicit statements to the state, Go enact the

18   law for the purpose of facilitating reconciliation, I think

19   there is certainly enough during the course of the history,

20   including the trust responsibilities that we have, that were

21   given to the State of Hawaii by the United States when the

22   state was -- when Hawaii became a state, those trust

23   responsibilities are perhaps not explicit as to -- as to a

24   reorganization of Native Hawaiian governing entity, but they do

25   express that the state has a responsibility to better the

1   condition of Native Hawaiians and acting for the purpose of

2   facilitating self-governance is acting in the betterment of

3   Native Hawaiians.

4        THE COURT:  Well, I mean Congress presumably wants the

5   betterment of everything.  There's nothing they don't want the

6   betterment of, I would suspect.

7        MS. KALAMA:  Sure.

8        THE COURT:  It's just I don't have a whole lot to grab

9   on to as far as case law and from the Supreme Court.

10        MS. KALAMA:  Right.

11        THE COURT:  That the case does seem to suggest you

12   need more of a nexus than I'm hearing from you right now.  I'll

13   take a hard look at this, but I'm just not sure that that nexus

14   is there in this case.  And then in my own mind I'm also

15   questioning how do I play in the Akaka Bill which was rejected

16   by Congress, making it a little bit harder for you to argue

17   this is following up in sort of Congress' wishes when for years

18   the Akaka Bill failed.  And I'm not drawing any conclusions as

19   to whether it's right or wrong, that's not my place, but it's

20   just the fact that it did.  And this Act 195 and what followed

21   is sort of, as I see it, in response to the failure to get

22   legislation passed at a federal level.

23        MS. KALAMA:  Well, the fact that the Akaka Bill didn't

24   pass doesn't mean that Congress is saying to Hawaii don't do

25   anything regarding self-governance.  I don't think they're

1    saying that at all.  I think the apology resolution is to the
2    contrary.  I think what's reflected in the notice of proposed
3    rulemaking reflects an acknowledgment of the fact that
4    reorganization of a Native Hawaiian governing entity is
5    important to the United States.  So, it may not have the
6    explicit type of delegation that we had in the Yakima case, but
7    not even going 150 laws out there, there are more explicit
8    trust delegations, expressions by the Congress of the
9    relationship and the importance of self-governance to
10   indigenous peoples, including the Native Hawaiians.  And I
11   think those are enough.  And, you know, the DOI in its brief
12   set that forth as well.  That is enough to provide the nexus
13   that's required to support Act 195.
14            THE COURT:  All right.  But you have no law to give me
15   other than what we talked about here today.
16            MS. KALAMA:  Other than what's in our brief, no.
17            THE COURT:  Okay.  All right.  All right.
18            MS. KALAMA:  Unless the Court has any other questions?
19            THE COURT:  Thank you.
20            MS. KALAMA:  Thank you.
21            THE COURT:  All right, Mr. Klein, I think you said
22   20 minutes, right?
23            MR. KLEIN:  Hopefully it'll be briefer than that.
24            THE COURT:  I will give you 21 because Ms. Kalama left
25   a minute on the table.

1        MR. KLEIN:  Promise I won't use that much, Your Honor.

2        THE COURT:  All right.

3        MR. KLEIN:  May it please the Court.  Your Honor, we

4   stand on the cusp of a historic election.  Very important to

5   tens of thousands of Hawaiians who have signed up to

6   participate in this election.  And what stands in the way of

7   that election is this Motion for Preliminary Injunction.  As

8   Your Honor, knows the election will commence on November 1st

9   with the issuance of ballots to all those people who signed up

10  whose names are on the list.

11       So when we talk about the equities of this case, we're

12  talking about a historic hundred-plus year opportunity that has

13  finally come to the Hawaiian people to engage in discussions

14  about self-determination, about their future, their future in

15  Hawaii, their future in the United States.  And so it is a very

16  important point in time for the Hawaiian people and their

17  aspirations that you are now in control of by controlling this

18  motion.

19       And, Your Honor --

20       THE COURT:  All right.  Let's get to the legal

21  principles.  I understand what you're saying, but let's get to

22  the legal principles.

23       MR. KLEIN:  Well, there are -- there are four parts of

24  the preliminary injunction that -- the test that the plaintiffs

25  have to meet and they have to be very clear and convincing on

1    all four parts.  I'm just talking about the equities at this

2    point.  They don't address -- they don't address the equities,

3    but we do.  There's considerable interest in this election.

