IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| KELII AKINA, et al., | ) | CIVIL NO. 15-00322 JMS-BMK |
| | ) | |
| Plaintiffs, | ) | ORDER DENYING PLAINTIFFS' |
| | ) | MOTION FOR PRELIMINARY |
| vs. | ) | INJUNCTION, DOC. NO. 47 |
| | ) | |
| THE STATE OF HAWAII, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION, DOC. NO. 47

## I. INTRODUCTION

Defendant Nai Aupuni[1] is conducting an election of Native Hawaiian

delegates to a proposed convention of Native Hawaiians to discuss, and perhaps to

organize, a "Native Hawaiian governing entity."  Delegate candidates have been

announced, and voting is to run from November 1, 2015 to November 30, 2015.

---

[1]  Nai Aupuni is "a Hawaii non-profit corporation that supports efforts to achieve Native Hawaiian self-determination."  Doc. No. 79-1, James Asam Decl. ¶ 6.
   Some names and Hawaiian language words use the diacritical markings "'okina" and "kahako" to indicate proper pronunciation or meaning.  "The 'okina is a glottal stop, similar to the sound between the syllables of 'oh-oh.'. . . .  The kahako is a macron, which lengthens and adds stress to the marked vowel."  *See* https://www.hawaii.edu/site/info/diacritics.php (last accessed Oct. 27, 2015).  But because different pleadings and sources use the markings inconsistently or improperly, this Order omits these diacritical marks for uniformity and to avoid compatibility issues between properly-used marks and electronic/internet publication.

Plaintiffs[2] have filed a Motion for Preliminary Injunction seeking, among other relief, to halt this election.

The voters and delegates in this election are based on a "Roll" of "qualified Native Hawaiians" as set forth in Act 195, 2011 Haw. Sess. Laws, as amended (the "Native Hawaiian Roll" or "Roll").  A "qualified Native Hawaiian" is defined as an individual, age eighteen or older, who certifies that they (1) are "a descendant of the aboriginal peoples who, prior to 1778, occupied and exercised sovereignty in the Hawaiian islands, the area that now constitutes the State of Hawaii," Haw. Rev. Stat. ("HRS") § 10H-3(a)(2)(A), and (2) have "maintained a significant cultural, social, or civic connection to the Native Hawaiian community and wishes to participate in the organization of the Native Hawaiian governing entity."  HRS § 10H-3(a)(2)(B).

Through a registration process, the Native Hawaiian Roll Commission (the "commission") asked or required prospective registrants to the Roll to make the following three declarations:

• Declaration One.  I affirm the unrelinquished sovereignty of the Native Hawaiian people, and my intent to participate in the process of self-governance.

---

[2] The Plaintiffs are Kelii Akina, Kealii Makekau, Joseph Kent, Yoshimasa Sean Mitsui, Pedro Kanae Gapero, and Melissa Leinaala Moniz.  Their backgrounds, as relevant to this suit, are discussed later in this Order.

- Declaration Two.  I have a significant cultural, social or civic connection to the Native Hawaiian community.

- Declaration Three.  I am a Native Hawaiian: a lineal descendant of the people who lived and exercised sovereignty in the Hawaiian islands prior to 1778, or a person who is eligible for the programs of the Hawaiian Homes Commission Act, 1920, or a direct lineal descendant of that person.

Doc. No. 1, Compl. ¶ 42; Doc. No. 47-9, Pls.' Ex. A.  Separately, the Roll also includes as qualified Native Hawaiians "all individuals already registered with the State as verified Hawaiians or Native Hawaiians through the office of Hawaiian affairs [("OHA")] as demonstrated by the production of relevant [OHA] records[.]"  HRS § 10H-3(a)(4).  Those on the Roll through an OHA registry do not have to affirm Declarations One or Two.

Plaintiffs filed suit on August 13, 2015, alleging that these "restrictions on registering for the Roll" violate the U.S. Constitution and the Voting Rights Act of 1965, 52 U.S.C. § 10301.  Doc. No. 1, Compl. ¶ 1.  As to the constitutional claims, they allege violations of (1) the Fifteenth Amendment; (2) the Equal Protection and Due Process clauses of the Fourteenth Amendment; and (3) the First Amendment.  They further allege that Nai Aupuni is acting "under color of state law" for purposes of 42 U.S.C. § 1983, and is acting jointly

with other state actors.[3]  *Id.* ¶¶ 59, 68, 70, 72, 74.  The Complaint seeks to enjoin

Defendants "from requiring prospective applicants for any voter roll to confirm

Declaration One, Declaration Two, or Declaration Three, or to verify their

ancestry."  *Id.* at 32, Prayer ¶ 2.  The Complaint also seeks to enjoin "the use of the

Roll that has been developed using these procedures, and the calling, holding, or

certifying of any election utilizing the Roll."  *Id.* ¶ 3.

To that end, Plaintiffs have moved for a preliminary injunction,

seeking an Order preventing Defendants "from undertaking certain voter

registration activities and from calling or holding racially-exclusive elections for

Native Hawaiians, as explained in Plaintiffs' Complaint."  Doc. No. 47, Pls.' Mot.

at 3.  They seek to stop the election of delegates, and thereby halt the proposed

convention.

The court heard Plaintiffs' Motion for Preliminary Injunction on

October 20, 2015, and fully considered all written and oral argument, as well as

---

[3]  In addition to Nai Aupuni, the Complaint names as Defendants:  (1) the Akamai Foundation; (2) the State of Hawaii, Governor David Ige, the Commissioners of the Native Hawaiian Roll Commission (Chair John D. Waihee III, Naalehu Anthony, Lei Kihoi, Robin Danner, Mahealani Wendt), and Clyde W. Namuo, Executive Director, Native Hawaiian Roll Commission, all in their official capacities (collectively the "State Defendants"); and (3) OHA Trustees (Chair Robert Lindsey, Jr., Colette Y. Machado, Peter Apo, Haunani Apoliona, Rowena M.N. Akana, John D. Waihee, IV, Carmen Hulu Lindsey, Dan Ahuna, Leinaala Ahu Isa), and Kamanaopono Crabbe, OHA Chief Executive, all in their official capacities (collectively, the "OHA Defendants").

the evidence properly submitted in the record.  The court issued an oral ruling on

October 23, 2015, explaining much of the court's reasoning and analysis.  This

written ruling provides further background and explanation, but is substantively

the same as the oral ruling.[4]  Based on the following, Plaintiffs' Motion is

DENIED.

## II.  BACKGROUND

### A.    Act 195 and the Native Hawaiian Roll

On July 6, 2011, then-Governor Neil Abercrombie signed into law

Act 195, which is codified in substantial part in HRS Chapter 10H.  Act 195

begins by declaring that "[t]he Native Hawaiian people are hereby recognized as

---

[4] On October 26, 2015, Plaintiffs filed a Notice of Interlocutory Appeal of the court's ruling. Doc. No. 106. "The general rule is that once a notice of appeal has been filed, the lower court loses jurisdiction over the subject matter of the appeal." *Bennett v. Gemmill (In re. Combined Metals Reduction Co.)*, 557 F.2d 179, 200 (9th Cir. 1977).  Nevertheless, even after an appeal has been filed, a district court "may act to assist the court of appeals in the exercise of its jurisdiction." *Davis v. United States*, 667 F.2d 822, 824 (9th Cir. 1982).  And, as summarized in *Inland Bulk Transfer Co. v. Cummins Engine Co.*, 332 F.3d 1007 (6th Cir. 2003), a district court's written opinion memorializing a court's prior oral ruling can certainly be "in aid of the appeal." *Id*. at 1013 (citing cases).  *See also In re Grand Jury Proceedings Under Seal*, 947 F.2d 1188, 1190 (4th Cir. 1991) (concluding that a district court's written order memorializing oral ruling aided an intervening appeal such that the notice of appeal did not divest the district court of jurisdiction to issue the written order).  At the October 23, 2015 hearing, the court anticipated the present posture by announcing that its oral ruling "is intended to be a summary of a more comprehensive written order to follow [and] [t]he written order is intended, if an appeal is taken from my ruling, to be in aid of the appellate process." Doc. No. 105, Tr. (Oct. 23, 2015) at 7. That is, on October 23, 2015, the court gave a detailed oral ruling pursuant to Federal Rules of Civil Procedure 52(a)(1) & (2), and issues this substantively-identical written decision with further background and explanation.

the only indigenous, aboriginal, maoli people of Hawaii." HRS § 10H-1. The

purpose of Act 195 is to:

> provide for and to implement the recognition of the
> Native Hawaiian people by means and methods that will
> facilitate their self-governance, including the
> establishment of, or the amendment to, programs,
> entities, and other matters pursuant to law that relate, or
> affect ownership, possession, or use of lands by the
> Native Hawaiian people, and by further promoting their
> culture, heritage, entitlements, health, education, and
> welfare.

HRS § 10H-2.

Act 195 establishes a five-member commission, which is responsible

for preparing and maintaining a roll of "qualified Native Hawaiians." HRS § 10H-

3(a)(1). As summarized above, § 10H-3(a)(2) (as amended by Act 77, 2013 Haw.

Sess. Laws), defines a "qualified Native Hawaiian" as

> an individual whom the commission determines has
> satisfied the following criteria and who makes a written
> statement certifying that the individual:

> (A) Is:

> > (i) An individual who is a descendant of the aboriginal
> > peoples who, prior to 1778, occupied and exercised
> > sovereignty in the Hawaiian islands, the area that now
> > constitutes the State of Hawaii;

> > (ii) An individual who is one of the indigenous, native
> > people of Hawaii and who was eligible in 1921 for the

programs authorized by the Hawaiian Homes
Commission Act, 1920, or a direct lineal descendant of
that individual; or

(iii) An individual who meets the ancestry requirements
of Kamehameha Schools or of any Hawaiian registry
program of the [OHA];

(B)  Has maintained a significant cultural, social, or civic
connection to the Native Hawaiian community and wishes to
participate in the organization of the Native Hawaiian
governing entity; and

(C)  Is eighteen years of age or older[.]

HRS § 10H-3(a)(2).[5]  Further, the commission is responsible for:

including in the roll of qualified Native Hawaiians all
individuals already registered with the State as verified
Hawaiians or Native Hawaiians through the [OHA] as
demonstrated by the production of relevant [OHA]

---

[5]  Elsewhere, Hawaii law defines "Hawaiian" and "Native Hawaiian" consistently with
HRS § 10H-3(a)(2).  Specifically, for purposes of OHA, HRS § 10-2 defines "Hawaiian" as:

any descendant of the aboriginal peoples inhabiting the Hawaiian
Islands which exercised sovereignty and subsisted in the Hawaiian
Islands in 1778, and which peoples thereafter have continued to
reside in Hawaii.