4    The equities should tip sharply in our favor, not in favor of

5    the plaintiffs.  I think when you get -- when you get to the

6    issues that are most important to our community, then you have

7    to look at this election in terms of the hundreds of -- the

8    100,000-plus Hawaiian people who are interested in the outcome

9    of this election.  You yourself said yesterday I think, Your

10   Honor, talk to 100 Hawaiians you might get 100 different points

11   of view with respect to what their future looks like and

12   self-determination, what that looks like.

13            Well, this is the opportunity for those voices to come

14   together and to decide the kind of future that they wish to

15   make within their rights as native people.  So, we believe the

16   equities tip sharply in our favor.

17            We also don't believe that the plaintiffs can show any

18   irreparable harm.  They spent all of one line in their brief

19   talking about irreparable harm.  The case law is clear, Your

20   Honor, simply stating a claim for a constitutional violation is

21   not enough to show irreparable harm.  More is necessary.  Case

22   law is clear on that.  They have to show particularized injury,

23   they have to show lack of redressability, and they haven't

24   shown or bothered to show any of that to this Court.

25            So, Your Honor, what we're left with is an analysis of

 1    likelihood of success on the merits.  And for that, I think

 2    we've had discussion by the Court, by counsel about the state

 3    actor tests.  I don't want to go into those in any great detail

 4    because I believe the briefs and the arguments today are very

 5    clear on that point.

 6            But opposing counsel mentioned the Terry case, the

 7    Rice case, and the Guam case as the pillars of their argument.

 8    I think Your Honor distinguished Terry, a distinction we agree

 9    with.  Terry was the Jaybird election case.  And as Your Honor

10    stated, we need to look at the function.  What was the result.

11    What was that election all about.  It's certainly way different

12    from the Na'i Aupuni election because that election was about

13    electing state officials.  And this one certainly isn't.  If

14    you win an election to become a delegate in the Hawaiian

15    convention, you're not going to be occupying any public office

16    whatsoever.

17            There are many steps, as Your Honor pointed out,

18    between the election, the convention, the ratification, the

19    potential request, the potential passage of the rule from the

20    federal government, the decision to even access that rule.

21    These are all speculative steps.  We have no idea what will

22    happen in the future.

23            So, as far as the State -- as far as Terry is

24    concerned, I agree with them, I think Terry controls.  And

25    that's why Na'i Aupuni is not a state actor because the

 1   election cannot result in the election of public officials, any

 2   decisions about passing laws of general applicability in the

 3   state, nor of state policy.

 4            Simply completely different from the Rice case which

 5   when you look at it in hindsight, based on the Fifteenth

 6   Amendment analysis, it's pretty clear, state officials, OHA

 7   trustees are being elected under state law and if you are not

 8   of the favored race you could not vote.  That election scheme

 9   violated the Fifteenth Amendment, but it's hardly precedent for

10   what's going on here.

11            As far as the Guam case is concerned, clearly Guam is

12   a standing case.  But more so it was the status of Guam that

13   was at stake in that plebiscite.  This election that Na'i

14   Aupuni is conducting is not going to change the status of

15   anything in the State of Hawaii, let alone the status of Hawaii

16   as a state in the union.  So that case is totally inapposite.

17            THE COURT:  So do you agree with, in the discussions

18   I've had so far with counsel, my articulation of what the

19   result of the election would be?  It sounds like you do agree

20   with what I said.

21            MR. KLEIN:  I would even add a few more steps.

22            THE COURT:  Okay.

23            MR. KLEIN:  I mean the result of the election is that

24   Hawaiian people will be delegates to an 'aha, a convention,

25   where they'll meet and they'll discuss their future, exercising

1    their right of self-determination.  We have no idea what it

2    will produce.  That's up to them.  That's up to the Hawaiian

3    people.  Should they -- should they decide to create organic

4    documents of a government, that government has no status unless

5    and until it's recognized either internationally or nationally.

6    So, I do agree with you.  There are many steps, they're all

7    speculative, we have no idea.  We don't even have any idea who

8    will be elected let alone what their platforms are, their

9    points of view, what have you, all we know is that there will

10   be an election.

11        THE COURT:  So I'm getting a hint from you and

12   Mr. Meheula that the UN may play a part in this.  I don't know

13   that I necessarily see that.  I'm not sure that I see that the

14   UN could unilaterally declare things in conjunction with a

15   private entity.