And it defines "Native Hawaiian" as:

any descendant of not less than one-half part of the races inhabiting
the Hawaiian Islands previous to 1778, as defined by the Hawaiian
Homes Commission Act, 1920, as amended; provided that the term
identically refers to the descendants of such blood quantum of such
aboriginal peoples which exercised sovereignty and subsisted in
the Hawaiian Islands in 1778 and which peoples thereafter
continued to reside in Hawaii.

> records, and extending to those individuals all rights and
> recognitions conferred upon other members of the roll.

HRS § 10H-3(a)(4).

Under these provisions, persons who are included on the Roll through

§ 10H-3(a)(4) as having "already registered with the State" through OHA do not

have to certify that they have "maintained a significant cultural, social, or civic

connection to the Native Hawaiian community," nor that they "wish[] to

participate in the organization of the Native Hawaiian governing entity" as set

forth in § 10H-3(a)(2).  And Nai Aupuni's President, Dr. James Asam, attests that:

> [Nai Aupuni] understood that OHA's Hawaiian Registry
> process did not require attestation of the "unrelinquished
> sovereignty of the Native Hawaiian people", and "intent
> to participate in the process of self-governance"
> ("Declaration One").  [Nai Aupuni] concluded, *on its
> own*, that having this alternate registration process was
> favorable because it provided Native Hawaiians who
> may take issue with Declaration One with the
> opportunity to participate in the [Nai Aupuni] process.

Doc. No. 79-1, Asam Decl. ¶ 19; *see also* Doc. No. 83-1, Kamanaopono Crabbe

Decl. ¶ 11 ("[A]n OHA Database registrant may be transferred to the Roll

Commission and included on the Roll without affirming the declarations required

under Act 195.").  Indeed, according to the Complaint, many of these OHA-

registrants were placed on the Roll without their knowledge or consent.  Doc. No.

1, Compl. ¶ 35.[6]

At the October 20, 2015 hearing, the parties stipulated that approximately 62 percent of the Roll comes from an OHA registry, and the other 38 percent come directly through the Roll commission process. *See* Doc. No. 104, Tr. (Oct. 20, 2015) at 57-58.  It follows that approximately 62 percent of the Roll did not have to affirm Declarations One or Two.  That is, approximately 62 percent of the Roll did not have to make an affirmation regarding sovereignty or significant connection to the Native Hawaiian community.[7]

---

[6]  OHA was established under 1978 Amendments to the Hawaii Constitution, and has its mission "[t]he betterment of conditions of native Hawaiians . . . [and] Hawaiians."  HRS § 10-3.

> Implementing statutes and their later amendments vested OHA with broad authority to administer two categories of funds: a 20 percent share of the revenue from the 1.2 million acres of lands granted to the State pursuant to § 5(b) of the Admission Act, which OHA is to administer 'for the betterment of the conditions of native Hawaiians,' Haw. Rev. Stat. § 10-13.5 (1993), and any state or federal appropriations or private donations that may be made for the benefit of "native Hawaiians" and/or "Hawaiians," Haw. Const., Art. XII, § 6.  *See generally* Haw. Rev. Stat. §§ 10-1 to 10-16.

*Rice v. Cayetano*, 528 U.S. 495, 509 (2000).  *Rice* held that OHA is a public state agency, responsible for "the administration of state laws and obligations," and that OHA elections are "the affair of the State of Hawaii."  *Id.* at 520.

[7]  The exact origin of Declaration One ("I affirm the unrelinquished sovereignty of the Native Hawaiian people, and my intent to participate in the process of self-governance") is not clear from the current record.  When asked about Declaration One at the October 20, 2015 hearing, Roll commission executive director Clyde Namuo testified that "[t]he Akaka Bill had been around for at least 10 years by the time the Roll Commission started its work.  The issue of

(continued...)

9

Under Act 195, the Governor of Hawaii appointed the five members of the commission selected "from nominations submitted by qualified Native Hawaiians and qualified Native Hawaiian membership organizations," where "a qualified Native Hawaiian membership organization includes an organization that, on [July 6, 2011], has been in existence for at least ten years, and whose purpose has been and is the betterment of the conditions of the Native Hawaiian people." HRS § 10H-3(b). The commission is funded by OHA, Act 195 § 4, and is placed "within the [OHA] for administrative purposes only." HRS § 10H-3(a).

The commissioners are responsible for (1) "[p]reparing and maintaining a roll of qualified Native Hawaiians;" (2) "[c]ertifying that the individuals on the roll of qualified Native Hawaiians meet the definition of qualified Native Hawaiians;" and (3) "[r]eceiving and maintaining documents that verify ancestry; cultural, social, or civic connection to the Native Hawaiian community; and age from individuals seeking to be included in the roll of qualified Native Hawaiians." HRS § 10H-3(a).

The commission is required to "publish notice of the certification of

---

[7](...continued)
unrelinquished sovereignty has been . . . included in every version of the Akaka Bill since its inception." Doc. No. 104, Tr. (Oct. 20, 2015) at 14. A full discussion of the "Akaka Bill" is well beyond the scope of this Order. A version of the Akaka Bill, known as "The Native Hawaiian Government Reorganization Act of 2009," H.R. 2314/S. 1011, 111th Cong. (2009), is discussed at Doc. No. 93-1, Amicus Br. Ex. A at 6 (80 Fed. Reg. at 59118).

the qualified Native Hawaiian roll, update the roll as necessary, and publish notice

of the updated roll of qualified Native Hawaiians[.]" HRS § 10H-4(a).  Under the

Act,

> The publication of the initial and updated rolls shall
> serve as the basis for the eligibility of qualified Native
> Hawaiians whose names are listed on the rolls to
> participate in the organization of the Native Hawaiian
> governing entity.

HRS § 10H-4(b).  Further,

> The publication of the roll of qualified Native
> Hawaiians, as provided in section 10H-4, is intended to
> facilitate the process under which qualified Native
> Hawaiians may independently commence the
> organization of a convention of qualified Native
> Hawaiians, established for the purpose of organizing
> themselves.

HRS § 10H-5.[8]

---

[8] Act 195 created the following other provisions regarding dissolution, effect, reaffirmation of delegation of federal authority, and severability:

> The governor shall dissolve the Native Hawaiian roll commission
> upon being informed by the Native Hawaiian roll commission that
> it has published notice of any updated roll of qualified Native
> Hawaiians, as provided in section 10H-4, and thereby completed
> its work.

HRS § 10H-6.

> Nothing contained in this chapter shall diminish, alter, or amend
> any existing rights or privileges enjoyed by the Native Hawaiian
> people that are not inconsistent with this chapter.

(continued...)

11

The commission "began accepting registrations for the Roll in July of 2012." Doc. No. 80-1, Clyde Namuo Decl. ¶ 3. Registration "has been closed at times in the past, but [at least as of September 30, 2015] it is presently open." *Id*. "Registrations can be done either online or by paper registration." *Id.* Further, from time to time after Act 195 was amended in 2013 to require the commission to include OHA registrants in 2013, Act 77, 2013 Haw. Sess. Laws, OHA has transmitted to the commission updated "lists of individuals registered through OHA's registries and verified by OHA as Hawaiian or Native Hawaiian." *Id.* ¶ 6.

---

[8](...continued)
HRS § 10H-7.

> (a) The delegation by the United States of authority to the State of Hawaii to address the conditions of the indigenous, native people of Hawaii contained in the Act entitled "An Act to Provide for the Admission of the State of Hawaii into the Union", approved March 18, 1959 (Public Law 86-3), is reaffirmed.

> (b) Consistent with the policies of the State of Hawaii, the members of the qualified Native Hawaiian roll, and their descendants, shall be acknowledged by the State of Hawaii as the indigenous, aboriginal, maoli population of Hawaii.

HRS § 10H-8.

> If any provision of this Act, or the application thereof to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of this Act, which can be given effect without the invalid provision or application, and to this end the provisions of this Act are severable.

Act 195 § 6 (uncodified).

The website of the "Kanaiolowalu" project of the commission lists 122,785 registered members on the Roll. *See* www.kanaiolowalu.org (last accessed Oct. 29, 2015).

Before OHA began transferring names of OHA registrants to the commission, the commission issued and distributed a press release on August 7, 2013 that, among other things, provided members on OHA lists a telephone number to call if they "[do] not wish to have their names transferred" to the Roll. Doc. No. 80-1, Namuo Decl. ¶ 5. On September 20, 2013, OHA transmitted an initial list of registrants to the commission that excluded approximately 36 persons who had requested that their names be withheld from the transfer. *Id.* ¶ 6.

On approximately October 10, 2013, the commission posted information on its website about removal from the Roll. It included a removal request form that could, and still can, be downloaded and sent to the commission. *Id.* ¶ 8. At various times in October to December of 2013, the commission also sent newsletters and emails to OHA registrants that included information on how to remove oneself from the Roll. *Id.* ¶¶ 9, 10. And from March 24, 2014 to April 4, 2014, the commission made available for public viewing (with binders in various locations, and on its website) a "pre-certified" list of individuals on the Roll. *Id.* ¶ 11. The purpose was, in part, to allow individuals to remove

themselves if they so chose. *Id.* ¶ 12.

Similarly, "[o]n at least three separate occasions in August, September, and October 2013, OHA provided public notice of the Act 77 transfer to OHA Database registrants[.]"  Doc. No. 83-1, Crabbe Decl. ¶ 12.  They "were informed of their right to complete and submit a short form . . . to opt-out of the Act 77 transfer." *Id*. ¶ 13.  On August 14, 2013, "OHA sent email notification to OHA Database registrants regarding OHA's transfer of information to the Roll Commission pursuant to Act 77," *id.* ¶ 14, and that notification included information regarding such an "opt-out form." *Id*.  OHA's chief executive, Dr. Crabbe, attests that this email was sent to an email address on file for Plaintiff Moniz. *Id.*  When asked at the October 20, 2015 hearing about Plaintiff Gapero, Dr. Crabbe testified that he had no specific knowledge regarding Gapero, but he "[is] confident that [OHA] took the appropriate measures to inform all those who were on the [OHA] databases[.]"  Doc. No. 104, Tr. (Oct. 20, 2015) at 22.