16        MR. KLEIN:  Personally that would worry me, Your

17   Honor.  I'm not suggesting that'll happen.  All I'm suggesting

18   is, there is -- nothing forecloses the right of the people who

19   are elected as delegates to that convention to consider all

20   options.  No one is predetermining that.  Certainly not any

21   state agency, certainly not Na'i Aupuni or anything else.

22        THE COURT:  Do you see this any different, let's say

23   that Mr. Asam -- is it Mr. or Dr.?  Dr. -- Dr. Asam 2 years

24   ago, 3 years ago put out a hat and started raising money from

25   private individuals.  And he raised two-and-a-half million

```
 1    dollars.  Or let's make it three-and-a-half million dollars
 2    because he went to Mr. Minkin.  We all know how much money
 3    Mr. Minkin has.
 4           MR. MINKIN:  Now that those tuitions are over.
 5           THE COURT:  Yeah.  And on his own privately set up a
 6    list, a Roll if you will.  In other words, advertised, got
 7    people to come forward, putting aside Declaration One for a
 8    minute, you know, attested to they're Native Hawaiian and
 9    18 years of age, let's say, at a minimum.
10           MR. KLEIN:  Sure.
11           THE COURT:  And you get a list of 100,000 people.  And
12    then through this private funding you contract out with EA and
13    you hold a private election.  Is it your view the result of
14    that scenario is exactly the same as the result of the scenario
15    before me now?
16           MR. KLEIN:  I would say the result is the same.
17           THE COURT:  That's what I'm getting at.  The result is
18    the same.
19           MR. KLEIN:  I would say the result is the same.
20           THE COURT:  There's no more state action in that
21    entity or state power in that entity that comes out of that
22    election, whether it's borne out of OHA funds or Act 195, and
23    if it's private, purely private.
24           MR. KLEIN:  Right, because if you focus on the
25    election itself, there's, number one, the Minkin-financed
```

1    election is not mandated by any government.  Neither is the

2    Na'i Aupuni election mandated by any government.  Neither would

3    the result of the election result in any public office, public

4    issues being resolved, laws passed in either election.  So I

5    think you hit the nail on the head at the very beginning.  You

6    have to look at the function because that's where the cases

7    lead you.

8            The Terry case leads you to the conclusion that their

9    scheme wasn't -- would not pass constitutional muster because

10   at the end of the scheme public officials are being elected.

11   It was a public election.  The Minkin election, the Na'i Aupuni

12   are not public elections unless you twist the law into a belief

13   that somehow something of public -- some public office is being

14   filled or some public law passed simply to say that there is a

15   public interest.  Suppose -- suppose the Cooke brothers have a

16   pack and they decide to run an election to elect officers to

17   that pack.  And their pack is instrumental in forging policy

18   and creating candidates who want to be elected so they can

19   fulfill those policy mandates of the Cooke brothers.  Does that

20   become a public election simply because the Cooke brothers have

21   an interest in the public policy of the United States?  I think

22   not.

23           And similarly in this case.  Number one, we don't even

24   know, as we've gone through, we don't know the result of what's

25   going to happen with the election.  But we know one thing.

1    They're not going to elect any public officials.  They're not

2    going to pass any laws.  They're going to discuss their future.

3    What that future may be is up to them.

4           So any of these state actor tests -- I'm not going to

5    go back over it, Mr. Meheula I think covered that quite well --

6    they simply don't apply here.  Na'i Aupuni is not a state

7    actor, not controlled by OHA in any way, shape or form, is not

8    carrying out a public function.

9           Your Honor asked Ms. Kalama, and I'll just touch on it

10   briefly, about the Mancari argument with respect to the

11   federal/state link, if there is any.  I think it's correct to

12   point out the Admissions Act, when Hawaii became a state,

13   delegated to the State of Hawaii the administration of the

14   Hawaiian Homes Commission Act and created the ceded lands

15   trust, which in part was for the betterment of the condition of

16   Native Hawaiians.  And Your Honor posed the question of well,

17   isn't Act 195 sort of a reaction to Congress' failure to pass

18   the Akaka Bill.  I would say Act 195 is the state's consistent

19   application of its trust responsibilities to Native Hawaiians

20   that were delegated from the federal government to the state

21   when Hawaii became a state in 1959.  It merely continues that

22   policy.

23           THE COURT:  But that's a penumbra argument, right?

24           MR. KLEIN:  Yes.

25           THE COURT:  I mean really it is.

1          MR. KLEIN:  Yes.

2          THE COURT:  So there's a legal question here I have to

3    resolve, right?