**B.     Nai Aupuni, the Akamai Foundation, and a Grant from OHA**

As noted above, Nai Aupuni "is a Hawaii non-profit corporation that supports efforts to achieve Native Hawaiian self-determination."  Doc. No. 79-1, Asam Decl. ¶ 6.  It was incorporated on December 23, 2014, and was intended to be independent of OHA and the State of Hawaii. *Id*.; Doc. No. 79-6, Nai Aupuni

Ex. 4 (By-Laws) at 1. It "is comprised of five directors who are Native Hawaiian, [and] are active in the Native Hawaiian community[.]" Doc. No. 79-1, Asam Decl. ¶ 29. The current directors are James Kuhio Asam, Pauline Nakoolani Namuo, Naomi Kealoha Ballesteros, Geraldine Abbey Miyamoto, and Selena Lehua Schuelke. Nai Aupuni was formed "to provide a process for Native Hawaiians to further self-determination and self-governance for Native Hawaiians." *Id*.

OHA has a policy of supporting Native Hawaiian self-governance. Doc. No. 83-1, Crabbe Decl. ¶ 17. On October 16, 2014, the OHA Board of Trustees "realign[ed] its budget" -- consisting of trust funds under § 5(f) of the Admissions Act for its purpose of supporting the betterment of Native Hawaiians -- to "provide funds to an independent entity to formulate a democratic process through which Native Hawaiians could consider organizing, for themselves, a governing entity." *Id*. Nai Aupuni subsequently "requested grant funds from the OHA so that [it] may conduct its election of delegates, convention and ratification vote process." Doc. No. 79-1, Asam Decl. ¶ 14.

"On April 27, 2015, at [Nai Aupuni's] request," OHA, the Akamai Foundation ('Akamai') and Nai Aupuni entered into a Grant Agreement whereby OHA provided $2,595,000 of Native Hawaiian trust funds to Akamai as a grant for the purpose of [Nai Aupuni] conducting an election of delegates, convention and

15

ratification vote[.]"  *Id.*; Doc. No. 79-2, Louis F. Perez III Decl.¶ 3.  "Akamai is a

non-profit Internal Revenue Code (IRC) Section 501(c)(3) organization

incorporated in the State of Hawaii[.]"  Doc. No. 79-2, Perez Decl. ¶ 2.  "Akamai's

mission and work is community development."  *Id.*

> **Nai Aupuni's Autonomy.**  As set forth in the separate
> Fiscal Sponsorship Agreement, OHA hereby agrees that
> neither OHA nor [Akamai] will directly or indirectly
> control or affect the decisions of [Nai Aupuni] in the
> performance of the Scope of Services, and OHA agrees
> that [Nai Aupuni] has no obligation to consult with OHA
> or [Akamai] on its decisions regarding the performance
> of the Scope of Services.  [Nai Aupuni] hereby agrees
> that the decisions of [Nai Aupuni] and its directors, paid
> consultants, vendors, election monitors, contractors, and
> attorneys regarding the performance of the Scope of
> Services will not be directly or indirectly controlled or
> affected by OHA.

The Grant Agreement contains the following autonomy clause:

Doc. No. 79-1, Asam Decl. ¶ 14.  "Pursuant to the Grant Agreement, OHA is

prohibited from exercising direct or indirect control over [Nai Aupuni]; provided

only that [Nai Aupuni's] use of the grant does not violate OHA's fiduciary duty to

allocate Native Hawaiian trust funds for the betterment of Native Hawaiians."

Doc. No. 83-1, Crabbe Decl. ¶ 19.  "Similarly, [Nai Aupuni] has no obligation

under the Grant Agreement to consult with OHA."  *Id.* ¶ 21.  There is no evidence

in the record that OHA in fact controlled or directed Nai Aupuni as to any aspect

16

of the Grant Agreement.

As referenced in the Grant Agreement clause, on April 27, 2015, Nai Aupuni and Akamai entered into a separate Fiscal Sponsorship Agreement.  They did so "because [Nai Aupuni] does not have a 501(c)(3) exemption."  Doc. No. 79-1, Asam Decl. ¶ 15; Doc. No. 79-2, Perez Decl. ¶ 4.  And on May 8, 2015 "OHA, [Nai Aupuni] and Akamai entered into a Letter Agreement that addressed the timing and disbursement of the grant funds."  Doc. No. 79-1, Asam Decl. ¶ 16; Doc. No. 79-2, Perez Decl. ¶ 6.

## C.     Nai Aupuni's Planned Election and Convention

Nai Aupuni's directors decided that "the voter[s] for election of delegates and the delegates should be limited to Native Hawaiians."  Doc. No. 79-1, Asam Decl. ¶ 13.  "While [Nai Aupuni] anticipated that the convention delegates will discuss and perhaps propose a recommendation on membership of the governing entity, [Nai Aupuni] decided, on its own, that Native Hawaiian delegates should make that determination and that its election and convention process thus should be composed of Native Hawaiians."  *Id.* (emphasis omitted). "Prior to entering into the Grant Agreement, [Nai Aupuni] informed OHA that it intended to use the Roll but that it continued to investigate whether there are other available lists of Native Hawaiians that it may also use to form its voter list."  Doc.

17

No. 83-1, Crabbe Decl. ¶ 20; *see also* Doc. No. 79-1, Asam Decl. ¶ 13.  Both OHA and Nai Aupuni agree that "under the Grant Agreement, [Nai Aupuni] has the sole discretion to determine whether to go beyond the inclusion of the Roll in developing its list of individuals eligible to participate in Native Hawaiians' self-governance process."  Doc. No. 83-1, Crabbe Decl. ¶ 20; Doc. No. 79-1, Asam Decl. ¶ 13.

"[Nai Aupuni] directors discussed . . . the utility of available lists of adult Native Hawaiians other than the [commission's] list.  After considering this issue for over two-months, [Nai Aupuni] directors determined that the [commission's] list was the best available option because it is extraordinarily expensive and time consuming to compile a list of Native Hawaiians."  Doc. No. 79-1, Asam Decl. ¶ 18 (emphasis omitted).  "[O]n June 1, 2015, the [Nai Aupuni] board decided, on its own, that it would use the [commission's] certified list as supplemented by OHA's Hawaiian Registry program."  *Id.* (emphasis omitted).

When asked at the October 20, 2015 hearing about Act 195, Dr. Asam testified credibly that "[t]here is no indication on my part or the board's part that [Nai Aupuni] needed to comply with Act 195."  Doc. No. 104, Tr. (Oct. 20, 2015) at 41.  That is, Dr. Asam indicated that he "didn't feel Act 195 controlled the decision-making of [Nai Aupuni]," and that it "could act independently of Act

195." *Id*. Nai Aupuni "[wasn't] driven by Act 195 at all." *Id*. at 42. The court

finds this testimony credible, and accepts it as true.

> "Although [Nai Aupuni] understood that unlike the [commission]
> process, [OHA's] Hawaiian Registry process . . . did not require registrants to
> declare 'a significant cultural, social or civic connection to the Native Hawaiian
> community,' ('Declaration Two'), [Nai Aupuni] believes that registering with
> OHA in and of itself demonstrates a significant connection." Doc. No. 79-1,
> Asam Decl. ¶ 20 (emphasis omitted). "[Nai Aupuni] believes that most of the
> OHA registrants have this connection because they either reside in Hawaii, are
> eligible to be a beneficiary of programs under the Hawaiian Homes Commission
> Act, participate in Hawaiian language schools or programs, attended or have
> family members who attend or attended Kamehameha Schools, participate in OHA
> programs, are members of Native Hawaiian organizations or are regarded as
> Native Hawaiian in the Native Hawaiian community." *Id*.

> "On June 18, 2015, [Nai Aupuni] and Election-America ('EA')
> entered into an Agreement for EA to provide services to conduct the delegate
> election." *Id.* ¶ 21. On August 3, 2015, "EA sent to approximately 95,000
> certified Native Hawaiians a Notice of the election of delegates that included
> information about becoming a delegate candidate." *Id.* ¶ 25; Doc. No. 79-14, Nai

Aupuni Ex. 12.  The Notice included the following timeline for 2015 to 2016:

| | |
|---|---|
| End of September: | List of qualified delegate candidates announced. |
| October 15: | Voter registration by the Roll Commission closes. |
| November 1: | Ballots will be sent to voters certified by the Roll Commission as of 10/15/15. |
| November 30: | Voting ends. |
| Day after voting ends: | Election results announced publicly. |

After the election of delegates, the target dates for the Aha [(convention)] and any ratification vote are as follows:

Between February and April 2016:  Aha held on Oahu over the course of eight consecutive weeks (40 work days, Monday through Friday).

Two months after the Aha concludes:  If delegates recommend a governance document, a ratification vote will be held among all certified Native Hawaiian voters.

Doc. No. 79-14, Nai Aupuni Ex. 12.

According to Dr. Asam, "[Nai Aupuni], on its own, decided on these dates and deadlines, the apportionment plan and the election process set forth in the Notice."  Doc. No. 79-1, Asam Decl. ¶ 25 (emphasis omitted).  This statement

is consistent with evidence from the commission's executive director, Doc. No.

80-1, Namuo Decl. ¶ 22, and from OHA's chief executive.  Doc. No. 83-1, Crabbe

Decl. ¶ 22.  "For purposes of determining who is eligible to vote in the November

delegate election, [Nai Aupuni] will allow individuals that the [commission] has

certified as of October 15, 2015."  Doc. No. 79-1, Asam Decl. ¶ 25.  And Dr.

Asam attests that:

> [Nai Aupuni] intends to proceed with and support the
> delegate election in November, regardless of whether the
> Roll Commission has certified the final version of the
> Roll by that date.  In February to April [2016], [Nai
> Aupuni] intends to proceed with and support the elected
> delegates [to] come together in a convention to consider
> matters relating to self-governance.  In or about June
> 2016, or thereafter, [Nai Aupuni] intends to proceed with
> and support a ratification vote of any governing
> document that the delegates may propose.

*Id.* ¶ 32.

**D.     The Department of the Interior's Notice of Proposed Rulemaking**

On October 1, 2015, the United States Department of the Interior

("Department") published a Notice of Proposed Rulemaking ("NPRM") titled

"Procedures for Reestablishing a Formal Government-to-Government

Relationship With the Native Hawaiian Community."  Doc. No. 93-1, Amicus Br.

Ex. A (80 Fed. Reg. 59113 (Oct. 1, 2015)).  The public comment period is open,

with comments on the proposed rule due by December 30, 2015.  80 Fed. Reg. at

59114.  The Department has submitted an amicus brief that explains, as

background information to the NPRM, some of the context for the actions of the

Roll commission, OHA, and Nai Aupuni.  *See* Doc. No. 93.  As the Department

describes it, the NPRM is based in part on the United States' "special political and

trust relationship that Congress has already established with the Native Hawaiian

community," Doc. No. 93, Amicus Br. at 5, as well as the suggestion by the Ninth

Circuit in *Kahawaiolaa v. Norton*, 386 F.3d 1271, 1283 (9th Cir. 2004), for the

Department to apply its expertise to "determine whether native Hawaiians, or

some native Hawaiian groups, could be acknowledged on a government-to-

government basis."  80 Fed. Reg. at 59117-18.  A full description of this NPRM is

not necessary here, and is well beyond the scope of current proceedings.  Some

aspects, however, are particularly relevant.