4          MR. KLEIN:  Yes, Your Honor.  I agree.

5          THE COURT:  Okay.

6          MR. KLEIN:  I'm trying to help you resolve that in our

7    favor.

8          THE COURT:  Well...

9          MR. KLEIN:  I mean because -- because that is a

10   serious trust responsibility when the federal government left

11   that to the State of Hawaii and the State of Hawaii obviously

12   has taken it very seriously.  Constitution was amended to

13   create OHA to carry out that function.  Act 195 furthers that

14   and fulfills that, and there may be other laws.  But I think

15   that is the best answer we can give you.

16         THE COURT:  All right.

17         MR. KLEIN:  Anything further, Your Honor?

18         THE COURT:  No.  Thank you.

19         MR. KLEIN:  Thank you.

20         MR. MEHEULA:  Actually I --

21         THE COURT:  You trying to take some time, just like a

22   congressional debate here, you get a few minutes that he didn't

23   use?

24         MR. MEHEULA:  I would like to try and address that

25   Yakima argument.

1          THE COURT:  I will permit it.

2          MR. MEHEULA:  Okay.

3          THE COURT:  You can.  You understand my concern.

4          MR. MEHEULA:  I do.  Right.

5          THE COURT:  So if I find a sufficient parallel that,

6    you know, Morton could otherwise apply.

7          MR. MEHEULA:  Right.

8          THE COURT:  I'm not sure if people call it Mancari or

9    Morton, how it's referred to in the shorthand, but if that case

10   could apply to a federal law involving Native Hawaiians, it's

11   the state action that I'm struggling with here.

12         MR. MEHEULA:  Right.  And I think your -- I mean I

13   think like the KG case, let's talk about, they're looking for

14   under Yakima is there authorization by Congress for the State

15   to basically step in the shoes for Congress to help Native

16   Hawaiians.

17         THE COURT:  Right.

18         MR. MEHEULA:  Okay.  And I think the two things that

19   are pretty specific in that regard.

20         THE COURT:  Okay.

21         MR. MEHEULA:  One of them is the apology bill.  And I

22   know that the United States Supreme Court pretty much nullified

23   use of the finding section of that but not the substantive

24   sections of it.  And the substantive section of it was pretty

25   specific that Congress was encouraging the State to further

1   reconciliation with Native Hawaiians for the purposes of

2   furthering their self-determination.  So I think that's pretty

3   specific.

4           The other thing, Your Honor, that's even more specific

5   is the -- is the proposed rule that's now being considered.

6   And I think that -- that's specific right there, but it's not a

7   rule yet.  But because we are in --

8           THE COURT:  Let me just stop you there.  Why can that

9   come from an agency?  I mean the agency can only --

10          MR. MEHEULA:  Because Congress --

11          THE COURT:  That may mean that the Department of

12  Interior has agreed with you that there's not an explicit

13  delegation, they're such that they can enforce that delegation.

14  But a statement from the Department of Interior in and of

15  itself is meaningless unless there's some congressional

16  authorization behind that.

17          MR. MEHEULA:  Well, that's the congressional -- the

18  broad congressional authorization that Congress gave to the

19  department so that they can pass laws like this.

20  Administrative rules like this that have the force of law.

21          So, and the fact that this is a Motion for Preliminary

22  Injunction, when is the trial going to be?  In something like

23  8, 9 months?  By then this could be law, federal law, under the

24  federal registry.  And if it is, and that's pretty specific

25  direction from the federal government that this type of process

1    should be pursued.

2           And the -- actually the KG case at Page 25, on this

3    point, you know, that was a preliminary injunction case, too.

4    And they talked about the fact that well, you know, this tribe

5    doesn't have the tribal land yet, but it will probably at the

6    time of trial.  And so for purposes of the -- of the

7    preliminary injunction we're going to take that into

8    consideration.

9           So I think you can take into consideration because

10   this isn't the trial, this is a Motion for Preliminary

11   Injunction, as to what's likely to happen.  We're in the Obama

12   administration, they're going to be -- and is this -- is this

13   likely to be granted?  Well, you know, for purposes of

14   preliminary injunction they haven't shown, you know, likelihood

15   on the merits.  And so I do believe that it's -- and this case

16   stands for that, that you can consider that.

17          THE COURT:  Okay.

18          MR. MEHEULA:  Thank you.

19          THE COURT:  Thank you.  All right.  So, Mr. Popper, I

20   think I should give you a few more than 10 minutes.  All right.