  "The NPRM proposes an administrative procedure, as well as criteria,

for determining whether to reestablish a formal government-to-government

relationship between the United States and the Native Hawaiian community."

Doc. No. 93, Amicus Br. at 4 (citing Proposed Rule ("PR") 50.1).  It was issued

after a 2014 Advance Notice of Proposed Rulemaking ("ANPRM"), which

"solicited public comment regarding whether the Department should facilitate

22

(1) reorganization of a Native Hawaiian government and (2) reestablishment of a formal government-to-government relationship with the Native Hawaiian community." *Id.* at 3-4 (citing 79 Fed. Reg. 35297, 35302-03).  After considering comment to the ANPRM, "the Department determined that it would not propose a rule presuming to reorganize a Native Hawaiian government or prescribing the form or structure of that government; the Native Hawaiian community itself should determine whether and how to reorganize a government." *Id.* at 4.  Rather, "[t]he process of drafting a constitution or other governing document and reorganizing a government should be driven by the Native Hawaiian community, not by the United States."  80 Fed. Reg. at 59119.  And, similar to Act 195's definition of a "qualified Native Hawaiian," the NPRM defines a "Native Hawaiian" as "any individual who is a: (1) Citizen of the United States; and (2) Descendant of the aboriginal people who, prior to 1778, occupied and exercised sovereignty in the area that now constitutes the State of Hawaii."  80 Fed. Reg. at 59129 (PR § 50.4).

And so, "[t]he Department's proposed rule contemplates a multistep process for a Native Hawaiian government to request a government-to-government relationship with the United States, if it chooses to do so."  Doc. No. 93, Amicus Br. at 5.  It contemplates the use of the Native Hawaiian Roll for determining who

may participate in any referendum, but does not require such use. *Id.* at 6 (citing PR §§ 50.12(b), 50.14(b)(5)(iii), (c); and 80 Fed. Reg. at 59121). "[T]he Secretary [of the Interior] [would, however,] reestablish a formal government-to-government relationship with only one sovereign Native Hawaiian government, which may include political subdivisions with limited powers of self-governance defined in the Native Hawaiian government's governing document." 80 Fed. Reg. at 59129 (PR § 50.3).

The NPRM would require "specific evidence of broad-based community support," Doc. No. 93, Amicus Br. at 6, and would require a Native Hawaiian governing entity to demonstrate that its governing document was "based on meaningful input from representative segments of the Native Hawaiian community and reflects the will of the Native Hawaiian community." 80 Fed. Reg. at 59130 (PR § 50.11); *see also* 80 Fed. Reg. at 59119 ("The process should be fair and inclusive and reflect the will of the Native Hawaiian community.").

## E.     The Legal Challenge

Plaintiffs' suit challenges the constitutionality of the Roll process and the election for delegates to Nai Aupuni's proposed convention on various grounds, with each of the six Plaintiffs having slightly different claims:

24

### 1.    *The Six Plaintiffs*

As alleged in the Complaint and in his declaration, Plaintiff Kelii

Akina is a Hawaii resident of Native Hawaiian ancestry.  Doc. No. 1, Compl. ¶ 6.

Doc. No. 47-8, Akina Decl. ¶¶ 7-8.  He contends he was denied registration on the

Roll because he would not affirm "the unrelinquished sovereignty of the Native

Hawaiian people" in Declaration One, and objects to that statement.  Doc. No. 47-

8, Akina Decl. ¶¶ 11-12.  He would like to register and vote in Nai Aupuni's

election.  *Id.* ¶ 16.  He would also like to run for delegate to the convention, but

cannot run because he claims he could not register.  *Id.* ¶¶ 19-20.  He contends he

was discriminated against because of his viewpoint regarding Declaration One.

*Id*. ¶ 18.

Plaintiff Kealii Makekau is a Hawaii resident of Native Hawaiian

ancestry.  Doc. No. 47-2, Makekau Decl. ¶¶ 2-3.  He would like to register and

vote in the election "that those on the Kanaiolowalu Roll are eligible to vote in,"

*id.* ¶ 12, and contends he was denied the right to vote because he objects to

Declaration One -- he could not truthfully affirm that he supports "the

unrelinquished sovereignty of the Native Hawaiian people."  *Id*. ¶¶ 7-8.  He

contends he was discriminated against because of his viewpoint regarding

Declaration One.  *Id*.  ¶ 14.

Plaintiff Joseph William Kent is a Hawaii resident of non-Hawaiian ancestry as defined in Act 195.  Doc. No. 47-6, Kent Decl. ¶¶ 2, 5.  He attempted to register on the Roll, but was denied registration because he could not affirm Hawaiian ancestry and did not have a "significant connection to the Native Hawaiian Community."  *Id*. ¶¶ 6-7.  He wants to "participate in the governance of my State through the democratic process," and "participate in the election that those on the Kanaiolowalu Roll will be able to participate in."  *Id.* ¶ 10.  He objects to the inability to "sign up for an election in the United States of America because of [his] race."  *Id.* ¶ 11.

Plaintiff Yoshimasa Sean Mitsui is a Hawaii resident of Japanese ancestry.  Doc. No. 47-3, Mitsui Decl. ¶¶ 2,5.  He would like to register on the Roll and vote in the upcoming election of delegates, but could not truthfully affirm Native Hawaiian ancestry, or "significant connections to the Native Hawaiian community."  *Id.* ¶¶ 4, 6-8.  He contends he is "being denied the right to vote in that election because of [his] race."  *Id.* ¶ 8.

Plaintiff Pedro Kanae Gapero is a Hawaii resident of Native Hawaiian ancestry.  Doc. No. 47-4, Pedro Gapero Decl. ¶¶ 2-3.  He claims he was registered on the Roll without his knowledge or consent.  *Id*. ¶ 4.  He objects to "the use of his name . . . without [his] free, prior and informed consent."  *Id*. ¶ 6.  He contends

that such use "violates [his] rights and provides an unauthorized assertion that [he] support[s] a position that [he] did not affirmatively consent to support." *Id.* ¶ 7.

Plaintiff Melissa Leinaala Moniz is a resident of Texas of Native Hawaiian ancestry. Doc. No. 47-5, Moniz Decl. ¶ 2, 4. She registered with Kau Inoa (an OHA registry). *Id.* ¶ 2. She attests that she was registered on the Roll without her permission. *Id.* ¶ 6. She believes that the Roll is "race-based and has caused great division among Hawaiians." *Id.* ¶ 8. She believes that the use of her name on the Roll without her permission "provides an unauthorized showing that [she] support[s] the Kanaiolowalu Roll and its purpose, which [she] [does] not." *Id.* ¶ 9.

### 2. *The Complaint*

Plaintiffs' Complaint alleges nine separate counts, as follows:

Count One (titled "Violation of the Fifteenth Amendment and 42 U.S.C. § 1983") alleges that "Act 195 and the registration process used by defendants restrict who may register for the Roll on the basis of individuals' Hawaiian ancestry." Doc. No. 1, Compl. ¶ 80. It alleges that "[t]he registration process used by the defendants is conduct undertaken under color of Hawaii law," *id.* ¶ 83, and that "Act 195 and the defendants' registration procedures deny and abridge the rights of Plaintiffs Kent and Mitsui to vote on account of race, in

violation of the Fifteenth Amendment." *Id.* ¶ 84.

Count Two (titled "Violation of the Equal Protection Clause of the Fourteen Amendment and 42 U.S.C. § 1983") alleges that "Act 195 and the registration process used by the defendants discriminate against Plaintiffs Kent and Mitsui on account of their race," *id*. ¶ 87, and thus "violate[s] the rights of Plaintiffs Kent and Mitsui under the Fourteenth Amendment to the equal protection of the laws." *Id.* ¶ 89.

Count Three (titled "Violation of Section 2 of the Voting Rights Act") alleges that "Act 195 intentionally discriminates, and has the result of discriminating, against Plaintiffs Kent and Mitsui on the basis of their race, in violation of Section 2 of the Voting Rights Act [(52 U.S.C. § 10301)]." *Id.* ¶ 94.

Count Four (titled "Violations of the First Amendment, Fourteenth Amendment, and 42 U.S.C. § 1983") alleges that "[i]t is not possible to register for the Roll without confirming [Declaration One]." *Id.* ¶ 97.  It claims that "[a]s a practical matter, requiring confirmation of [Declaration One] will stack the electoral deck, guaranteeing that Roll registrants will support the outcome favored by the defendants in any subsequent vote." *Id.* ¶ 98.  It alleges that "[r]equiring agreement with Declaration One in order to register for the Roll is conduct undertaken under color of Hawaii law," *id.* ¶ 99, and that "[b]y conditioning

registration upon agreement with Declaration One, the defendants are compelling speech based on its content." *Id.* ¶ 100.  It contends that "[r]equiring agreement with Declaration One in order to register for the Roll discriminates against those who do not agree with that statement, including Plaintiffs Akina and Makekau." *Id.* ¶ 101.  These practices are alleged violations of the First and Fourteenth Amendments.  *Id.* ¶¶ 104-05.

Count Five (titled "Violation of the Fifteenth Amendment and 42 U.S.C. § 1983") alleges that "[o]n information and belief, the process for determining who may be a candidate for the proposed constitutional convention restricts candidacy to Native Hawaiians, as defined by Hawaii law." *Id.* ¶ 109.  It contends that "[t]he disqualification of candidates based on race is conduct undertaken under color of Hawaii law," *id.* ¶ 111, and thus "violates the Fifteenth Amendment rights of all Hawaii voters, including Plaintiffs Akina, Makekau, Kent, Mitsui, and Gapero." *Id.* ¶ 112.

Count Six (titled "Violation of Section 2 of the Voting Rights Act") alleges that "[t]he disqualification of candidates based on race ensures that the political process leading to nomination or election in the State are not equally open to participation by citizens who are not Hawaiian," *id.* ¶ 114, and "results in a discriminatory abridgement of the right to vote." *Id.* ¶ 115.  This violates Section 2

29

of the Voting Right Act.  *Id.* ¶ 116.