21   So I'll give you 15 minutes since I allowed a little bit extra

22   time to the other side.

23          MR. POPPER:  Thank you, Your Honor.

24          MR. SCHOETTLE:  And, Your Honor, may I have at least

25   1 minute?

1           THE COURT:  1 minute.  Well, I have not given you

2      permission to do so.  I thought we were in agreement on that.

3           MR. SCHOETTLE:  That's why I'm asking for a minute.

4           THE COURT:  So, all right, no, I will not give you a

5      minute.

6           MR. SCHOETTLE:  All right.  Thank you.

7           THE COURT:  You're welcome.

8           MR. POPPER:  Your Honor, the defendants have amply

9      demonstrated for you the importance of this election.  They

10     have called it historic just now.  This vote could be and this

11     election could be one of the most important in the history of

12     the State of Hawaii.  This could be a turning point for the

13     state, and my plaintiffs can't vote in it because of their race

14     and because of their viewpoint.  And certainly because of their

15     race.

16          The idea or the notion that what might happen will be

17     prospective, that it could be in the future is explained or

18     should be viewed in the context of the fact that this is a

19     process.  It starts with certain things and leads to the next

20     thing and it's the convention.  The convention does a

21     government's document.  The government's document gets ratified

22     or whatever happens to the government's document, or it gets

23     accepted by the Department of the Interior.  And we're at one

24     point in that process.

25          That's not to say that the future doesn't matter, it

1    can be discounted or that things that happen in the future

2    aren't relevant.  Consider that in Guam the plebiscite was an

3    earlier part of this same process.  That was to determine

4    whether they would do what the State of Hawaii is doing now in

5    this election.  What we maintain the state is doing.

6              THE COURT:  So what about my question to Mr. Klein I

7    asked about if Dr. Asam had raised purely private funds, what

8    would you be arguing?  Would you be standing there right now,

9    and if so, what different arguments would you be making?

10             MR. POPPER:  If he had raised purely private funds and

11   was holding an election using a list that he created.

12             THE COURT:  No, a list that -- let's say it's a list

13   of Native Hawaiians.  I mean let's not say who created it.  He

14   created it, yes, he paid to get it created.

15             MR. POPPER:  Okay.

16             THE COURT:  Okay?

17             MR. POPPER:  I would say there's several different

18   hypotheticals there.  If he got that list through a process

19   that was understood to involve contracts with the State and if

20   he told the State before --

21             THE COURT:  Well, take out state action.  That's what

22   I'm trying to do here.  So whenever or however he gets the

23   list, there's no state action involved.  Okay?

24             MR. POPPER:  Yeah.

25             THE COURT:  There's no state action involved here.

 1          MR. POPPER:  Of course.

 2          THE COURT:  In the sense of no state action in that

 3   OHA wasn't involved, the Roll Commission wasn't involved, there

 4   weren't contracts with the state to, you know, give us the list

 5   for $5,000, nothing of that sort.

 6          MR. POPPER:  Your Honor, he could run that election,

 7   and that's exactly what's wrong with the Cooke brothers

 8   analogy.  He could run that election.

 9          THE COURT:  And you would have no -- you could not be

10   standing here today if that was the case.

11          MR. POPPER:  I don't see how we could.  If he's taking

12   his own money and then running an election using, you know --

13          THE COURT:  Well, because it's so important, see?  So

14   you keep coming back to it's so important.  So now you're being

15   inconsistent.

16          MR. POPPER:  Well, no, Your Honor --

17          THE COURT:  And so that doesn't really mesh up, your

18   argument it's so important, therefore it's subject to the

19   Fifteenth Amendment, but it's so important over here and it's

20   not subject to the Fifteenth Amendment.

21          MR. POPPER:  Because, Your Honor, it gets back to

22   whether the governmental policy issues are involved.  And the

23   governmental policy issues that are involved here are more

24   concrete and more concern the relationship of Hawaiians to

25   Native Hawaiians and how people will live in the State of

1    Hawaii.  Whether the Cooke brothers can influence the public

2    debate and put people on TV saying certain things, you know,

3    that's sort of amorphous or vague.  Difficult to quantify

4    effect on the public interest is different from where you're

5    going to have a governance document and the only chance that

6    non-Native Hawaiians will have to comment on it is from a

7    subsequent process.  Well, they can comment on the work that's

8    already been done, but they can't participate in the doing of

9    the work in the first case.  So that's different, that's a

10   fundamentally different scenario.