Count Seven (titled "Violation of the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. § 1983") challenges Declaration Two, which states "I have a significant cultural, social or civic connection to the Native Hawaiian community." *Id.* ¶ 118.  It alleges that "Plaintiffs Kent and Mitsui cannot affirm this statement as they understand it." *Id.* ¶ 119.  It contends that "[r]equiring Plaintiffs Kent and Mitsui to confirm this statement . . . is a burden on Plaintiffs Kent and Mitsui that is not required for the sake of election integrity, administrative convenience, or any other significant reason." *Id.* ¶ 120.  It concludes that "[r]equiring Plaintiffs Kent and Mitsui to have particular connections with the Native Hawaiian community violates the rights of Plaintiffs Kent and Mitsui under the Fourteenth Amendment to the equal protection of the law." *Id.* ¶ 123.

Count Eight (titled "Violation of the Due Process Clause of the Fourteenth Amendment and 42 U.S.C. § 1983") contends that "[b]y requiring Plaintiffs to confirm Declarations One, Two, and Three, the registration process used by the defendants will cause the planned election to be conducted in a manner that is fundamentally unfair." *Id*. ¶ 126.  It allegedly "burdens the right to vote of all Plaintiffs in violation of their constitutional rights to Due Process." *Id*. ¶ 127.

Finally, Count Nine (titled "Violation of the First Amendment and 42 U.S.C. § 1983") alleges that "[v]oter registration is speech protected by the First Amendment," *id*. ¶ 130, and that "[f]orcibly registering an individual amounts to compelled speech." *Id*. ¶ 131. It contends that Plaintiffs Gapero and Moniz do not wish to bolster the legitimacy of the Roll," *id*. ¶ 134, and "have not agreed, and do not agree, with Declaration One." *Id*. ¶ 136. Thus, "[b]y registering Plaintiffs Gapero and Moniz without their consent and without notice to them, the [commission] compelled their speech and violated their First Amendment right to refrain from speaking." *Id*. ¶ 137.

As summarized above, the Complaint asks the court to:

1.  Issue a declaratory judgment finding that the registration procedures relating to the Roll violate the U.S. Constitution and federal law, as set forth above;

2.  Issue preliminary and permanent relief enjoining the defendants from requiring prospective applicants for any voter roll to confirm Declaration One, Declaration Two, or Declaration Three, or to verify their ancestry;

3.  Issue preliminary and permanent relief enjoining the use of the Roll that has been developed using these procedures, and the calling, holding, or certifying of any election utilizing the Roll;

4.  Order Defendants to pay reasonable attorneys' fees incurred by Plaintiffs, including litigation expenses and costs, pursuant to 52 U.S.C. § 10310(e) and 42 U.S.C.

§ 1988; [and]

5.  Retain jurisdiction under Section 3(c) of the Voting Rights Act, 52 U.S.C. § 10302(c), for such a period as the Court deems appropriate and decree that, during such period, no voting qualification or prerequisite to voting or standard, practice, or procedure with respect to voting different from that in force at the time this proceeding was commenced shall be enforced by Defendants unless and until the Court finds that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color[.]

*Id.* at 31-32.

The Motion for Preliminary Injunction incorporates such relief by seeking "an Order preventing [Defendants] from undertaking certain voter registration activities and from calling or holding racially-exclusive elections for Native Hawaiians, as explained in Plaintiffs' Complaint."  Doc. No. 47, Pls.' Mot. at 3 (referring to "Doc. No. 1, p. 32, Prayer for Relief").

## III.  <u>STANDARD OF REVIEW</u>

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted).  It is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *Lopez v.*

32

*Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (internal quotation marks and citation omitted).

To obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. "[I]f a plaintiff can only show that there are 'serious questions going to the merits' -- a lesser showing than likelihood of success on the merits -- then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)). "The elements . . . must be balanced, so that a stronger showing of one element may offset a weaker showing of another." *Lopez*, 680 F.3d at 1072. All four elements must be established. *DISH Network Corp. v. F.C.C.*, 653 F.3d 771, 776 (9th Cir. 2011).

## IV. DISCUSSION

### A. Plaintiffs Have Standing to Bring this Challenge

The court begins by addressing standing. The court has a duty to address jurisdiction and standing "even when not otherwise suggested." *Steel Co.*

33

*v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (citation omitted); *see also*

*Bernhardt v. Cty. of L.A.*, 279 F.3d 862, 868 (9th Cir. 2002) ("[F]ederal courts are

required sua sponte to examine jurisdictional issues such as standing.") (citations

omitted).  And indeed Defendants have challenged Plaintiffs' standing, at least as

to some claims, contending that they have not suffered a particularized injury.  *See*

Doc. No. 83, OHA Def.'s Opp'n at 14 ("[A] plaintiff lacks standing to challenge

the mere fact of a classification itself.") (citing *Carroll v. Nakatani*, 342 F.3d 934,

946 (9th Cir. 2003)); Doc. No. 79, Nai Aupuni Opp'n at 29 (joining OHA's

arguments regarding standing).

      "Article III restricts federal courts to the resolution of cases and

controversies." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 732 (2008) (citation

omitted).  "To qualify as a case fit for federal-court adjudication, 'an actual

controversy must be extant at all stages of review, not merely at the time the

complaint is filed.'" *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67

(1997) (quoting *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975)).  "[A] claimant must

present an injury that is concrete, particularized, and actual or imminent; fairly

traceable to the defendant's challenged behavior; and likely to be redressed by a

favorable ruling." *Davis*, 554 U.S. at 733 (citing *Lujan v. Defs. of Wildlife*, 504

U.S. 555, 560-61 (1992)).  "[T]he injury required for standing need not be

actualized.  A party facing prospective injury has standing to sue where the

threatened injury is real, immediate, and direct." *Id*. at 734 (citing *Los Angeles v.*

*Lyons*, 461 U.S. 95, 102 (1983)).

When determining Article III standing, courts "'accept as true all

material allegations of the complaint' and 'construe the complaint in favor of the

complaining party.'" *Davis v. Guam*, 785 F.3d 1311, 1314 (9th Cir. 2015)

(quoting *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011)).  "[S]tanding

doesn't depend on the merits of the plaintiff's contention that particular conduct is

illegal." *Id.* at 1316 (quotation marks and citation omitted).

The court concludes that there is standing to challenge Act 195 and the

proposed election, at least at this preliminary injunction stage.  Among other

matters, Plaintiffs allege that Nai Aupuni is acting under color of law, and is

holding a state election.  Assuming those allegations are true, and without

determining the merits of those allegations, at least some Plaintiffs are injured -- at

minimum, if true on the merits, Plaintiffs Kent and Mitsui would be deprived of a

right to vote in a public election.  Further, for purposes of standing, this case is

similar to *Davis*, where the Ninth Circuit found a plaintiff's allegations of injury in

being excluded on the basis of race from a Guam plebescite vote that could have

led to a change in Guam's future political relationship with the United States were

35

sufficient to confer standing. 785 F.3d at 1315. Moreover, generally, "[i]t is

enough, for justiciability purposes, that at least one party with standing is present."

*Kostick v. Nago*, 960 F. Supp. 2d 1074, 1089 (D. Haw. 2013) (citing *Dep't of*

*Commerce v. U.S. House of Representatives*, 525 U.S. 316, 330 (1999)); *see also*

*Pickup v. Brown*, 740 F.3d 1208, 1224 n.2 (9th Cir. 2013) ("[T]he presence in a

suit of even one party with standing suffices to make a claim justiciable.") (quoting

*Brown v. City of Los Angeles*, 521 F.3d 1238, 1240 n.1 (9th Cir. 2008) (per

curiam)).

## B.    The *Winter* Analysis for a Preliminary Injunction

The court now applies the four-part *Winter* test, beginning with a

discussion of whether Plaintiffs can demonstrate a likelihood of success.

### 1.    *Likelihood of Success*

#### a.    *Plaintiffs Have Not Demonstrated a Likelihood of Success on Their Fifteenth Amendment and Voting Rights Act Claims.*

As to Plaintiffs' Fifteeth Amendment and Voting Rights Act claims --

Counts One, Three, Five, and Six -- the evidence demonstrates that Nai Aupuni's

upcoming election is a private election, and not a State election. As a result,

Plaintiffs have not demonstrated a likelihood of success on these claims.

This election is fundamentally different than the elections at issue in

*Rice v. Cayetano*, 528 U.S. 495 (2000), and in *Arakaki v. Hawaii*, 314 F.3d 1091 (9th Cir. 2002), which found Fifteenth Amendment violations.  Those opinions were based on a conclusion that OHA elections are an "affair of the State of Hawaii" for public officials for public office to a "state agency" established by the State Constitution.  *See Rice*, 528 U.S. at 520-21, 525; *Arakaki*, 314 F.3d at 1095.  Not so here.  As set forth in *Terry v. Adams*, 345 U.S. 461 (1953), the Fifteenth Amendment precludes discrimination against voters in "elections to determine public governmental policies or to select public officials," *id.* at 467, not in private elections to determine private affairs.  Similarly, the Voting Rights Act applies to "votes cast with respect to candidates for public or party office."  *Chisom v. Roemer*, 501 U.S. 380, 391 (1991).

Certainly, this is not a state election governed by Chapter Eleven of the Hawaii Revised Statutes, or the State's regulatory systems covering public elections.  It is not an election run by the State of Hawaii Office of Elections for any federal, state, or county office, nor is it a general or special election to decide any referendum, constitutional, or ballot question.  No public official will be elected or nominated; no matters of federal, state, or local law will be determined.  Rather, the evidence indicates it is an election conducted by Elections America, Inc. -- a private company -- with all decisions regarding the election made by Nai

37

Aupuni, not by any state actor or entity.  There is no evidence before the court that any state official dictated or controlled the requirements for this election.

So what is this election?  How is it best characterized?  The court concludes -- at this preliminary injunction stage -- that this is an election for delegates to a private convention, among a community of indigenous people for purposes of exploring self-determination, that will not -- and cannot -- result in any federal, state, or local laws or obligations by itself.  Stated differently, this election will not result in any federal, state, or county officeholder, and will not result, by itself, in any change in federal or state laws or obligations.  Although it might result in a constitution of a Native Hawaiian governing entity, as OHA correctly argues, "even if such a constitution is ratified, the resulting Native Hawaiian self-governing entity would have no official legal status unless it were otherwise recognized by the state or federal government."  Doc. No. 83, OHA Opp'n at 9.

And as Nai Aupuni recognizes, "even if the convention results in the formation of a Native Hawaiian governing entity, that [governing entity] *by itself* would not alter in any way how the State is governed."  Doc. No. 79, Nai Aupuni Opp'n at 28.  Nai Aupuni recognizes that "[a]ny such alteration of government will require subsequent action (*e.g.*, formal recognition) by the federal and possibly state governments.  Similarly, any alteration of inter-governmental structure will

38

require subsequent Federal and State legislative and/or executive action with respect to the [entity]." *Id.* This statement is absolutely true, and critical to an understanding of the court's conclusion.