11          Your Honor -- I'm sorry, Mr. Meheula argued or

12   conceded that Na'i Aupuni is looking forward to the Department

13   of the Interior's involvement in this process and that's why he

14   said that it was important that it be a race restricted

15   election in order to comply with the regulations that the

16   Department of the Interior is expected to promulgate.  So

17   everyone in this room is looking forward to what the Department

18   of Interior is going to do with this election.  That's the kind

19   of election that everyone should be able to vote on.  That's

20   different than a Cooke brothers election, it's different than a

21   private Minkin election that we discussed.  That's the kind of

22   election where there should be Fifteenth Amendment protections.

23          The State likewise got up and said holding this

24   election is important.  If this is a Minkin election --

25          THE COURT:  I think we can all stipulate it's

1    important if it goes forward.  I don't think anyone is

2    disagreeing with that.  What is the, you know, result of that,

3    right, in the legal analysis.

4         MR. POPPER:  Your Honor, no people, whether indigenous

5    or not indigenous, should have a right to hold a publicly

6    financed race-based election, unless they're an Indian tribe or

7    a reservation or there's been a statute that describes their

8    right to do so.

9         I understand that and perhaps what we're struggling

10   with is I think an issue that's not even presented here.  There

11   could be an election that just doesn't rise to the level of

12   public interest or public importance.  There certainly could be

13   private elections or club elections or, you know, even larger

14   elections than that and where that line falls you can't say.

15        But in this case where the Department of Interior is

16   interested and where the definition of a new governmental

17   entity that's going to have its own particular relation to the

18   United States is involved, that has to qualify.

19        I think it is inconsistent of the defendants to point

20   out that the elections -- pardon me, that the elections in

21   Terry concern public officials because the language said if

22   it's an important governmental issue or, disjunctively, the

23   election of public officials.  And they would then have no

24   explanation, the defendants, for even the limited result in

25   Guam.

1            What the court in Guam noted in the sentence before

2    the one I read last time is that:  If the plebiscite is held,

3    this would make it more likely that Guam's relationship to the

4    United States would be altered to conform to that preferred

5    outcome.  More likely.  More likely that that entity's

6    relationship to the United States would change.

7            This makes it a lot more likely.  In fact, if those

8    regulations are passed then it will happen and there will be no

9    involvement by any state election or federal official or a

10   federal vote.  The people will not be able to vote on that

11   result.  It will just happen.  That makes this different than

12   all the examples we've been thinking about.  Yes, there must be

13   some line where what happens in an election is just not a

14   public interest, it's just -- whatever that means.  It's just

15   not important enough to involve the people of the United

16   States.  But there also has to be a line that when you have a

17   government official colluding, arranging, acting in concert,

18   whatever, with private actors, like they did in Terry, to bring

19   about a race-based election on a matter that people care about

20   and a right to care about --

21           THE COURT:  County officials.  Let's be clear.  It was

22   a county election.

23           MR. POPPER:  That strengthens our case, Your Honor.  I

24   mean that --

25           THE COURT:  Really?  Why?

1           MR. POPPER:  Well, because it just indicates that it

2    wasn't a statewide election, the kinds of elections that can be

3    involved can be local.  And Terry even says that.

4           THE COURT:  Yeah, of course.

5           MR. POPPER:  Well, Terry even says it can be a

6    community.  It can be a community.

7           THE COURT:  I would think my neighborhood board

8    election, if I were ever to vote in it, would -- couldn't be

9    race based.  I would think.

10           MR. POPPER:  I would think that's right.

11           THE COURT:  I don't have any argument with that.

12           MR. POPPER:  Would Your Honor -- I shouldn't ask the

13    Court a question -- but I don't think the Court would contend

14    that that election is more important than this one.

15           THE COURT:  See, you keep coming back to importance,

16    but I've pointed out and you've agreed with me that if this is

17    purely private funded it doesn't matter how important it is,

18    you couldn't be standing here right now.  So you keep coming

19    back --

20           MR. POPPER:  No, Your Honor --

21           THE COURT:  You keep coming back to importance, but it

22    isn't just importance.

23           MR. POPPER:  It isn't just importance, but, Your

24    Honor, in a way the public funding is a red herring.  You know,

25    it's not public action because it's public funded.  Defendants

1    amply demonstrate that that's not the test.  We never said it

2    was the test, we never will say it's the test.

3                THE COURT:  Okay.  All right.

4                MR. POPPER:  Now, these are public monies.  They're

5    trust funds, they're not tax dollars.