The court likewise agrees with the Department of the Interior's observation that "this case is about Native Hawaiian elections for Native Hawaiian delegates to a convention that might propose a constitution or other governing document for the Native Hawaiian community.  This election has nothing to do with governing the State of Hawaii."  Doc. No. 93, Amicus Br. at 21.

Plaintiffs argue that this is an important election about "public issues," and has the potential to be historic, and thus falls under the Fifteenth Amendment. They point to the Department of the Interior's October 1, 2015  NPRM as indicative of the election's importance -- it could conceivably lead to a "Native Hawaiian governing entity" that could eventually negotiate important questions on a "government-to-government" basis.  But such potential is entirely speculative. Notably, the NPRM is just that -- proposed -- and has no force at all as of yet. Even if adopted in proposed form, many discretionary steps would be required before any proposed governing entity could even be recognized.  *See* 80 Fed. Reg. at 59129-31 (explaining proposed "Criteria for Reestablishing a Formal Government-to-Government Relationship," PR §§ 50.11 to 50.16).

Plaintiffs rely heavily on *Terry v. Adams*, a case invalidating elections of the private "Jaybird party" that excluded African-Americans from primary elections that functioned essentially as a nominating process for public primary elections for county office.  345 U.S. at 463-64.  Specifically, Plaintiffs rely on *Terry's* statement that the Fifteenth Amendment "includes any election in which public issues are decided or public officials selected."  *Id.* at 468.  But this statement must be read in the specific context addressed by the court -- "[t]he Jaybird primary has become an integral part, indeed the only effective part, of the elective process that determines who shall rule and govern in the county."  *Id.* at 469.  Thus, the racist selection of candidates stripped African-Americans "of every vestige of influence" in selecting public county officials.  *Id.* at 470.  This court simply cannot read, in context, the statement that the Fifteenth Amendment applies to an election to decide "public issues" to apply to this private election.

In short, much more will need to happen under any scenario before this election leads to any public change at all.  A Native Hawaiian governing entity may recommend change, but cannot alter the legal landscape on its own.

Morever, this is not a public election based on Act 195 itself.  The creation of a Roll of Native Hawaiians does not mean its commissioners are conducting an election.  Act 195, although it contemplates a convention of

Hawaii's indigenous peoples to participate in the organization of a Native

Hawaiian governing entity, does not mandate any election.  It doesn't impose,

direct, or suggest any particular process.  Under HRS § 10H-5, the Roll is intended

to facilitate an *independent* process for Native Hawaiians to organize *themselves*.

As an internal matter of self-governance by a group of the Native Hawaiian

community, it does not involve a public election at all.  At most, Act 195 facilitates

*private* self determination, not governmental acts of organization.

> b.  *Plaintiffs Have Not Demonstrated a Likelihood of Success on Their Fourteenth Amendment Claims.*

Nor is Nai Aupuni's election, or Act 195 itself, a violation of

Plaintiffs' equal protection or due process rights under the Fourteenth Amendment

as asserted in Counts Two, Four, Seven, and Eight of the Complaint.  To state a

cause of action under 42 U.S.C. § 1983 for deprivation of a constitutional right,

Plaintiffs must demonstrate that the deprivation occurs "under color of any statute,

ordinance, regulation, custom, or usage of any State[.]"  *Lugar v. Edmondson Oil

Co., Inc.*, 457 U.S. 922, 924 (1982).  That is, there must be "state action."  *Id*. at

935 n.18 ("[C]onduct satisfying the state-action requirement of the Fourteenth

Amendment satisfies the statutory requirement of action under color of state law

[under § 1983].").  This requirement "excludes from [§ 1983's] reach merely

private conduct, no matter how discriminatory or wrongful." *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (quotation marks and citation omitted). And determining whether there is state action is a "necessarily fact-bound inquiry." *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 298 (2001).

But, because Nai Aupuni's election is a private election, Nai Aupuni is not a "state actor" for much the same reason.  Its election does not fit under the "public function" test of state action, which requires a private entity to be carrying out a function that is "traditionally the *exclusive* prerogative of the State." *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982).  In the area of elections, "[t]he doctrine does not reach to all forms of private political activity, but encompasses only state-regulated elections or elections conducted by organizations which in practice produce 'the uncontested choice of public officials.'" *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 158 (1978).  And although *some* (even most) elections are "public functions," clearly not all elections are public.

Nor does Nai Aupuni's election fall under a "joint action" test, which asks "whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." *Franklin v. Fox*, 312 F.3d 423, 445 (9th Cir. 2002) (quotation marks and citation omitted).  The evidence does not

42

suggest joint action here -- although certainly Nai Aupuni obtained significant

funds through an OHA grant, it did so with a specific autonomy clause whereby

OHA agreed not to "directly or indirectly control or affect the decisions of [Nai

Aupuni]." Doc. No. 79-1, Asam Decl. ¶ 14. All the evidence suggests that OHA

has no control over Nai Aupuni, and that Nai Aupuni is acting completely

independently. Plaintiffs have not met their burden to demonstrate otherwise.

That is, OHA's grant of funds to Nai Aupuni, through the Akamai

Foundation, does not make this a public election. Indeed, Plaintiffs admitted at the

October 20, 2015 hearing that public funding is a "red herring." Doc. No. 104, Tr.

(Oct. 20, 2015) at 126-27 ("[I]t's not public action because it's public[ly] funded.

Defendants amply demonstrate that that's not the test. We never said it was the

test, we never will say it's the test."). And this admission was well-taken given

cases such as *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982), and *San Francisco Arts

and Athletics, Inc. v. United States Olympic Committee*, 483 U.S. 522, 544 (1987),

which explain that "[t]he Government may subsidize private entities without

assuming constitutional responsibility for their actions." For example, in *Rendell-

Baker* the Supreme Court found no relevant state action by a private school even

where public funds accounted for at least 90 percent of its budget. 457 U.S. at 832.

The "receipt of public funds does not make [the agency's] discharge decisions acts

43

of the State." *Id.* at 840.

Rather, "[s]tate action may be found if, though only if, there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950, 955 (9th Cir. 2008) (en banc) (citing *Brentwood Acad.*, 531 U.S. at 295).  And in addressing that "nexus," the inquiry must begin by focusing on the "specific conduct of which the plaintiff complains." *Caviness v. Horizon Cmty. Learning Ctr., Inc.*, 590 F.3d 806, 812 (9th Cir. 2010) (quoting *Sullivan*, 526 U.S. at 51); *see also, e.g.*, *Barrios-Velasquez v. Asociacion de Empleados del Estado Libre Asociado de P.R.*, 84 F.3d 487, 490 n.1 & 493 (1st Cir. 1996) (finding no state action in private election of a quasi-public entity with several indicia of government control, emphasizing that the analysis focuses on "the government's connection to the complained-of action, not the government's connection to the [organization] itself").  Thus, "an entity may be a State actor for some purposes but not for others." *Caviness*, 590 F.3d at 812-13.

There is no such "close nexus" here between the State and this particular election that would make this a public election.  An OHA grant was not for the purpose of a public election.  And even if OHA -- certainly a "state actor" -- desires or agrees with some of Nai Aupuni's choices it makes in conducting the

44

election of delegates and holding a convention, the Supreme Court has held that "[a]ction taken by private entities with the mere approval or acquiescence of the State is not state action." *Sullivan*, 526 U.S. at 52.

Likewise -- although Act 195 itself, and the commission's actions in creating the Roll, certainly constitute "state action" -- this does not mean such action is an equal protection violation.  The court finds merit in Defendants' argument that the Roll itself is simply a list of people with Native Hawaiian ancestry who may or may not have declared that they have a civic connection to the Hawaiian community or believe in "unrelinquished sovereignty."  *See* Doc. No. 83, OHA Defs.' Opp'n at 15-17; Doc. No. 80, State Defs.' Opp'n at 1.  The Roll is essentially a classification, and as the Supreme Court stated in *Nordlinger v. Hahn*, "[t]he Equal Protection Clause does not forbid classifications."  505 U.S. 1, 10 (1992).  Rather, it is directed at unequal *treatment*.  *Id.*  It is the *use* of the Roll that Plaintiffs attack.  But Act 195's creation of the commission and a Roll does not actually *treat* persons differently.  Nothing in Act 195 calls for a vote.  Even if HRS § 10H-5 contemplates or even encourages a convention, it simply calls for a chance for certain Native Hawaiians to *independently* organize *themselves*, without involvement from the State.

The court also finds some merit in Defendants' argument that

45

*Brentwood Academy* acknowledged a type of exception or consideration (where state action might otherwise exist) for "unique circumstances" where that action raises "some countervailing reason against attributing activity to the government." 531 U.S. at 295-96.  And Act 195 is certainly a unique law -- its stated purpose is meant to facilitate *self*-governance and the organizing of the State's indigenous people independently and amongst themselves.  *See* HRS §§ 10H-2, 10H-5.  By definition, then, such organizing (especially private organization as is at issue here) must occur amongst Native Hawaiians only -- and this is a "countervailing reason against attributing activity to the government."

Furthermore, forcing a private entity such as Nai Aupuni to associate with non-Native Hawaiians in its convention to discuss matters of potential self-governance could implicate Nai Aupuni's own First Amendment rights.  *See, e.g.*, *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000) ("The forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints.") (citation omitted).[9]  The Ninth Circuit explained in *Single Moms, Inc. v. Montana Power Co.*, 331 F.3d 743 (9th

---

[9]  This is a factor whether considered at this first prong of *Winter*, or when considering the balance of the equities at the third prong.

Cir. 2003), that such First Amendment rights can also be a "countervailing reason against attributing" even "significant government involvement in private action" to be state action. *Id.* at 748.

In short, Plaintiffs have not demonstrated a likelihood of success on their Fourteenth Amendment claims.

      c.      *Morton v. Mancari, 417 U.S. 535 (1974).*

The court next addresses the Defendants' secondary argument as to equal protection -- that is, *assuming* that Nai Aupuni is a state actor and that Act 195's Roll otherwise implicates equal protection under § 1983, under *Mancari*, unequal treatment need only be "tied rationally" to some legitimate governmental purpose. 417 U.S. at 555. That is, "legislative classifications are valid unless they bear no rational relationship to the State's [legitimate] objectives." *Wash. v. Confederated Bands & Tribes of Yakima Indian Nation*, 439 U.S. 463, 502 (1979). The court recognizes that this secondary analysis may not be necessary, given the court's findings regarding a lack of state action and that Act 195 does not otherwise violate equal protection. Nevertheless, it is important to reach some of these secondary questions to help explain, and perhaps bolster, the court's ultimate conclusion.

"In *Mancari*, the Supreme Court upheld an employment preference

for Native Americans seeking positions in the Bureau of Indian Affairs ('BIA').