6                THE COURT:  Right.

7                MR. POPPER:  But it's a public function because

8    elections are public functions.  And there has to be -- for

9    example, Your Honor, a certain person were empowered, say you

10   had a state that didn't have a lieutenant governor and that

11   person were empowered to do all the things that a lieutenant

12   governor ordinarily does, but that person was a private actor

13   and there's no lieutenant governorship, there's no lieutenant

14   governorship position.  I mean is he a public official?  Well,

15   he's a public official depending on the nature of the decisions

16   he makes.  Is this an interest -- a matter of public interest?

17   Well, it is depending on what's going to happen.  And what's

18   going to happen is momentous.  Your Honor, this will be, I

19   concur, a historic election.

20               And, Your Honor, the importance of the election helps

21   to determine whether there's state action.  It plays into that

22   calculus.

23               I also wanted to point out just that I -- I concurred

24   when Your Honor was asking the State, I agreed with your point

25   that there's no statute, no federal statute authorizing Act

1   195.  And they never did manage to say, and it does appear to

2   be their position moreover, whether Senator Akaka was just

3   wasting his time.  He was doing something he didn't have to do,

4   to seek an actual federal statute that would govern the way in

5   which Native Hawaiians would be -- acquire their own governing

6   entity, was not the right thing to pursue when he could have

7   taken from sort of a mass of statutes involved, health issues

8   and so on, concerning the Native Hawaiian community, he could

9   have taken from that all the justification he would need to

10  hold a race-based election concerning private Hawaiian

11  governance.

12         Your Honor, I note as well that this principle to the

13  extent that it's described by the defendants is ungovernable.

14  Where does this stop?  I mean is it possible that a federal law

15  could give black voters the authority to choose a special

16  status or a special relationship or a special part of the

17  country and with their relationships to the United States and

18  could a federal statute say that only black voters could vote

19  in that election?

20         Your Honor, there are congressional enactments that

21  identify Appalachian whites as a group that has historically

22  severe socioeconomic conditions and living arrangements.  Could

23  there be a whites only election for those voters in which they

24  choose their status and their relationship to the United

25  States?  I can't tell Your Honor where the line of importance

1    is.  But this crosses it and there doesn't seem to be anyone in

2    this room who says differently.

3            THE COURT:  All right.  Any final closing remarks?

4            MR. POPPER:  Yes, Your Honor, just with respect to

5    compelling state interest.  Your Honor referred to -- I'm

6    sorry, one of the attorneys referred to the importance of a

7    unifying voice.  I would respectfully submit that there is no

8    way a compelling state interest can be demonstrated by a

9    definition of race that is this broad.

10            I have ancestors all over Europe.  I have ancestors

11   extending down to the Middle East.  If you were to go back

12   9 generations so you could pick my 500 ancestors, they would

13   have just about nothing to do with each other.  But if you pick

14   the one ancestor who was Hungarian, would that entitle me to be

15   part of a Hungarian tribe in the United States if there was a

16   federal law saying you could do it?

17            That doesn't meet strict scrutiny.  That can't be a

18   compelling justification.  Arguably the Hawaiian Homes

19   Commission Act is closer at least with something that defines

20   strict scrutiny because it refers to a population that is

21   50 percent Native Hawaiian.  But the standard that they have

22   elucidated can't be the basis for strict scrutiny

23            THE COURT:  All right.  Thank you, Mr. Popper.

24            MR. POPPER:  Thank you, Your Honor.

25            THE COURT:  Appreciate your arguments.

1          All right.  So, counsel, timing.  Let's talk a little

2    bit about that.  I don't know that I will have a full written

3    order ready to go before the election one way or the other.  I

4    will certainly have a decision well before the election.  So, I

5    don't know who wants to take the lead in having a discussion or

6    we can just have an open discussion here.  There are a couple

7    alternatives.  I can tell you which way I'm leaning.

8          One is for me, once I have a final decision, is to

9    just do a very short grant or deny.  I mean, you know, very

10   brief.  Written order to follow.

11         The other and because of the public importance of this

12   matter overall and the public's interest is for us to get back

13   together in a few days.  I will give more detailed reasoning

14   than I would in a -- in a line or two with a fuller written

15   order to follow.

16         I'm inclined -- you two may have travel plans back to

17   the Mainland, I understand that.  You could certainly appear by

18   phone.  I would want at least until Friday to do that, but I

19   will be prepared to rule on Friday.  That could change.  But

20   that is my view right now.