The class action plaintiffs, who were non-Indian applicants for BIA employment,

argued that the preference amounted to invidious racial discrimination that violated

their right to equal protection." *Artichoke Joe's Cal. Grand Casino v. Norton*, 353

F.3d 712, 732 (9th Cir. 2003). *Mancari* "concluded that strict scrutiny did not

apply because the preference for Indians relied on a political, rather than a racial,

classification. The hiring preference was not directed toward 'a "racial" group

consisting of "Indians"; instead, it applie[d] only to members of "federally

recognized" tribes.'" *Id*. (quoting *Mancari*, 417 U.S. at 554 n.24).

   In this regard, although Native Hawaiians have not been classified as a

"tribe," Defendants and amicus have made a strong argument that *Mancari* can also

apply to uphold Congressional action taken under its powers to support Native

Hawaiians as indigenous people. *See, e.g.*, 42 U.S.C. § 11701(17) (Congressional

finding that "[t]he authority of the Congress under the United States Constitution to

legislate in matters affecting the aboriginal or indigenous peoples of the United

States includes the authority to legislate in matters affecting the native peoples of

Alaska and Hawaii"); 20 U.S.C. § 7512(12)(B) (Congressional finding that

"Congress does not extend services to Native Hawaiians because of their race, but

because of their unique status as the indigenous people of a once sovereign nation

48

as to whom the United States has established a trust relationship"); 20 U.S.C. § 7512(12)(D) (Congressional finding that "the political status of Native Hawaiians is comparable to that of American Indians and Alaska Natives"); 20 U.S.C. § 7512(1) (Congressional finding that "Native Hawaiians are a distinct and unique indigenous people with a historical continuity to the original inhabitants of the Hawaiian archipelago"); 42 U.S.C. § 11701(1) (Congressional finding that "Native Hawaiians comprise a distinct and unique indigenous people with a historical continuity to the original inhabitants of the Hawaiian archipelago whose society was organized as a Nation prior to the arrival of the first nonindigenous people in 1778").

But another step is required before *Mancari* can apply to *state* laws -- that is, before such federal power would allow a state to treat Native Hawaiians differently under a "rationally related" test.  This is a more difficult question. *Yakima Indian Nation*, reasons that a state has power if federal law *explicitly* gives a state authority.  439 U.S. at 501.  The state law at issue in *Yakima Indian Nation* "was enacted in response to a federal measure explicitly designed to readjust the allocation of jurisdiction over Indians."  *Id*.  But it is unclear whether the specific type of alleged state actions at issue here (*e.g.*, creation of the Roll, facilitating Native Hawaiian self-governance) are encompassed within existing grants of

49

federal authority.  *Compare KG Urban Enters., LLC v. Patrick*, 693 F.3d 1, 19, 20

(1st Cir. 2012) (reasoning that "it is quite doubtful that *Mancari's* language can be

extended to apply to preferential *state* classifications based on tribal status" and

questioning "whether the [Indian Gaming Regulatory Act] 'authorizes' the state's

actions on the present facts") *with Greene v. Comm'r Minn. Dep't of Human*

*Servs*., 755 N.W.2d 713, 727 (Minn. 2008) ("Generally, courts have applied

rational basis review to state laws that promote tribal self-governance, benefits

tribal members, or implement or reflect federal laws.") (citing *Yakima Indian*

*Nation*, 439 U.S. at 500-01) (other citations omitted).  The court will not, however,

reach -- as the Supreme Court stated in *Rice* -- this "difficult terrain."  528 U.S. at

519.  *Mancari* is not necessary if a strict scrutiny test can otherwise be satisfied to

the specific actions at issue here.

> d.    *Strict Scrutiny*

Next, the court discusses whether -- again, assuming Nai Aupuni is

involved in state action and/or that Act 195 implicates equal protection -- a strict

scrutiny test could be met to justify the challenged actions under the Fourteenth

Amendment.  And, if it becomes necessary to reach this issue, the court's answer

would be "yes."  The court certainly recognizes that strict scrutiny is a difficult test

to meet, and that this is a close question.  But the court also recognizes that it faces

a unique issue, one with a long history.

Act 195 and the upcoming election cannot be read in a vacuum.  Both must be read in context of Hawaiian history and the State's trust relationship with Native Hawaiians.  As explained in Act 195 § 1, "[f]rom its inception, the State has had a special political and legal relationship with the Native Hawaiian people and has continually enacted legislation for the betterment of their condition."  As the Department of the Interior's October 1, 2015 NPRM summarizes, the United States also has a history of recognizing through many laws of a "special political and trust relationship with the Native Hawaiian community."  Doc. No. 93-1, 80 Fed. Reg. at 59116.  *See also, e.g.*, *id.* at 59114-118 (providing background of the NPRM and recounting history of Congressional enactments supporting Native Hawaiians, and some efforts at self-determination).

As quoted above, in passing laws specifically to benefit Native Hawaiian healthcare, Congress found that "Native Hawaiians comprise a distinct and unique indigenous people with a historical continuity to the original inhabitants of the Hawaiian archipelago whose society was organized as a Nation prior to the arrival of the first nonindigenous people in 1778."  42 U.S.C. § 11701(1).  It recognized that "[a]t the time of the arrival of the first nonindigenous people in Hawaii in 1778, the Native Hawaiian people lived in a

51

highly organized, self-sufficient, subsistence social system based on communal land tenure with a sophisticated language, culture, and religion." 42 U.S.C. § 11701(4). And Congress found that "[i]n 1898, the United States annexed Hawaii through the Newlands Resolution without the consent of or compensation to the indigenous people of Hawaii or their sovereign government who were thereby denied the mechanism for expression of their inherent sovereignty through self-government and self-determination, their lands and ocean resources." 42 U.S.C. § 11701(11).

Similarly, Congress, in enacting laws specifically to benefit Native Hawaiian education, recognized and reaffirmed that "Native Hawaiians have a cultural, historic, and land-based link to the indigenous people who exercised sovereignty over the Hawaiian Islands, and that group has never relinquished its claims to sovereignty or its sovereign lands." 20 U.S.C. § 7512(12)(A). Congress reaffirmed that "the aboriginal, indigenous people of the United States have . . . (i) a continuing right to autonomy in their internal affairs; and (ii) an ongoing right of self-determination and self-governance that has never been extinguished." 20 U.S.C. § 7512(12)(E). And Congress found that "[d]espite the consequences of over 100 years of nonindigenous influence, the Native Hawaiian people are determined to preserve, develop, and transmit to future generations their ancestral

52

territory and their cultural identity in accordance with their own spiritual and traditional beliefs, customs, practices, language, and social institutions." 20 U.S.C. § 7512(20).

Act 195 likewise acknowledges that "Native Hawaiians have continued to maintain their separate identity as a single, distinctly native political community through cultural, social, and political institutions and have continued to maintain their rights to self-determination, self-governance, and economic self-sufficiency." Act 195 § 1. The Hawaii Legislature thus found that "[t]he Native Hawaiian people are hereby recognized as the only indigenous, aboriginal maoli people of Hawaii." HRS § 10H-1.[10] The Admissions Act itself, and other provisions of Hawaii law, require the "betterment of conditions of native Hawaiians . . . and Hawaiians." HRS § 10-3; Admission Act, Pub. L. No. 86-3 § 5(f), 73 Stat. 6 (1959).

It follows that the State has a compelling interest in bettering the conditions of its indigenous people and, in doing so, providing dignity in simply

---

[10] *See also* HRS § 10H-8(b) ("Consistent with the policies of the State of Hawaii, the members of the qualified Native Hawaiian roll, and their descendants, shall be acknowledged by the State of Hawaii as the indigenous, aboriginal, maoli population of Hawaii."). This section is read in conjunction with § 10H-8(a) and restates the State's recognition in § 10H-1 that the Native Hawaiian people are "the only indigenous, aboriginal, maoli people of Hawaii." It does not mean, of course, that the members of the Roll are the *only* "indigenous, aboriginal, maoli population of Hawaii." It goes without saying that a person of Native Hawaiian ancestry does not, and cannot, lose their ancestry simply by not being included on the Roll.

allowing a starting point for a process of self-determination.  And there is a history of attempts at self-governance, as set forth in the Department of the Interior's NPRM, *see* 80 Fed. Reg. at 59117, and other sources.  *See generally Native Hawaiian Law* ch. 5 at 271-79 (Melody Kapilialoha MacKenzie ed., 2015). Nevertheless, before any discussion of a "government-to-government" relationship with any "Native Hawaiian governing entity" under the NPRM could even begin to take place, such an entity should reflect the "will of the Native Hawaiian community."  80 Fed. Reg. at 59130 (PR § 50.11).  The State has a compelling interest in facilitating the organizing of the indigenous Native Hawaiian community so it can decide for itself, independently, whether to seek self-governance or self-determination, and if so, in what form.[11]  The question of "Hawaiian sovereignty" -- which means different things to different people -- is not going to go away.  So the State could be said to have a compelling interest in facilitating a forum that might result in a unified and collective voice amongst Native Hawaiians.[12]  And, by definition, this is not possible without limiting such

---

[11]  And this is particularly true given that the undisputed evidence in the record before the court is that "Native Hawaiians' socio-economic status has steadily declined, and for the last several decades has been the lowest of any ethnic group residing in Hawaii."  Doc. No. 83-1, Crabbe Decl. ¶ 23.

[12]  This interest is far different than a right of "the Native Hawaiian people to reestablish an autonomous sovereign government," *State v. Armitage*, 132 Haw. 36, 56, 319 P.3d 1044, 1064

(continued...)

self-governance discussions to Native Hawaiians themselves.  Stated differently,

the restriction to Native Hawaiians is precisely tailored to meet that compelling

interest.  It would meet strict scrutiny for purposes of equal protection.

"Purport[ing] to require the Native Hawaiian community to include non-Natives in

organizing a government could mean in practice that a Native group could never

organize itself, impairing its right to self-government[.]"  Doc. No. 93, Amicus Br.

at 20.

> e.    *Plaintiffs Have Not Demonstrated a Likelihood of Success on
> Their First Amendment Claims*.

Likewise, Plaintiffs have not demonstrated a likelihood of success on

their claims under the First Amendment (Counts Four and Nine).  In Count Four,

Plaintiffs Akina and Makekau contend that their First Amendment rights were

violated because conditions were placed on their registration for the Roll (*i.e.*,

requiring Declaration One), which implicates rights under the First Amendment.

The evidence in this regard is mixed -- Defendants attest that Plaintiffs

Akina and Makekau can (or could have) participated in the process without

affirming Declaration One.  *See, e.g.*, Doc. No. 80-1, Namuo Decl. ¶ 23; Doc. No.