21         So what I'm thinking might be useful is to get back

22   together on Friday, I will rule from the bench and provide some

23   level of reasoning so that before the election, whether it goes

24   forward or not, the public would have some idea of why.  Not

25   the full reasoning behind it.  And then a written order to

1    follow with the fuller reasoning.

2            So given the public importance of this, that was just

3    my thought as the best way to proceed.  Any comments, any views

4    on that?

5            MR. KLEIN:  Your Honor, we agree with that, Your

6    Honor.

7            THE COURT:  I'm sorry?

8            MR. POPPER:  May we briefly consult?

9            THE COURT:  Of course.  Of course.

10                   (Pause in the proceedings.)

11           MR. POPPER:  The Friday option sounds good, Your

12   Honor.  We probably will be on the Mainland.

13           THE COURT:  All right.  So we could do it Friday

14   morning to help you with the time change.

15           MR. MEHEULA:  That's fine, Your Honor.

16           MS. KALAMA:  Fine with us, Your Honor.

17           THE COURT:  All right.  So what do we have Friday

18   morning?

19                   (Court and clerk conferring.)

20           THE COURT:  Let's do it at 10:30.  Okay?  I have a

21   10 o'clock criminal matter, which shouldn't take more than half

22   an hour.

23           MR. POPPER:  And, Your Honor, not to ask too leading a

24   question, but it will be an appealable order?

25           THE COURT:  Well, that's a good question.  I mean as

1    far as when the timing runs from, you will have to look at

2    that, whether it's oral or my written order that follows on an

3    interlocutory appeal.  If either side takes an interlocutory

4    appeal, you're just going to have to do the research to see if

5    that oral ruling is sufficient to kick in the interlocutory

6    appeal or if you have to wait for the written.  Okay?  So I'm

7    not going to give you guidance on that because I don't know the

8    answer, if that's the question you.

9              MR. POPPER:  Yes, Your Honor.

10             THE COURT:  And I don't know if I just magically say

11   here's what it is and the Ninth Circuit agrees with that.  They

12   often don't agree with such things.

13             All right.  Anything else then?

14             MR. MEHEULA:  No, Your Honor.

15             MR. KLEIN:  No, Your Honor.

16             MR. POPPER:  No, Your Honor.

17             THE COURT:  There was a motion and I don't know

18   exactly what it was.

19             MR. POPPER:  Is that the Kingdom of Hawaii?

20             THE COURT:  Right.  I mean it could be read as a

21   motion to intervene when you look at the conclusion and what is

22   being sought.

23             MR. POPPER:  Your Honor, as I understood it, the

24   Kingdom of Hawaii, such as it is --

25             THE COURT:  I think his lawyer, their lawyer, if they

1    are an entity, is here.

2              Are you seeking any ruling from me?  You're Mr.?

3              MR. SINKIN:  Sinkin.

4              THE COURT:  Sinkin.  It's a little unclear to me based

5    on what you filed if you're seeking from me anything in

6    particular or if it's a notice, as you put it in your caption I

7    believe.

8              MR. SINKIN:  It was a notice and intended to put the

9    Court -- to make the Court aware of what we consider to be a

10   missing indispensable party which would have jurisdictional

11   implications for this case.

12             THE COURT:  Right.  Okay.  But you're not asking to

13   intervene, you're not asking anything of that sort --

14             MR. SINKIN:  We're not asking to become a party.

15             THE COURT:  You're not asking to become a party.

16             MR. SINKIN:  No.

17             THE COURT:  All right.  So I don't think I need

18   anything from -- unless I ask for it from anybody.  All right?

19             All right.  Anything further?  No.  Thank you all very

20   much.

21             MR. MEHEULA:  Thank you.

22             (The proceedings concluded at 1:52 p.m.,

23   October 20, 2015.)

24

25

```
 1                  COURT REPORTER'S CERTIFICATE

 2

 3          I, CYNTHIA FAZIO, Official Court Reporter, United

 4   States District Court, District of Hawaii, do hereby certify

 5   that pursuant to 28 U.S.C. §753 the foregoing pages is a

 6   complete, true, and correct transcript of the stenographically

 7   reported proceedings held in the above-entitled matter and that

 8   the transcript page format is in conformance with the

 9   regulations of the Judicial Conference of the United Stated.

10          DATED at Honolulu, Hawaii, October 24, 2015.

11

12

13                          /s/ Cynthia Fazio
                         CYNTHIA FAZIO, RMR, CRR
14

15

16

17

18

19

20

21

22

23

24

25
```