_____

[12](...continued)
(2014), which the Hawaii Supreme Court held is not a fundamental right existing in the Hawaii
Constitution.  *Id.* at 56-57, 319 P.3d at 1064-65 ("Petitioners fail to establish that the right to
form a sovereign native Hawaiian nation is a 'fundamental right.'").  It is simply an interest in
facilitating discussions about self-determination amongst Native Hawaiians.

104, Tr. (Oct. 20, 2015) at 15-17; Doc. No. 79-1, Asam Decl. ¶ 26 (providing

newspaper editorial published purporting "to inform Plaintiffs [Akina and

Makekau] and Native Hawaiians generally that they may register without making

[Declaration One]" that explains that "[w]e understand that the Roll Commission

has registered and certified voters -- and will continue to do so -- even if these

voters refuse to agree to this declaration.").  Indeed, Act 195 itself (as amended)

*requires* OHA registrants to be included on the list, irrespective of Declaration One

or Two.  As explained above, if Plaintiffs Akina and Makekau, as Native

Hawaiians as defined by Hawaii law, had registered under the OHA Hawaiian

Registry, they would have been included on the Roll (without making Declaration

One or Two).

      Both Akina and Makekau dispute that they had notice that they could

have registered for the Roll without affirming Declaration One.  See Doc. No. 91-2,

Second Akina Decl. ¶ 4 ("Once I failed to confirm the statement and the principles

asserted in Declaration One, I received no other information from the [commission]

website suggesting that I could register without affirming the Declaration."); *id.* ¶ 6

("To my knowledge, I never received any communications of any kind (prior to the

filing of this lawsuit) from any source informing me that I did not have to affirm

Declaration One."); Doc. No. 91-1, Second Makekau Decl. ¶ 4 ("At no time during

56

the registration process was I given the option to avoid asserting Declaration One."); *id*. ¶ 8 ("I received no communication from any source telling me I did not have to confirm Declaration One to register.").

From the record as a whole, it certainly appears that if Akina and Makekau truly wanted to participate in Nai Aupuni's process they could have easily done so, but they chose not to.

In any event, given the focus at this preliminary injunction stage on the Roll's use in the election, the claim is not likely to succeed because the burdens that Akina and Makekau assert only apply if they concern a right to vote in a public election, and Nai Aupuni's election is private. They contend that their inability to register for the Roll (without affirming Declaration One's reference to "unrelinquished sovereignty") deprives them of the right to participate in Nai Aupuni's process -- the vote for delegates, the ability to run as a delegate, participation in the convention. But again, Nai Aupuni's delegate election and proposed convention is a private matter, not involving state action.

In a different First Amendment theory, in Count Nine, Plaintiffs Gapero and Moniz contend that their inclusion on the Roll through an OHA registry violates a First Amendment right against compelled speech or a right not to register to vote. Doc. No. 47-1, Pls.' Mem. at 22 (citing *Buckley v. Am. Const. Law*

57

*Found.*, 525 U.S. 182, 195 (1999) ("[T]he choice not to register implicates political thought and expression.").  Count Nine alleges that "[f]orcibly registering an individual amounts to compelled speech," Doc. No. 1, Compl. ¶ 131, and that, where they do not agree with Declaration One, Plaintiffs Gapero and Moniz do not wish to bolster the legitimacy of the Roll." *Id*. ¶¶ 134, 136.  "By registering Plaintiffs Gapero and Moniz without their consent and without notice to them, the [commission] compelled their speech and violated their First Amendment right to refrain from speaking." *Id*. ¶ 137.  Plaintiff Gapero contends that such use provides an unauthorized assertion that he supports a position.  Doc. No. 47-4, Gapero Decl. ¶ 7.  Likewise, Plaintiff Moniz alleges that the use of her name on the Roll wrongly indicates that she supports the Roll and its purpose.  Doc. No. 47-5, Moniz Decl. ¶ 9.

They, however, are unlikely to succeed on the merits of such claims. It is undisputed that approximately 62 percent of the Roll comes from OHA registries, which, again, do not require affirmations of sovereignty or a civic connection to the Native Hawaiian community.  Only 38 percent of the Roll has made those affirmations.  These Plaintiffs are thus unlikely to prevail on a claim that inclusion on the Roll implies that they have certain views.  Merely being on the Roll does not compel a statement as to sovereignty.  Moreover, as already

established, the Roll itself is not a voter-registration list.  Gapero and Moniz

cannnot be said to have been compelled to register to vote.  Finally, the evidence

establishes that Gapero and Moniz could have easily removed themselves from the

Roll as early as 2013, if they did not want to remain on the list.  Indeed, as OHA

Defendants note, even if there were a First Amendment violation, the likely remedy

would not be to halt the planned election -- it would be to remove them from the

list.  Doc. No. 83, OHA Defs.' Opp'n at 20 n.5.  In short, simply being included on

the Roll does not implicate the First Amendment.

Plaintiffs have thus failed to meet the first requirement for granting a

preliminary injunction, and all four prongs of the *Winter* test must be met.

"Because it is a threshold inquiry, when a plaintiff has failed to show the likelihood

of success on the merits, [the court] need not consider the remaining three *Winter*

elements." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (citations and

internal editorial marks omitted).  Nevertheless, the court briefly explains why

Plaintiffs also fail to meet *Winter's* other three prongs.

### 2.    *Irreparable Harm*

Plaintiffs assert very generally that they will suffer irreparable harm

because of "the various illegal activities to be carried out in the

registration/election/convention process under Act 195."  Doc. No. 47-1, Pls.'

Mem. at 30.  They refer to the right to vote and the principle that "an alleged constitutional infringement will often alone constitute irreparable harm."  *Id.*

But there is no constitutional violation.  Plaintiffs are not being deprived of a right to vote in a public election.  There is no showing of a First Amendment violation.  And the harm from being deprived of participation in Nai Aupuni's election and convention is speculative.  *Winter* reiterated that "[a] preliminary injunction will not be issued simply to prevent the possibility of some remote future injury."  555 U.S. at 22 (citation and quotation marks omitted).  In short, Plaintiffs have not demonstrated irreparable harm.

### 3.  *Balance of Equities*

Plaintiffs must demonstrate that the balance of equities tips in their favor.  Defendants argue that Plaintiffs waited too long to bring suit -- Act 195 passed in 2011 and this suit was not filed until August 2015.  But Plaintiffs respond by pointing out that the decisions regarding the election were not made until this year.  Suit was filed within five weeks of when the election schedule was first reported.  Plaintiffs could not have sued to enjoin an election that was not scheduled.  Thus, at least as to claims regarding the election itself, the timing of the suit does not affect the equities.

Nevertheless, Plaintiffs have not demonstrated that the equities tip in

their favor.  They have no right to participate in a private election.  And Plaintiffs Akina and Makekau could have participated, as voters and/or candidates for delegates, even without making Declarations One and Two.  They both qualify as Native Hawaiians to register on OHA's Hawaiian Registry.  The evidence indicates that they could have participated if they wanted to do so, even if registration occurred after suit was filed.  And Plaintiffs Gapero and Moniz could have easily removed (and may still remove) themselves from the Roll.

On the other hand, enjoining a private election process that has already begun -- with candidates for delegate having registered, notices having been given, and campaign activities occurring -- would disrupt Native Hawaiian efforts to organize.  In short, the equities do not tip in Plaintiffs' favor.

### 4.  *Public Interest*

Finally, Plaintiffs have not demonstrated that the public interest would be served by a preliminary injunction.  Plaintiffs are not likely to be deprived of any Constitutional rights.  And granting an injunction now would potentially affect approximately 100,000 people who are on Nai Aupuni's voter list who might want to participate in a process of self-determination.

///

///

61

### C.     What the Court Is Not Deciding

The court pauses to emphasize the limited scope of this Order.  To be clear, the court is tasked *only* with determining whether Plaintiffs have met their burden under *Winter* to obtain an injunction, "an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24.  The court, however, is not assessing the process itself.  The court is *not* deciding whether this specific election will lead to an entity that reflects "the will of the native Hawaiian community" or whether it will be "fair and inclusive" such that the United States may then begin to negotiate on a "government-to-government" basis, as set forth in the Department of the Interior's NPRM, 80 Fed. Reg. at 59119.  Nor is the court deciding whether any potential actions under Act 195 or the NPRM -- such as encouraging Native Hawaiian self-governance, or negotiating or engaging on a "government-to-government" basis with a "reorganized Native Hawaiian government" -- reflect wise public policy.  And the court is not deciding whether the Department of the Interior even has the Congressional authorization to facilitate the "reestablishment" of a government-to-government relationship with the Native Hawaiian community.  The court has only addressed the legal considerations underlying the specific challenged actions, and has considered whether Plaintiffs have demonstrated that the proposed election, and challenged aspects of Act 195, are likely to be

unconstitutional so as to require stopping the process now (at this preliminary injunction phase).

## V.  CONCLUSION

Act 195 is a unique law.  It is both symbolic and remarkable.  It reaffirms a delegation of authority in the Admissions Act from the United States to the State of Hawaii to address conditions of Hawaii's indigenous people.  It declares that the Native Hawaiian people are Hawaii's only "indigenous, aboriginal, maoli people."  It is meant -- in limited fashion -- to facilitate a possible mechanism of independent *self*-determination and *self*-governance of Hawaii's indigenous people.  It facilitates -- simply by creating a Roll of qualified Native Hawaiians -- a possible process for the Native Hawaiian community to determine *for themselves* (absent any other involvement by the State of Hawaii) what collective action, if any, might be sought by that community.

Undoubtedly there is *some* "state action."  But, based on the information presented at this preliminary injunction stage, Nai Aupuni's planned election of delegates is not; Nai Aupuni's determination of who may participate is not; the planned convention is not.  And the state is not involved in whether this process is or will be "fair and inclusive" and "reflect the will of the Native Hawaiian community" for purposes of the Department of the Interior's NPRM.

63

The election will not result in any state officials, law, or change in state government.  The election and convention might be a step towards self-governance by Native Hawaiians, or it might accomplish nothing of substance. Even if, however, a self-proclaimed Native Hawaiian governing entity is created with a governing document or a constitution, the result would most certainly not be a state entity.

Plaintiffs have not met their burden of demonstrating that excluding them from this particular private election is unconstitutional, or will otherwise violate federal law.  And that is the only question now before this court.

Plaintiffs' Motion for Preliminary Injunction is DENIED.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, October 29, 2015.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Akina et al. v. State of Hawaii et al.*, Civ. No. 15-00322 JMS-BMK, Order Denying Plaintiffs' Motion for Preliminary Injunction, Doc. No. 47